Kyle S. Hirsch, Esq. (#024155)
Julie M. Birk, Esq. (#033908)
**BRYAN CAVE LEIGHTON PAISNER LLP**
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
Telephone: (602) 364-7000
Facsimile: (602) 364-7070
Internet: kyle.hirsch@bclplaw.com
          julie.birk@bclplaw.com

Counsel for Indigo-DLI Holdings I, LLC

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | In Involuntary Proceedings Under Chapter 11 |
| GILBERT HOSPITAL, LLC, | Case No. 2:18-bk-04557-BMW |
| Debtor | **DECLARATION SUPPORTING MOTION FOR RELIEF FROM THE AUTOMATIC STAY** |
| INDIGO-DLI HOLDINGS I, LLC, | |
| Movant, | |
| v. | |
| GILBERT HOSPITAL, LLC, | |
| Respondent | |

I, Benjamin Bornstein, first being duly sworn, upon my oath, make the following declaration.

1.      I am of sound mind, over the age of 18 years, and fully competent to testify to the matters stated herein.

2.      I am a Company Officer of Indigo Capital Services, LLC, the special servicer to Indigo-DLI Holdings I, LLC ("Lender"). I am authorized to make this declaration on Lender's behalf.

3.      I make this declaration of my own personal knowledge. If called to testify, I could and would testify consistently with my testimony set forth herein.

11689988.1\0553206

Bryan Cave Leighton Paisner LLp
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

1   4.  Attached as Exhibit 1 is the application to appoint a receiver, along with my

2 accompanying declaration, filed in the Maricopa County Superior Court ("Receivership Action

3 Declaration"), which I hereby incorporate by this express reference. Capitalized terms not

4 defined in this Declaration have the meaning given in the Receivership Action Declaration.

5   5.  I have also read and reviewed Lender's motion seeking relief from the automatic

6 stay that is being filed in the above-referenced bankruptcy case ("Stay Relief Motion").

7 Attached as Exhibits 1-3 to the Stay Relief Motion are operating figures pulled directly from

8 reports submitted to Lender by GH and FHA management.

9   6.  GH and FHA reported to Lender that they had combined cash, by the end of

10 January 2018, of less than $200,000. GH and FHA reported slightly higher cash balances as of

11 the end of February 2018.

12   7.  GH and FHA provided Lender, through counsel, with cash projections for the

13 2018 calendar year. According to those projections, FHA will run out of cash by September

14 2018, and GH will have only $36,000 in cash by the end of November 2018.

15   8.  According to GH and FHA's management, specifically Dennis Rutherford, GH

16 and FHA have been engaged since approximately October 2017 in an ongoing effort to sell their

17 assets and operations as a going concern. To date, Borrowers have received only one letter of

18 intent, dated March 30, 2018, that Borrowers have not accepted and which contains several

19 defects.

20   I have read the foregoing Declaration and declare under penalty of perjury that the

21 foregoing is true and correct.

22 DATED: May 3, 2018.

23         By

24          Benjamin Bornstein

25

26

27

28

2

11689988.1\0553206

# EXHIBIT 1

COPY

1  Kyle S. Hirsch, 024155
2  Julie M. Birk, 033908
   BRYAN CAVE LEIGHTON PAISNER
3  Two N. Central Avenue, Suite 2100
   Phoenix, AZ 85004-4406
4  Telephone: (602) 364-7000
   Facsimile: (602) 364-7070
5  E-mail:    kyle.hirsch@bclplaw.com
6             julie.birk@bclplaw.com

APR 0 6 2018



MICHAEL K. JEANES, CLERK
C. CRUZ
DEPUTY CLERK

7  Attorneys for Plaintiff Indigo-DLI Holdings I, LLC

8      **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

9          **IN AND FOR THE COUNTY OF MARICOPA**

10

11  INDIGO-DLI HOLDINGS I, LLC, a Delaware      Case No. CV2018-005740
    limited liability company,
12
                                                **APPLICATION FOR *EX PARTE***
13          Plaintiff,                          **APPOINTMENT OF RECEIVER**

14      vs.                                     **(Commercial Court Assignment**
                                                **Requested)**
15  NEW VISION HEALTH, LLC, and Arizona
    limited liability company; GILBERT
16  HOSPITAL, LLC, an Arizona limited liability
    company; and FLORENCE HOSPITAL AT
17  ANTHEM, LLC, an Arizona limited liability
    company,
18
19          Defendants.
20

21       Pursuant to A.R.S. § 12-1241 and 1242, Plaintiff Indigo-DLI Holdings I, LLC
22  ("Plaintiff") submits this Application for the appointment of a receiver ("Application") to
23  take full possession and control over the property owned by, and the business operations
24  conducted by, defendants New Vision Health, LLC ("NVH"), Gilbert Hospital, LLC
25  ("GH"), and Florence Hospital at Anthem, LLC ("FHA" and, collectively with GH and
26  NVH, "Borrowers").  Plaintiff seeks the appointment of a receiver without notice to the
27  defendants pursuant to Arizona Rule of Civil Procedure 66(a)(3).
28

(Sidebar, left margin)
BRYAN CAVE LEIGHTON PAISNER
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

1  This Application is further supported by the attached exhibits which include,
2  among other things, the supporting declaration of Plaintiff's representative, Benjamin
3  Bornstein, attached here as Exhibit 1 ("Bornstein Declaration") with the exhibits attached
4  thereto, and the supporting declaration of the proposed receiver, attached here as Exhibit
5  2 with the exhibits attached thereto; the proposed form of Receivership Order submitted
6  concurrently herewith; the accompanying application for entry of an order to show cause;
7  and the entire record before the Court.

8  ## MEMORANDUM OF POINTS AND AUTHORITIES

9  **I.  INTRODUCTION.**

10  GH operates an emergency hospital located at 5656 S. Power Road, Gilbert,
11  Arizona ("GH Business"). FHA operates an emergency hospital located at 4545 North
12  Hunt Highway, Florence, Arizona ("FHA Business" and, collectively with the GH
13  Business, "Business"). NVH owns 100% of the equity interests in GH and FHA.

14  Borrowers are obligated to Plaintiff under three loans secured by security interests
15  in and to virtually all of the Borrowers' assets. Borrowers have defaulted on their
16  payment and performance obligations to Plaintiff, and in the controlling loan documents
17  GH and FHA agreed to the appointment of a receiver upon the occurrence of a default.

18  Furthermore, the appointment of a receiver is essential to protect and preserve
19  Plaintiff's rights and interests. Appointing a receiver without notice is imperative, among
20  other reasons, to protect Plaintiff's collateral values in light of threats of eviction by the
21  existing landlords.

22  **II.  RELEVANT FACTUAL BACKGROUND.**

23  **A.  The Loans.**

24  FHA filed a petition for Chapter 11 bankruptcy protection on March 6, 2013, in
25  the United States Bankruptcy Court for the District of Arizona ("Bankruptcy Court"),
26  thereby commencing Case No. 4:13-bk-03201-BMW ("FHA Bankruptcy Case"). GH
27  filed a petition for Chapter 11 bankruptcy protection on February 5, 2014, in the

28

BRYAN CAVE LEIGHTON PAISNER
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

2

1  Bankruptcy Court, thereby commencing Case No. 2:14-bk-01451-MCW ("GH

2  Bankruptcy Case"). The GH Bankruptcy Case and the FHA Bankruptcy Case were

3  jointly administered for plan confirmation purposes only, and on February 9, 2016,

4  Bankruptcy Judge Brenda Moody Whinery entered an order in the FHA Bankruptcy Case

5  confirming a plan of reorganization ("Plan") that, among other things, (i) restructured

6  prepetition secured debt obligations owed by GH and FHA to Bank SNB; and (ii)

7  reorganized the ownership structure vesting 100% of the ownership interests of GH and

8  FHA in NVH, a newly-formed limited liability company.

9      In connection with the Plan provision that restructured the prepetition secured debt

10 obligations owed to Bank SNB, the Borrowers entered into that certain Amended and

11 Restated Loan and Security Agreement dated March 14, 2016 (as the same may have

12 been amended and/or modified from time to time, "Loan Agreement"). Pursuant to the

13 Loan Agreement:  (i) GH agreed to repay Bank SNB the principal amount of

14 $5,711,285.42 ("GH Loan") secured by, among other things, a blanket lien in virtually all

15 of GH's personal property interests ("GH Property"); FHA agreed to repay Bank SNB

16 the principal amount of $8,288,714.58 ("FHA Loan") secured by, among other things, a

17 blanket lien in virtually all of FHA's personal property interests ("FHA Property"); and

18 (iii) Bank SNB extended a $750,000.00, one-time revolving loan to all three Borrowers

19 ("Revolver" and, collectively with the GH Loan and the FHA Loan, "Loans") secured by,

20 among other things, the GH Property, the FHA Property, and a blanket lien in virtually all

21 of NVH's personal property interests ("NVH Property" and, together with the GH

22 Property and the NVH Property, "Property"). The Loans are all cross-defaulted.

23     The Loan Agreement expressly provides that the lender is entitled to 100% of the

24 proceeds of the sale of any collateral securing repayment of the Loans, net of reasonable

25 closing costs actually paid. Upon the occurrence of an event of default, the Loan

26 Agreement expressly authorizes the lender to exercise all rights, powers and remedies

27 available under the prepetition security agreements, which continued in effect post-

28

BRYAN CAVE LEIGHTON PAISNER
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

3

confirmation. The prepetition security agreements expressly provide consent to the appointment of a receiver in the event of a default.

Effective as of December 31, 2016, Plaintiff acquired all Bank SNB's right, title and interest in and to the Loans and the documents evidencing and securing the Loans (collectively, "Loan and Security Documents").

**B.    Borrowers' Defaults And Creditor Enforcement Threats.**

On November 2, 2017, Plaintiff delivered a letter to Borrowers providing notice of certain events of default under the Loan and Security Documents, including breaches of financial covenants and the failure to pay the required monthly payments due under the Loan by no later than October 14, 2017. Defendants have failed to cure the covenant defaults, failed to cure the missed payments due October 14, 2017, and have subsequently missed required monthly payments due under the Loans. Plaintiff is presently owed roughly $13.1 million under the Loans.

Plaintiff has also learned that GH and FHA are in default to other creditors. For example, GH and FHA are operating the Business under terminated leases due to their failure to pay rent for several months. The landlords have demanded that the Borrowers vacate the hospital facilities. *See* Ex. 3. Based on representations by counsel for the landlords, eviction proceedings are imminent. As another example, GH and FHA's medical records hosting vendors have threatened to terminate critical services due to months of non-payment. *See* Ex. 4. If medical records hosting services terminate, patient records cannot be accessed and billings cannot be submitted for payment.

Plaintiff has also recently learned that Borrowers have liquidated assets without Plaintiff's consent to affiliates and/or insiders, including assets potentially worth more than $3 million.

Plaintiff has also learned that Borrowers are quickly running out of cash to support the Business. According to cash flow projections prepared by the Borrowers, the Business will run out of operating cash in September 2018.

BRYAN CAVE LEIGHTON PAISNER
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

4

## III. LEGAL ARGUMENT.

This Court "may appoint a receiver to protect and preserve property or the rights of parties therein, even if the action includes no other claim for relief." A.R.S. § 12-1241. The legislature amended A.R.S. § 12-1241 in 1993 so that a party seeking a receiver only needs to prove "that the property or the rights of the parties need protection," and is not required to show irreparable harm or lack of an adequate legal remedy. <u>Gravel Resources of Ariz. v. Hills</u>, 217 Ariz. 33, 37, 170 P.3d 282, 286 (App. 2007) (affirming trial court's exercise of discretion ordering appointment of receiver over partnership).

Plaintiff requests the Court immediately appoint a receiver over the Borrowers with full authority to operate and manage the Business and, as necessary and appropriate in the Receiver's discretion, to liquidate the Property for distribution to Plaintiff in accordance with the Loan and Security Documents and applicable law. GH and FHA expressly consented to the appointment of a receiver to take possession of the GH Property and the FHA Property upon the occurrence of an event of default. Not only have Borrowers defaulted on their obligations to Plaintiff, but they have also defaulted on their obligations to several others.

Under the circumstances, the immediate appointment of a receiver is critical not only to protect and preserve Plaintiff's security interests in the Property, but also to oversee and manage emergency hospital operations. To the extent a receiver is not immediately appointed, hospital operations could very likely become quickly and severely impacted, thereby posing a serious threat to Plaintiff and to the public. The landlords have issued notices of lease termination and have demanded that Borrowers vacate the hospital buildings; eviction proceedings are imminent. Medical hosting providers are threatening to terminate services, and are under no obligation to continue providing services. Under these circumstances, timing is critical such that an immediate receivership is vital to preserving the existing Business and property value without interrupting the emergency medical services provided by the Business.

5

BRYAN CAVE LEIGHTON PAISNER
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA, 85004-4406
(602) 364-7000

1   A receiver would be a neutral, independent party serving at the direction of the
2   Court under the terms of a receivership order approved by the Court, the proposed form
3   of which is included with this Application for the Court's consideration. A receiver
4   would protect, preserve, and safeguard the Property, with the power of sale to liquidate
5   the Property for the benefit of Plaintiff and Borrowers' other creditors (if any).
6   Importantly, the receivership order authorizes the receiver to operate the Business using
7   all existing medical licenses, including Medicare and Medicaid billing numbers and
8   procedures. The immediate appointment of a receiver would preserve operations and
9   facilitate what may otherwise be numerous independent enforcement efforts by various
10  creditors in a single, consolidated, organized fashion.

11  Plaintiff proposes that Resolute Commercial Services ("Resolute"), by and
12  through its Principal, Jeremiah Foster, act as the receiver. The Declaration of Proposed
13  Receiver attached as Exhibit B sets forth the relevant background, skills, and experience
14  of Resolute and its professionals, specifically focusing on hospital operations. Resolute,
15  by and through Mr. Foster, is willing to perform the duties and responsibilities of a
16  receiver as set forth in the proposed form of receivership order. Plaintiff requests that the
17  Court immediately appoint Resolute to act as the receiver, with reasonable bond as
18  determined by the Court. Appointing Resolute as receiver will protect Plaintiff's
19  interests and the public interest by inserting a professional who will secure and protect
20  the Property, operate and manage the Business with an understanding of the financial
21  pressures presently imposed thereon, and make sound financial decisions designed to
22  minimize the negative impact on creditors (including Plaintiff) and the public. Plaintiff
23  reserves the right to proceed with other enforcement rights, such as and without limitation
24  pursuing a UCC sale of its collateral. To the extent a receiver is appointed, Plaintiff and
25  other creditors will be in a stronger position to pursue recovery without Borrowers'
26  interference. This dual-tracked approach may efficiently limit a prolonged receivership.
27
28

BRYAN CAVE LEIGHTON PAISNER
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

6

IV.  **CONCLUSION.**

Plaintiff asks that the Court: (i) grant this Application and immediately enter the Receivership Order; and (ii) grant such other and further relief as the Court deems just and proper under the circumstances.

DATED this _16_ day of April, 2018.

BRYAN CAVE LEIGHTON PAISNER

By _____

Kyle S. Hirsch
Julie M. Birk
Two N. Central Avenue, Suite 2100
Phoenix, AZ 85004-4406
Attorneys for Plaintiff

BRYAN CAVE LEIGHTON PAISNER
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

7

# EXHIBIT 1

```
 1   Kyle S. Hirsch, 024155
 2   Julie M. Birk, 033908
     BRYAN CAVE LEIGHTON PAISNER
 3   Two N. Central Avenue, Suite 2100
     Phoenix, AZ 85004-4406
 4   Telephone: (602) 364-7000
     Facsimile: (602) 364-7070
 5   E-mail:    kyle.hirsch@bclplaw.com
 6              julie.birk@bclplaw.com

 7   Attorneys for Plaintiff Indigo-DLI Holdings I, LLC

 8          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

 9             IN AND FOR THE COUNTY OF MARICOPA
10
```

| | |
|---|---|
| INDIGO-DLI HOLDINGS I, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>NEW VISION HEALTH, LLC, and Arizona limited liability company; GILBERT HOSPITAL, LLC, an Arizona limited liability company; and FLORENCE HOSPITAL AT ANTHEM, LLC, an Arizona limited liability company,<br><br>Defendants. | Case No. _____<br><br>**DECLARATION OF BENJAMIN BORNSTEIN IN SUPPORT OF APPLICATION FOR APPOINTMENT OF RECEIVER** |

BRYAN CAVE LEIGHTON PAISNER
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

I, Benjamin Bornstein, pursuant to A.R.S. § 12-1242, first being duly sworn, upon my oath, make the following declaration.

1.   I am of sound mind, over the age of 18 years, and fully competent to testify to the matters stated herein.

2.   I am Partner of Indigo Capital Services, LLC, the special servicer to Indigo-DLI Holdings, LLC ("Plaintiff"). I am authorized to make this declaration on Plaintiff's behalf.

3. In my employment capacity, I have access to the books and records pertaining to the obligations due under the loans and other matters that are the subject of the above-captioned action and dispute. I make this declaration based upon my personal knowledge and upon the information contained in the books and records of Plaintiff, that are kept in the regular course of business, which I personally have reviewed and which this declaration accurately reflects. Based upon my personal knowledge of the regular business practices of Plaintiff, the documents attached as Exhibits A-H: (A) were made at or near the time of the occurrence of the matters set forth therein by, or from information transmitted by a person with knowledge of those matters, (B) were made and kept in the course of regularly conducted business activity of Plaintiff, and (C) were made as a regular practice in the conduct of the regularly conducted business activity of Plaintiff.

4. On or about December 31, 2016, Plaintiff acquired all of the rights and interests of Bank SNB, an Oklahoma state banking association ("Bank SNB"), in and to the loan obligations owed by New Vision Health, LLC ("NVH"), Gilbert Hospital, LLC ("GH"), and Florence Hospital at Anthem, LLC ("FHA" and, collectively with GH and NVH, "Borrowers") to Bank SNB as set forth in that certain Amended and Restated Loan and Security Agreement dated March 14, 2016, among Bank SNB and Borrowers (as the same may have been amended and/or modified from time to time, "Loan Agreement"). Attached here as Exhibit A is a true and correct copy of the Assignment and Bill of Sale reflecting Bank SNB's assignment to Plaintiff ("Assignment"). Attached here as Exhibit B is a true and correct copy of the Loan Agreement.

5. The Loan Agreement amends and restates, pursuant to the terms of a confirmed Chapter 11 plan of reorganization entered in the FHA bankruptcy case, prepetition loans secured by blanket liens in virtually all of the personal property assets of GH ("GH Property") and FHA ("FHA Property"). Attached as Exhibits C-D are true and correct copies of the relevant security agreements (collectively, "Security Agreements"). The Security Agreements expressly the lender to pursue the appointment of a receiver in the event of a default. *See* Ex. C, at 6; Ex. D, at 5.

2

BRYAN CAVE LEIGHTON PAISNER
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

BRYAN CAVE LEIGHTON PAISNER
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

6.     Pursuant to the Loan Agreement:   (i) GH agreed to repay Bank SNB the principal amount of $5,711,285.42 ("GH Loan") secured by, among other things, the GH Property; FHA agreed to repay Bank SNB the principal amount of $8,288,714.58 ("FHA Loan") secured by, among other things, the FHA Property; and (iii) Bank SNB extended a $750,000.00, one-time revolving loan to all three Borrowers ("Revolver" and, collectively with the GH Loan and the FHA Loan, "Loans") secured by, among other things, the GH Property, the FHA Property, and a blanket lien in virtually all of NVH's personal property interests ("NVH Property" and, together with the GH Property and the NVH Property, "Property").   Pursuant to the Loan Agreement, the Loans are cross-defaulted.

7.     Plaintiff has perfected its security interests in and to the Property as evidenced by UCC Financing Statements, continuation statements, and/or assignments filed in the Arizona Secretary of State's Office, true and correct copies of which are attached as Exhibit E-G.

8.     The Loan Agreement expressly provides that the lender is entitled to 100% of the proceeds of the sale of any collateral securing repayment of the Loans, net of reasonable closing costs actually paid.  Loan Agreement, at 15, ¶ 4.5(b).  Upon the occurrence of an event of default, the Loan Agreement expressly authorizes the lender to exercise all rights, powers and remedies available under the Security Agreements, which continued in effect post-confirmation.  Loan Agreement, at 34-36, ¶¶ 12.1(b), 12.2(b), 12.3(b).

9.     I will refer to all of the documents evidencing and securing the Loans collectively as the "Loan and Security Documents."

10.     Borrowers failed to timely make the required monthly payment that was due by no later than October 14, 2017.  In addition, Borrowers failed to comply with a number of covenants required under the Loan Agreement.  Accordingly, on November 2, 2017, Plaintiff delivered a letter to Borrowers providing notice of certain events of

3

default under the Loan and Security Documents, a true and correct copy of which is attached as Exhibit H.

11. Borrowers failed to cure the covenant defaults, failed to cure the missed payment due October 14, 2017, and have subsequently missed additional required monthly payments due under the Loans.

12. Plaintiff is presently owed roughly $13.1 million under the Loans, including approximately $5,140,092 in outstanding principal under the GH Loan; $6,290,365 in outstanding principal under the FHA Loan; and $531,622 in outstanding principal on the Revolver; plus accrued, unpaid interest, fees, and expenses incurred by Plaintiff.

13. Based on my conversations with members of the Borrowers' management team, I understand that GH and FHA are in default to other creditors. For example, GH and FHA have failed to pay rent for several months. As a result, GH and FHA are currently operating the Business on terminated leases. As another example, GH and FHA failed to pay their medical records hosting vendors. As a result, the medical hosting companies have given notice of the pending termination of critical services to GH and FHA.

14. I have also learned that, despite the language in the Loan and Security Documents obligating the Borrowers to turn over to Plaintiff the proceeds of the sale of any collateral securing repayment of the Loans, Borrowers have disposed of assets without Plaintiff's consent or timely disclosure on at least two recent occasions. First, Borrowers were in a dispute with an insider involving $1,040,000 in proceeds of the sale of property located in Buckeye, Arizona ("Buckeye Property"). Borrowers settled the dispute over the Buckeye Property sale proceeds in exchange for little or no value. Borrowers did not consult Plaintiff or seek Plaintiff's approval to the terms of the settlement, and Borrowers did not disclose the transaction to Plaintiff for several months. Second, GH held a claim against the bankruptcy case of Peoria Regional Medical Center ("PRMC") in the face amount of $2.4-$5.3 million. GH transferred the claim to a

4

Case 2:18-bk-04557-BMW    Doc 16    Filed 05/03/18    Entered 05/03/18 15:04:14    Desc
Main Document    Page 15 of 174

BRYAN CAVE LEIGHTON PAISNER
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

1    company owned and/or controlled by one of its board members for an undisclosed
2    amount. GH did not consult Plaintiff or seek Plaintiff's approval, and did not disclose the
3    transaction to Plaintiff. Considering (i) the disputed Buckeye Property sale proceeds of
4    over $1 million and (ii) the low-end face amount of the PRMC claim, Borrowers
5    disposed of Plaintiff's collateral potentially worth more than $3 million.

6         15.    Borrowers provided Plaintiff with cash projections for the 2018 calendar
7    year. According to those projections, Borrowers will run out of operating cash in
8    September 2018.

9         16.    Based on the consent given in the Loan and Security Documents; the
10   payment and covenant defaults; and the Borrowers' disposal of Plaintiff's collateral
11   without delivering any value to Plaintiff in return; and the approaching cash shortfall,
12   Plaintiff requests the Court appoint a receiver over the Borrowers with full authority to
13   operate and manage the Business and, as necessary and appropriate in the Receiver's
14   discretion, to sell and/or liquidate the Property for distribution to Borrower's creditors in
15   accordance with contracts and applicable law.

16        17.    Under the circumstances, the appointment of a receiver is critical not only
17   to protect and preserve Plaintiff's security interests, but also to oversee and manage
18   emergency hospital operations. To the extent a receiver is not appointed, hospital
19   operations could very likely become quickly and severely impacted, thereby posing a
20   serious threat of public harm.

21        18.    Plaintiff proposes that Resolute Commercial Services ("Resolute"), by and
22   through its Principal, Jeremiah Foster, act as the receiver. Resolute's professionals have
23   appropriate background, skills, and experience. Plaintiff asks that the Court appoint
24   Resolute to act as the receiver, with reasonable bond as determined by the Court.

25        19.    Appointing Resolute as receiver will protect Plaintiff's interests and the
26   public interest by inserting a professional who will secure and protect the Property,
27   operate and manage the Business with an understanding of the financial pressures
28

5

1    presently imposed thereon, and make sound financial decisions designed to minimize the

2    negative impact on creditors (including Plaintiff) and the public.

3        20.    Plaintiff reserves the right to proceed with other enforcement rights, such as

4    and without limitation pursuing a UCC sale of its collateral, which Borrowers would have

5    the opportunity to impede absent the appointment of a receiver.

6        I have read the foregoing Declaration and declare under penalty of perjury that the

7    foregoing is true and correct.

8    DATED: April 4, 2018.

9

10                                        By
                                            Benjamin Bornstein

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

11603840.1\0553206

# EXHIBIT A

## ASSIGNMENT AND BILL OF SALE

Bank SNB, an Oklahoma state banking association ("Assignor"), desires to transfer all its right, title and interest in and to the notes, mortgages, deeds of trust, security agreements, guaranties and other instruments and the liens created thereby, and other interests (collectively, the "Loan Documents") described in Exhibit "A" to this Assignment and Bill of Sale (this "Assignment") to Indigo-DL1 Holdings I, LLC, a Delaware limited liability company ("Assignee").

## ASSIGNMENT AND AGREEMENTS:

1. For value received, the receipt and sufficiency of which are acknowledged, Assignor has granted, conveyed, transferred and assigned and does hereby grant, convey, transfer and assign to Assignee, all Assignor's right, title and interest in and to the Loan Documents, all other documents and instruments evidencing, securing or otherwise related to the loan evidenced thereby and the liens created and/or evidenced thereby, and any and all indebtedness evidenced by or arising under the Loan Documents (the "Debt"), including, but not limited to, (a) all prior instruments amended, modified, extended or restated by any of the Loan Documents, (b) all liens, rights, title and interest of Assignor, whether legal, beneficial or equitable, direct or indirect, in and to any of the Loan Documents, together with all privileges, entitlements, claims, demands and equities as to which the Assignor hereunder possesses or to which the Assignor is otherwise entitled in connection therewith and (c) all rights in and to any and all mortgage policies of title insurance, if the same exists, with respect to any of the Loan Documents.

2. The assignment made in Paragraph 1 above is made without recourse, warranty or representation, express or implied, except as set forth in that certain Loan and Real Estate Sale Agreement, by and between Assignee and Assignor dated as of December 13, 2016 (the "Agreement").

3. Assignor hereby agrees to execute and deliver or cause to be executed or delivered hereafter any and all further instruments, as Assignee may reasonably require to evidence and vest in Assignee all interests of Assignor in, to and under the Loan Documents and the Debt, and other right, title and interest described above, and which are intended to be transferred hereby.

4. This Assignment is binding upon Assignor and Assignee and inures to the benefit of Assignor and Assignee, and their respective successors and assigns.

5. This Assignment is delivered by Assignor to Assignee pursuant to the terms of the Agreement and is subject to the terms and conditions thereof.

[Signature Page to Follow]

MnnyOKC_I824915 4

EXECUTED effective as of December 31, 2016.

BANK SNB

By: _____

Name: Brent Bates
Title: EVP, Chief Credit Officer


STATE OF OKLAHOMA          )
                           )
COUNTY OF OKLAHOMA         )

    This instrument was acknowledged to me before on the 31st day of December, 2016 by Brent Bates, as Executive Vice President of Bank SNB.

_____
Notary Public

_____
Notary's Printed/Typed Name

My Commission Expires:


[Signature Page to Assignment and Bill of Sale]

18231915_2

# *EXHIBIT A*

## *ASSIGNED LOAN DOCUMENTS*

18231915_2

## CLOSING DOCUMENTS

1. Closing Checklist.

2. Deed of Trust, Assignment of Leases and Rents, Security Agreement, Financing Statement and Fixture Filing dated March 14, 2016 and recorded March 16, 2016 as Document No. 20160168289, Official Records of Maricopa County Recorder ("Official Records").

3. Memorandum of Option Agreement dated March 14, 2016 and recorded March 16, 2016 as Document No. 20160168291, Official Records.

4. Deed of Trust Subordination Agreement dated March 14, 2016 between GH and Lender, and recorded March 16, 2016 as Document No. 20160168290, Official Records.

5. Deed of Release and Reconveyance dated March 14, 2016 and recorded March 16, 2016 as Document No. 20160168288, Official Records.

6. Release of Lien by Layton Construction Co., Inc., a Utah corporation, recorded November 24, 2015 as Document No. 20150837935, Official Records, releasing the lien recorded on December 31, 2013 at Document No. 20131094817, Official Records.

7. Release of Lis Pendens recorded November 24, 2015 as Document No. 20150840577, Official Records, releasing the Notice of Lis Pendens recorded on June 23, 2014 at Document No. 20140409175, Official Records.

8. UCC Financing Statement showing GH, as debtor and Lender, as secured party, filed with the Arizona Secretary of State on March 16, 2016 as File No. _____.

9. UCC Financing Statement showing FHA, as debtor and Lender, as secured party, filed with the Arizona Secretary of State on March 15, 2016 as File No. 2016-001-0014-5.

10. UCC Financing Statement showing Holdco, as debtor and Lender, as secured party, filed with the Arizona Secretary of State on March 15, 2016 as File No. 2016-001-0013-2.

11. UCC Financing Statement showing GH41, LLC, an Arizona limited liability company ("GH 41"), as debtor and Lender, as secured party, filed with the Arizona Secretary of State on March 15, 2016 as File No. 2016-001-0012-1.

12. Final Closing Statement for Escrow #26010611 (Option Property).

13. Final Closing Statement for Escrow #26010612 (Peoria Property).

798506.1\0361242
04/07/2016

4

14. Extended Lender's Loan Policy of Title Insurance dated March __, 2016, [Peoria Property]

15. Opinion of Andante Law Group dated March 14, 2016, counsel to GH, Holdco and GH41.

16. Opinion of Fennemore Craig, P.C. dated March 14, 2016, counsel to FHA.

17. Commitment for Title Insurance issued by Escrow Holder as Order No. 26010612-026-LD1, and Proforma Loan Policy. (Peoria Property).

18. Commitment for Title Insurance issued by Escrow Holder as Order No. 26010611-026-LD1, (Gilbert Hospital Option Property).

19. Closing Instruction Letter on behalf of Lender dated March 15, 2016 signed by Justin A. Sabin, Esq.

20. Closing Instruction Letter on behalf of Buyer dated March 15, 2016 signed by Kurt A. Peterson, Esq.

21. ALTA ACSM Land Title Survey Peoria Medical Center prepared by Atwell as Job No. 15001903.

## LOAN DOCUMENTS

22. Amended and Restated Loan and Security Agreement dated March 14, 2016 among GH, FHA, Holdco and Lender..

23. Revolving Note dated March 14, 2016 made by Borrowers for the benefit of Lender.

24. Pledge Agreement dated March 14, 2016 between Holdco, as debtor, and Lender, as secured party.

25. Security Agreement dated March 14, 2016 between GH 41, as debtor and Lender, as secured party.

26. Security Agreement dated March 14, 2016 between GH, as debtor, and Lender, as secured party.

27. Security Agreement dated March 14, 2016 between FHA, as debtor, and Lender, as secured party.

28. Security Agreement dated March 14, 2016 between Holdco, as debtor, and Lender, as secured party.

29. Request for Advance dated February 19, 2016 between Borrowers and Lender.

30. Intercreditor Agreement between Lender and David K. Gottlieb, Creditor Trustee of the GH Unsecured Creditors Trust, on behalf of the GH Unsecured Creditors Trust, ("Second Lienholder").

## OPTION DOCUMENTS

31. Option Agreement for the Purchase and Sale of Real Property and Joint Escrow Instructions dated March 14, 2016, signed by GH, as buyer, CRK Properties, Inc., an Oklahoma corporation ("CRK"), as seller, and Grand Canyon Title Agency, a division of FNTA, as escrow holder.

32. Deed of Trust, Assignment of Leases and Rents, Security Agreement, Financing Statement and Fixture Filing dated March 14, 2016, between GH, as trustor and Lender, as beneficiary. [to be held in escrow until option is exercised]

33. Notice of Termination of Option, Release and Quit Claim Deed dated March 14, 2016, signed by CRK, as Optionor, and and GH, as optionee. [to be held in escrow in the event the option is cancelled]

34. Special Warranty Deed dated March 11, 2016, signed by CRK, in favor of GH. [to be held in escrow in the event the option is exercised].

## CORPORATE DOCUMENTS

35. Closing Certificate for GH dated March 14, 2016.

36. Officer's Closing Certificate for FHA dated March 14, 2016.

37. Officer's Closing Certificate for Holdco dated March 14, 2016.

38. Officer's Closing Certificate for GH 41 dated March 14, 2016.

39. Resolutions of the Board of Directors of CRK Properties, Inc. dated March 11, 2016

Case 2:18-bk-04557-BMW    Doc 16    Filed 05/03/18    Entered 05/03/18 15:04:14    Desc
Main Document    Page 24 of 174

**STILLWATER NATIONAL BANK AND TRUST COMPANY**
**Loan to**
**GILBERT HOSPITAL, LLC**

**INDEX**

| Tab | Document |
|-----|----------|
| 1. | Loan Agreement |
| 2. | Promissory Note (Land) for $7,328,924.00 |
| 3. | Promissory Note (Equipment) for $8,040,000.00 |
| 4. | Promissory Note (Working Capital) for $5,000,000.00 |
| 5. | Deed of Trust, Assignment of Rents, Security Agreement, Fixture Filing and Financing Statement recorded as Document No. 20071214970 in the real estate records of Maricopa County, Arizona |
| 6. | Arizona UCC Financing Statement No. 200715109223 filed with the Arizona Secretary of State |
| 7. | Maricopa County Fixture Filing recorded as Document No. 20071209103 in the real estate records of Maricopa County, Arizona |
| 8. | Security Agreement (Accounts) |
| 9. | Arizona UCC Financing Statement No. 200715109267 filed with the Arizona Secretary of State |
| 10. | Security Agreement (Equipment and Accounts Receivable) |
| 11. | Arizona UCC Financing Statement No. 200715109256 filed with the Arizona Secretary of State |
| 12. | Lockbox Agreement |
| 13. | Account Sweep Agreement |
| 14. | Limited Guaranty Agreement (Land Note) from David Wanger |
| 15. | Limited Guaranty Agreement (Equipment Note and Working Capital Note) from David Wanger |
| 16. | Limited Guaranty Agreement (Land Note) from Timothy A. Johns, MD |

17. ~~Limited Guaranty Agreement (Equipment Note and Working Capital Note) from Timothy A. Johns, M.D.~~

18. Environmental Indemnification Agreement

19. Certificate of Limited Liability Company Authority

20. Special Warranty Deed recorded as Document No. 20071214969 in the real estate records of Maricopa County, Arizona

21. Letter from Healthcare Strategic Support, Inc. to Robert Dickson

22. Borrower's Counsel's Opinion from Paul D. Ellsworth, PLC

23. Borrower's Counsel's Opinion from Scott Roman

24. Agreement to Provide Insurance

25. Affidavit of Non-Foreign Status

26. Borrower's Affidavit

27. Loans to One Borrower Certification

28. Notice of Mortgagee Title Insurance

29. Purchase and Sale Agreement and Joint Escrow Instructions

30. First Amendment to Purchase and Sale Agreement and Joint Escrow Instructions

31. Settlement Statement

32. Title Policy

**STILLWATER NATIONAL BANK AND TRUST COMPANY**
First Amendment to Loan to
**GILBERT HOSPITAL, LLC**

INDEX

Tab     Document

1.      First Amendment to Loan Agreement and Guarantors' Consent

2.      Amended and Restated Promissory Note for $5,000,000.00

**STILLWATER NATIONAL BANK AND TRUST COMPANY**
Second Amendment to Loan to
**GILBERT HOSPITAL, LLC**

## INDEX

Tab    Document

1.    Second Amendment to Loan Agreement and Guarantors' Consent

2.    Amended and Restated Promissory Note for $5,000,000.00

**STILLWATER NATIONAL BANK AND TRUST COMPANY**
Third Amendment to Loan to
**GILBERT HOSPITAL, LLC**

INDEX

Tab    Document

1.    Third Amendment to Loan Agreement and Guarantors' Consent

2.    Third Amended and Restated Promissory Note for $5,000,000.00

**STILLWATER NATIONAL BANK AND TRUST COMPANY**
Fourth Amendment to Loan to
GILBERT HOSPITAL, LLC
(May 2010)
(7898-608)

### INDEX

Tab   Document

1.    Fourth Amendment to Loan Agreement and Guarantors' Consent

2.    Fourth Amended and Restated Promissory Note (Working Capital) for $5,000,000.00

STILLWATER NATIONAL BANK AND TRUST COMPANY
Fifth Amendment to Loan to
GILBERT HOSPITAL, LLC
(April 2011)
(7898-608)

INDEX

Tab   Document

1.   Fifth Amendment to Loan Agreement and Guarantors' Consent

2.   Fifth Amended and Restated Promissory Note (Working Capital) for $5,000,000.00

3.   Certificate of Limited Liability Company Authority

STILLWATER NATIONAL BANK AND TRUST COMPANY
LOAN TO GILBERT HOSPITAL, LLC
CW FILE NO. 7898-608

DOCUMENTS RELATED TO HOSPITAL LEASE

INDEX

Tab    Document

1.    Memorandum of Lease and Right of First Offer dated May 11, 2007

2.    SNDA dated May 11, 2007

3.    First Amendment to Memorandum of Lease and Right of First Offer dated July 1, 2010

4.    Special Warranty Deed dated January 4, 2011

5.    Correction Deed dated January 4, 2011

6.    Second Amendment to Memorandum of lease and Right of First Offer dated January 4, 2001

7.    Amendment to Adjacent Wall and Easement Agreement dated January 4, 2011

**STILLWATER NATIONAL BANK AND TRUST COMPANY**
Loan to Florence Hospital at Anthem, LLC
(the "Borrower")
7898,887

*Electronic*
**INDEX**
*See K Drive*

| Tab | Document |
|-----|----------|
| 1. | Loan Agreement, Borrower and SNB, effective March 5, 2012 |
| 2. | Promissory Note (Equipment) for $6,748,206.00 effective March 5, 2012 |
| 3. | Promissory Note (Working Capital) for $5,000,000.00 effective March 5, 2012 |
| 4. | Letter of Credit Demand Promissory Note for $1,200,000.00 effective March 5, 2012 |
| 5. | Security Agreement (Accounts) effective March 5, 2012 |
| 6. | UCC-1; AZ 201216832266; SNB; February 27, 2012 |
| 7. | Security Agreement (Cash Collateral Account) effective March 5, 2012 |
| 8. | UCC-1; AZ 201216832164; SNB; February 27, 2012 |
| 9. | Security Agreement effective March 5, 2012 |
| 10. | UCC-1; AZ 201216832153; SNB; February 27, 2012 |
| 11. | Security Agreement (Restricted Account effective March 5, 2012 |
| 12. | UCC-1; AZ 201216832142; SNB; February 27, 2012 |
| 13. | Guaranty Agreement from Gilbert Hospital, LLC effective March 5, 2012 |
| 14. | Limited Guaranty Agreement from Rick Ai, effective March 5, 2012 |
| 15. | Limited Guaranty Agreement from Bill and Tiffany Anderson effective March 5, 2012 |
| 16. | Limited Guaranty Agreement from Ronald Bliss, M.D. and Lynne Bliss effective March 5, 2012 |
| 17. | Limited Guaranty Agreement from Edward G. Brown effective March 5, 2012 |

84. Collateral Assignment of Management Agreement among Florence, Visionary and MPT dated November 4, 2010

85. Certificate of Limited Liability Company Authority for Florence Hospital at Anthem, LLC effective March 5, 2012

86. Certificate of Limited Liability Company Authority for Gilbert Hospital LLC effective March 5, 2012

87. Account Sweep Agreement, Borrower and SNB, effective March 5, 2012

88. Subordination Agreement effective March 5, 2012

89. Lookbox Agreement, Borrower and SNB, effective March 5, 2012

90. Operating Agreement of Visionary Health, LLC effective April 2, 2008

91. Irrevocable Standby Letter of Credit dated March 5, 2012

92. Revolving Credit Agreement between Gilbert Hospital, LLC and Florence Hospital at Anthem, November 21, 2007

93. Operating Agreement for Florence Hospital at Anthem, LLC, June 20, 2008

94. Articles of Organization for Florence Hospital at Anthem, LLC, November 21, 2007

95. Articles of Organization for Visionary Health, LLC dated April 2, 2008

96. SNB Loan Approval for Florence Hospital at Anthem, LLC, January 24, 2012

97. Additional SNB Loan Approvals for Florence Hospital at Anthem, LLC, January 24, 2012

98. Borrower's Counsel Opinion Letter from Paul D. Bilsworth, PLC, March 5, 2012

99. Intercreditor Agreement, SNB and MPT of Florence, LLC March 5, 2012

100. Lease Agreement between MPT and Florence Hospital (November 4, 2010)

# EXHIBIT B

**AMENDED AND RESTATED
LOAN AND SECURITY AGREEMENT**

among

**GILBERT HOSPITAL, LLC, FLORENCE HOSPITAL AT ANTHEM, LLC,
and NEW VISION HEALTH, LLC,**
as Borrowers,

and

**BANK SNB,**
as Lender

March 14, 2016

788801.10

# TABLE OF CONTENTS

Section 1.    Definitions..................................................................................................... 2

   1.1    Defined Terms ............................................................................................. 2
   1.2    UCC Terms ................................................................................................. 11
   1.3    Amended Joint Plan Terms ....................................................................... 12
   1.4    Singular and Plural.................................................................................... 12

Section 2.    The Obligations............................................................................................. 12

   2.1    GH Term Obligation .................................................................................. 12
   2.2    FHA Term Obligation ................................................................................ 12
   2.3    Revolver..................................................................................................... 12
   2.4    Notes .......................................................................................................... 12
   2.5    Loan Purposes ........................................................................................... 13
   2.6    GH Guaranty Obligation ........................................................................... 13

Section 3.    Interest.......................................................................................................... 13

   3.1    Interest Rate ............................................................................................... 13
   3.2    Default Interest.......................................................................................... 13
   3.3    Interest Calculation ................................................................................... 14

Section 4.    Payment........................................................................................................ 14

   4.1    Payments of Obligations............................................................................ 14
   4.2    Manner of Payments .................................................................................. 15
   4.3    Payment Authorization .............................................................................. 15
   4.4    Voluntary Prepayment ............................................................................... 15
   4.5    Additional Mandatory Payments............................................................... 15
   4.6    Late Charges .............................................................................................. 16
   4.7    Increased Costs; Capital Adequacy........................................................... 16

Section 5.    Conditions Precedent. ................................................................................... 17

   5.1    Conditions to Closing ................................................................................ 17
   5.2    Conditions to Advances ............................................................................. 18

Section 6.    Collateral. ..................................................................................................... 20

   6.1    Grant of Security Interests ........................................................................ 20
   6.2    No Assumption of Liability ....................................................................... 22
   6.3    Further Assurances..................................................................................... 22
   6.4    Commercial Tort Claims............................................................................ 22

Section 7.    Representations and Warranties................................................................... 22

   7.1    Legal Status................................................................................................ 23
   7.2    Subsidiaries................................................................................................ 23
   7.3    Authorization and Validity ........................................................................ 23
   7.4    No Conflict................................................................................................. 23
   7.5    Indebtedness............................................................................................... 23
   7.6    Title to Properties...................................................................................... 23

i

| | | |
|---|---|---:|
| 7.7 | Taxes | 23 |
| 7.8 | Litigation | 24 |
| 7.9 | Compliance with Laws | 24 |
| 7.10 | Compliance with Environmental Laws | 24 |
| 7.11 | Locations of Collateral | 24 |
| 7.12 | Financial Statements | 24 |
| 7.13 | Liabilities | 24 |
| 7.14 | Solvency | 24 |
| 7.15 | Foreign Assets Control Regulations, Etc. | 24 |
| 7.16 | Complete Disclosure | 25 |
| Section 8. | Affirmative Covenants | 25 |
| 8.1 | Payment of Indebtedness | 25 |
| 8.2 | Existence | 25 |
| 8.3 | Compliance with Laws; Licenses | 25 |
| 8.4 | Taxes | 25 |
| 8.5 | Collateral | 25 |
| 8.6 | Inspection | 26 |
| 8.7 | Accounts Audit | 26 |
| 8.8 | Insurance | 26 |
| 8.9 | Deposit Accounts | 26 |
| 8.10 | Operating Reserve | 26 |
| 8.11 | Reporting Obligations | 27 |
| 8.12 | Option Agreement | 28 |
| 8.13 | Appraisals | 28 |
| 8.14 | Certain Post-Closing Obligations | 28 |
| Section 9. | Negative Covenants | 28 |
| 9.1 | Existence of Liens | 28 |
| 9.2 | Restrictions on Debt | 28 |
| 9.3 | Sale of Assets | 28 |
| 9.4 | Purchase of Assets | 28 |
| 9.5 | Changes in Structure | 29 |
| 9.6 | Change of Name; Amendments to Organic Documents | 29 |
| 9.7 | Distributions | 29 |
| 9.8 | Loans and Investments | 29 |
| 9.9 | Subsidiaries | 29 |
| 9.10 | Collection of Accounts | 29 |
| 9.11 | Expenses | 29 |
| 9.12 | Reserves | 29 |
| Section 10. | Financial Covenants | 29 |
| 10.1 | Debt Service Coverage Ratio | 29 |
| 10.2 | Net Operating Margin | 30 |
| 10.3 | FHA Financial Covenants | 30 |
| 10.4 | GH Financial Covenants | 31 |

ii

Section 11.    Events of Default ................................................................................ 31

    11.1    GH Event of Default ................................................................ 31
    11.2    FHA Event of Default .............................................................. 32
    11.3    Revolver Event of Default ....................................................... 34

Section 12.    Remedies ............................................................................................ 34

    12.1    Remedies for GH Event of Default ......................................... 34
    12.2    Remedies for FHA Event of Default ....................................... 35
    12.3    Remedies for Revolver Event of Default ................................. 36

Section 13.    License ............................................................................................... 37

Section 14.    Miscellaneous. ................................................................................... 37

    14.1    Failure or Indulgence Not Waiver .......................................... 37
    14.2    Modification ............................................................................ 37
    14.3    USA PATRIOT Act ................................................................ 37
    14.4    Indemnification ....................................................................... 37
    14.5    Notices .................................................................................... 38
    14.6    Severability ............................................................................. 38
    14.7    Construction ............................................................................ 39
    14.8    Dates for Payment and Performance ....................................... 39
    14.9    Applicable Law ....................................................................... 39
    14.10   Assignability ........................................................................... 39
    14.11   Participations .......................................................................... 39
    14.12   Counterparts ........................................................................... 39
    14.13   Further Assurances ................................................................. 39
    14.14   Costs and Expenses ................................................................ 39
    14.15   Usury ...................................................................................... 40
    14.16   Integration .............................................................................. 40
    14.17   Time ....................................................................................... 40
    14.18   NOTICE OF FINAL AGREEMENT .................................... 40
    14.19   VENUE .................................................................................. 40
    14.20   WAIVER OF JURY TRIAL .................................................. 41
    14.21   Reaffirmation ......................................................................... 41

Case 2:18-bk-04557-BMW   Doc 16   Filed 05/03/18   Entered 05/03/18 15:04:14   Desc
Main Document    Page 39 of 174

## AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

THIS AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT (this "Agreement") is made as of March 14, 2016, by and among GILBERT HOSPITAL, LLC, an Arizona limited liability company ("GH"), FLORENCE HOSPITAL AT ANTHEM, LLC, an Arizona limited liability company ("FHA"), NEW VISION HEALTH, LLC, an Arizona limited liability company ("Holdco," and collectively with GH and FHA, "Borrowers"), and BANK SNB, an Oklahoma state banking corporation, successor by conversion to Bank SNB, National Association, formerly known as Stillwater National Bank and Trust Company ("Lender").

### PRELIMINARY STATEMENTS

GH and Lender entered into a lending relationship on or about November 8, 2007 (the "GH Loan"), pursuant to which GH, Lender, and others entered into various loan documents, including, but not limited to, those listed on attached Exhibit A (the "GH Loan Documents").

FHA and Lender entered into a lending relationship on or about March 5, 2012 (the "FHA Loan"), pursuant to which FHA, Lender, and others entered into various loan documents, including, but not limited to, those listed on attached Exhibit B (the "FHA Loan Documents").

GH filed its petition in the GH Bankruptcy on February 5, 2014, at which time the GH Loan was in default.

FHA filed its petition in the FHA Bankruptcy on March 6, 2013, at which time the FHA Loan was in default.

Both GH and FHA have asserted various defenses to payment of their respective obligations to Lender.

In an effort to provide a mechanism by which the various claims made by GH, FHA, Lender, and others in the GH Bankruptcy and the FHA Bankruptcy can be resolved, GH and Lender proposed the Amended Joint Plan. The Amended Joint Plan includes a compromise of any and all disputes arising from the GH Loan, the FHA Loan, and Lender's enforcement of its rights arising therefrom. The Amended Joint Plan does not constitute an admission of wrongdoing by any of the proponents thereof; rather, it is a collaborative effort to resolve all pending disputes between each of GH, FHA, and Lender. FHA approves of, and consents to, the Amended Joint Plan.

The Bankruptcy Court entered the Confirmation Order in the GH Bankruptcy and the FHA Bankruptcy, confirming the Amended Joint Plan. The Amended Joint Plan provides that as a condition to its effectiveness, among other things, FHA, GH, Holdco, and GH 41 enter into this Agreement and/or the other Loan Documents.

This Agreement and certain Loan Documents are being executed in accordance with the provisions of the Amended Joint Plan to effectuate its purposes. This Agreement amends and restates, in their entirety, (i) that certain Loan Agreement dated effective November 8, 2007 between GH and Lender as amended from time to time, and (ii) that certain Loan Agreement

1

dated effective March 5, 2012 between FHA and Lender as amended from time to time, in order to comply with the terms of the Amended Joint Plan.

## AGREEMENT

In consideration of the mutual covenants and agreements in this Agreement, and intending to be legally bound hereby, Lender and Borrowers agree as follows:

Section 1.    Definitions.

1.1    Defined Terms. Capitalized terms used in this Agreement (including all schedules and exhibits to this Agreement) and not otherwise defined have the meanings set forth in this Section 1.

"Adjacent Property" means an approximately 15-acre parcel of real property described more fully in that certain Deed of Trust, Assignment of Rents, Security Agreement, Fixture Filing and Financing Statement, which was recorded in the office of the Maricopa County, Arizona Recorder at Recording Number 2007-1214970, which real property is adjacent to the GH Hospital Property.

"Allowed" is defined in the Amended Joint Plan.

"Amended Joint Plan" means the Second Amended and Restated Joint Plan of Reorganization for Gilbert Hospital, LLC and Florence Hospital at Anthem, LLC Proposed by Gilbert Hospital, LLC and Bank SNB Dated May 4, 2015 (as Amended and Restated on June 25, 2015, July 17, 2015, August 2, 2015, and August 18, 2015) filed in the GH Bankruptcy on October 7, 2015 at docket number 1251 and in the FHA Bankruptcy on October 7, 2015 at docket number 1147, as amended or supplemented by the Confirmation Order or otherwise.

"Availability" is defined in Section 2.3.

"Bank SNB Quarterly Distribution" is defined in Section 4.5(a).

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Arizona.

"Borrowers" is defined in the preamble to this Agreement.

"Borrowing Base" means, on any date of determination, an amount equal to 40% of the aggregate amount of Eligible Accounts at such date.

"Borrowing Base Certificate" means a certificate in the form of Exhibit C to this Agreement setting forth in reasonable detail the calculation of the Borrowing Base.

"Business Day" means any day other than a Saturday, Sunday, or a federal or state holiday or other day on which Lender or commercial banks in Oklahoma, Texas, or Arizona are customarily closed or are required to close under federal laws or the laws of the State of Oklahoma, the State of Texas, or the State of Arizona.

2

"Change in Control" means any event, transaction, or series of transactions, whereby: (a) (i) at least 15% on a fully diluted basis of the economic and voting interests in Holdco cease to be owned and controlled, directly or indirectly, by its present members, or (ii) Holdco ceases to own or control, directly or indirectly, 100% on a fully diluted basis of the economic and voting interests in GH and GH 41, and at least 97% on a fully diluted basis of the economic and voting interests in FHA; or (b) (i) the board of managers of Holdco, GH, and FHA ceases to be composed of Dr. M.M. Salim, Dr. Brad Newswander, Mr. Bryan McCormick, Dr. Robert Mead, and Mr. Bryan Hargis, or, in the event of the resignation, incapacity, or other inability to serve, the first alternate board member pursuant to the Amended Joint Plan (which shall be Mr. Dennis Rutherford, provided Mr. Rutherford is still employed by Holdco as a member of its Senior Management), and then a replacement board member selected by majority vote of the remaining members of the board of managers, provided, however, that under no circumstances may Dr. Timothy Johns serve on the board of managers, or (ii) any change in Senior Management occurs unless a replacement candidate is timely identified to Lender and Lender consents in writing to such replacement candidate, which consent shall not be unreasonably withheld.

"Change in Law" means the occurrence, after the date hereof, of (a) the adoption, taking effect, or phasing in of any law, rule, regulation, or treaty, (b) any change in any law, rule, regulation, or treaty or in the administration, interpretation, or application thereof, or (c) the making, issuance, or application of any request, guideline, requirement, or directive (whether or not having the force of law) by any governmental authority.

"Closing Date" is defined in Section 5.1.

"Collateral" means the GH Collateral, the FHA Collateral, the Holdco Collateral, the GH 41 Collateral, the LOC Collateral, the Reserves, the Revolver Reserve, the Swept Funds Account, the Effective Date Reserve, the Operating Reserve, the FHA Administrative Reserve, and, in the event GH purchases the Adjacent Property pursuant to the Option Agreement, the Adjacent Property.

"Confirmation Order" means the final order(s) of the Bankruptcy Court confirming the Amended Joint Plan entered in the FHA Bankruptcy on October 23, 2015 at docket number 1183 (as amended by the final order of the Bankruptcy Court entered in the FHA Bankruptcy on February 29, 2016 at docket number 1381) and in the GH Bankruptcy on October 26, 2015 at docket number 1277 (as amended by the final order of the Bankruptcy Court entered in the GH Bankruptcy on March 8, 2016 at docket number 1491).

"Debt Service Coverage Ratio" means the ratio derived by dividing Net Operating Income by Debt Service where: Net Operating Income = net income + amortization and depreciation + interest expense + other non-cash items; and Debt Service = principal repayment + interest payments + lease payments. All components of Net Operating Income and Debt Service shall be construed in accordance with GAAP and consistent with relevant industry guidelines.

"Default" as used in any of the Loan Documents shall have the same meaning as the term "Event of Default" as defined in this Section 1.1.

3

"Deposit Account Security Agreement" means one or more security agreements in form and substance satisfactory to Lender, dated the date hereof, made by each Borrower and GH 41, as applicable, in favor of Lender granting to Lender a security interest in the deposit accounts to be established and maintained with Lender, including, without limitation, all Deposit Accounts of each Borrower and GH 41, the Reserves, the Effective Date Reserve, the Operating Reserve, the FHA Administrative Reserve, and the Swept Funds Account, and any other deposit accounts to be maintained with a financial institution other than Lender as permitted by Section 8.9.

"Distributions" is defined in the Amended Joint Plan.

"EBITDAR" means earnings before the deduction of interest, taxes, depreciation, amortization and rent, all as determined in accordance with GAAP.

"Effective Date" means February 19, 2016.

"Effective Date Contract Notice" is defined in the Amended Joint Plan.

"Effective Date Reserve" is defined in the Amended Joint Plan.

"Eligible Account" means any Account (other than any portion of which is owing in respect of sales, excise, or similar taxes) owing to GH or FHA that meets, and continues to meet, each of the following requirements:

(a)     It arises in the ordinary course of business from the final, bona fide sale of goods or the rendering of services that have been fully performed by GH or FHA.

(b)     It is owned solely by GH or FHA.

(c)     It is the enforceable and unconditional obligation of the Centers for Medicare and Medicaid Services under its Medicare, Medicaid, Medicare Managed, and Managed Care programs.

(d)     The amount of the Account eligible is net and after deductions for contractual adjustments.

(e)     It is not more than 60 days past the original claim date.

(f)     For the first 180 days after the Effective Date, it is an Account owed to GH.

(g)     After the expiration of the 180-day period in subsection (f) above, it is: (i) an Account owed to GH; or (ii) an Account owed to FHA provided that Lender shall have, at Borrowers' prior request, conducted a field audit of FHA pursuant to Section 5.2(f).

"Environmental Laws" means all laws, rules, regulations, and orders of any governmental authority relating to public health (but excluding occupational safety and health) or the protection or pollution of the environment, including the Comprehensive Environmental

4

Response Compensation and Liability Act, the Clean Water Act, and the Resource Conservation and Recovery Act.

"Event of Default" means individually or collectively a GH Event of Default, an FHA Event of Default, or a Revolver Event of Default. Notwithstanding the foregoing, (i) any "Event of Default" or "Default" as referenced in any GH Loan Document shall mean a GH Event of Default or a Revolver Event of Default, and (ii) any "Event of Default" or "Default" as referenced in any FHA Loan Document shall mean an FHA Event of Default or a Revolver Event of Default.

"Fixed Charges" means, with respect to GH or FHA, as applicable, the sum of the Lease Payments of such party and all other required principal and interest payments of such party with respect to Total Debt.

"FHA" is defined in the preamble to this Agreement.

"FHA Administrative Reserve" is defined in the Amended Joint Plan.

"FHA Bankruptcy" means the bankruptcy case filed by FHA in the Bankruptcy Court and assigned Case No. 4:13-bk-03201-BMW.

"FHA Collateral" is defined in Section 6.1(b).

"FHA Event of Default" is defined in Section 11.2.

"FHA Hospital Property" means that certain real and personal property described in the MPT FHA Lease.

"FHA Liquidating Trust" is defined in the Amended Joint Plan.

"FHA Loan" is defined in the Preliminary Statements section of this Agreement.

"FHA Loan Documents" is defined in the Preliminary Statements section of this Agreement.

"FHA MPT" means MPT of Florence, LLC, the counterparty to the MPT FHA Lease.

"FHA MPT Intercreditor Agreement" means that certain Intercreditor Agreement between Lender and FHA MPT dated March 5, 2012, as the same may be amended from time to time.

"FHA Obligations" means all Obligations owed by FHA as described in this Agreement, including, without limitation, the FHA Term Obligation and the Obligations arising from the Revolver.

"FHA Term Obligation" is defined in Section 2.2.

"GAAP" means generally accepted accounting principles in effect in the United States of America from time to time.

5

"GH" is defined in the preamble to this Agreement.

"GH 41" means GH 41, LLC, an Arizona limited liability company, which is a wholly-owned subsidiary of GH.

"GH 41 Collateral" is defined in Section 6.1(d).

"GH 41 Security Agreement" means a security agreement in form and substance satisfactory to Lender, dated the date hereof, made by GH 41 in favor of Lender granting to Lender a security interest in certain of the GH 41 Collateral.

"GH Bankruptcy" means the bankruptcy case filed by GH in the Bankruptcy Court and assigned Case No. 4:14-bk-01451-MCW.

"GH Collateral" is defined in Section 6.1(a).

"GH Event of Default" is defined in Section 11.1.

"GH Guaranty" means that certain Guaranty Agreement, dated effective March 5, 2012, made by GH in favor of Lender whereby GH guarantied the full and prompt payment and performance by FHA of the FHA Loan.

"GH Hospital Property" means that certain real and personal property described in the MPT GH Lease.

"GH Loan" is defined in the Preliminary Statements section of this Agreement.

"GH Loan Documents" is defined in the Preliminary Statements section of this Agreement.

"GH MPT" means MPT of Gilbert, LLC, the counterparty to the MPT GH Lease.

"GH Obligations" means all Obligations owed by GH as described in this Agreement, including, without limitation, the GH Term Obligation, the Obligations arising from the GH Guaranty, and the Obligations arising from the Revolver.

"GH Term Obligation" is defined in Section 2.1.

"GH USC Trust" is defined in the Amended Joint Plan.

"GH USC Trust Intercreditor Agreement" means an intercreditor agreement in form and substance satisfactory to Lender, dated the date hereof, between Lender and the GH USC Trust.

"Holdco" is defined in the preamble to this Agreement, and is an Arizona limited liability company created through the Amended Joint Plan, the initial assets of which shall be 100% of the newly issued membership interests in GH and no less than 97% of the newly issued membership interests in FHA.

"Holdco Collateral" is defined in Section 6.1(c).

6

"Indebtedness" means (a) all items that would be included as liabilities on a balance sheet in accordance with GAAP, including capital leases, but excluding trade payables incurred and being paid in the ordinary course of business, (b) all guaranties, indemnifications, and other contingent obligations, and (c) all reimbursement obligations in connection with letters of credit issued.

"Indemnitee" is defined in Section 14.4.

"Initial Tangible Net Worth" means, as to the entity to which it refers, the Tangible Net Worth of that entity determined as a result of: (i) an audit of the financial statements of such entity to be performed and delivered to Lender within 120 days following the occurrence of the Effective Date, or (ii) a review of the financial statements of such entity to be performed and delivered to Lender within 60 days following the occurrence of the Effective Date.

"Lease Payments" means, with respect to GH or FHA, as applicable, the sum of the payment obligations of such party as the lessee under any lease for real property.

"Lender" is defined in the preamble to this Agreement.

"Loan Documents" means this Agreement, the GH Loan Documents, the FHA Loan Documents, the Revolver Loan Documents, the Pledge Agreement, the GH 41 Security Agreement, each Deposit Account Security Agreement, the Peoria Deed of Trust, any deed of trust on the Adjacent Property for the benefit of Lender in the event provided pursuant to the Option Agreement, all financing statements perfecting a security interest, each other agreement, document, or instrument executed pursuant to any of the foregoing or in connection with any of the Loans, and all renewals and extensions of, or amendments or supplements to, or restatements of, any of the foregoing from time to time in effect.

"Loans" means the GH Term Obligation, the FHA Term Obligation, the Revolver, and the LOC Obligation, collectively.

"LOC" means the standby letter of credit issued by Lender to FHA MPT in the face amount of $1,200,000.

"LOC Collateral" is defined in Section 6.1(e).

"LOC Obligation" means any Obligations owing as the result of drawings under any of the LOCs, including, without limitation, the LOC.

"LOCs" is defined in Section 6.1(e).

"Material Adverse Effect" means any set of circumstances or events that (a) would have a material adverse effect upon the validity or enforceability of any of the Loan Documents, (b) is or could reasonably be expected to become material and adverse to the business condition or prospects (financial or otherwise), assets, properties, or operations of a Borrower or GH 41, (c) could reasonably be expected to materially impair the ability of a Borrower or GH 41 to fulfill its obligations under the Loan Documents, or (d) causes an Event of Default or an event that with the giving of notice or passage of time, or both, would constitute an Event of Default.

7

"MPT FHA Lease" means the Lease Agreement between FHA and FHA MPT dated as of November 4, 2010, as amended from time to time, concerning the FHA Hospital Property, as assumed by FHA in the FHA Bankruptcy.

"MPT GH Lease" means the Amended and Restated Lease Agreement between GH and GH MPT dated as of November 5, 2014, as amended from time to time, concerning the GH Hospital Property, as assumed by GH in the GH Bankruptcy.

"Net Distributable Cash" means any surplus of cash generated from the operation of the businesses of GH and FHA after the following obligations have been paid in this order: (a) required Effective Date payments; (b) ordinary operating expenses of Borrowers; (c) required payments to Lender; and (d) establishing, replenishing, or increasing Reserves.

"Net Operating Margin" means net operating income divided by net revenue, which shall be construed in accordance with GAAP and consistent with relevant industry guidelines.

"Obligations" means all obligations, liabilities, and indebtedness (monetary or otherwise, including post-petition and default interest, whether allowed or not) of a Borrower or GH 41 arising under this Agreement or any other Loan Document and all other obligations of a Borrower or GH 41 to Lender of any nature whatsoever, including, without limitation, for principal, interest, fees, costs, expenses, indemnification, and legal fees, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.

"Operating Reserve" is defined in Section 8.10.

"Option Agreement" means the Option Agreement for the Purchase and Sale of Real Property and Joint Escrow Instructions in a form satisfactory to Lender, dated the date hereof, between CRK Properties, Inc., an Oklahoma corporation (an affiliate of Lender), and GH, granting to GH an exclusive option to purchase the Adjacent Property on the terms and conditions set forth therein.

"Peoria Deed of Trust" means a deed of trust in form and substance satisfactory to Lender, dated the date hereof, made by GH 41, as trustor, in favor of Lender, as beneficiary, granting to Lender a lien and security interest in and to the Peoria Property.

"Peoria Property" means the 41 acres of real property owned by GH 41, commonly referred to as Lots 2 and 3 of a larger tract of land located at 26230 North Lake Pleasant Parkway, Peoria, Arizona.

"Permitted Indebtedness" means the Obligations and each of the following:

        (a)     obligations of GH and FHA to pay Allowed Claims under the Amended Joint Plan;

        (b)     obligations to Pinal County, Arizona, Maricopa County, Arizona, the GH USC Trust, and the FHA Liquidating Trust as described in the Amended Joint Plan;

8

(c)      FHA's obligations to FHA MPT under the MPT FHA Lease;

(d)      GH's obligations to GH MPT under the MPT GH Lease;

(e)      GH's and FHA's trade payables arising in the ordinary course of business;

(f)      GH's and FHA's purchase money Indebtedness in an amount not exceeding $50,000 in the aggregate outstanding at any time without need to obtain Lender's consent;

(g)      GH's and FHA's contingent obligations (i) arising from endorsements of payment items for collection or deposit in the ordinary course of business, or (ii) incurred in the ordinary course of business with respect to surety, appeal, or performance bonds or other similar obligations;

(h)      GH's other unsecured Indebtedness in an amount not exceeding $10,000 in the aggregate amount outstanding at any time; and

(i)      FHA's other unsecured Indebtedness in an amount not exceeding $10,000 in the aggregate amount outstanding at any time.

"Permitted Liens" means liens in favor of Lender and each of the following:

(a)      liens in favor of the GH USC Trust and the FHA Liquidating Trust as described in the Amended Joint Plan, all of which shall remain subordinate to Lender's liens at all times;

(b)      liens in favor of FHA MPT under the MPT FHA Lease;

(c)      liens in favor of GH MPT under the MPT GH Lease;

(d)      liens securing purchase money Indebtedness permitted by clause (f) of the definition of "Permitted Indebtedness" and attaching only to the property acquired with the proceeds of such Indebtedness;

(e)      liens for taxes not yet due and payable, or which are being diligently contested in good faith by proper proceedings;

(f)      mechanics, warehouseman's, and other similar liens arising in the ordinary course of business for obligations not yet due and payable;

(g)      easements, rights-of-way, restrictions, covenants and other agreements encumbering real property that do not secure any monetary obligation and do not materially interfere with any Borrower's business; and

(h)      normal and customary rights of setoff upon deposits in favor of depository institutions and liens of a collecting bank on payment items in the course of collection.

"Person" means any individual, partnership, corporation, business trust, joint stock company, trust, unincorporated association, joint venture, limited liability company, governmental authority, or other entity of any nature.

"Pledge Agreement" means the Pledge Agreement in a form satisfactory to Lender, dated the date hereof, made by Holdco in favor of Lender with respect to Holdco's membership interests in GH and FHA.

"Reorganized FHA SNB Claim" is defined in the Amended Joint Plan.

"Reorganized GH SNB Claim" is defined in the Amended Joint Plan.

"Reserves" means all reserves determined to be necessary or appropriate by Senior Management, including, but not limited to, the reserves discussed in Section 9.12.

"Revolver" is defined in Section 2.3.

"Revolver Event of Default" is defined in Section 11.3.

"Revolver Loan Documents" means this Agreement, the Revolving Note, and all other loan documents evidencing or securing the Revolver.

"Revolver Maturity Date" means February 28, 2017.

"Revolver Reserve" is defined in Section 6.1(f).

"Revolving Note" means a promissory note in the form of Exhibit D.

"Senior Management" is defined in the Amended Joint Plan.

"Solvent" means, with respect to a Borrower, that (a) the present fair salable value of the assets of such Borrower is not less than the Initial Tangible Net Worth, (b) such Borrower is able to pay (and is actually paying) all of its debts as they mature and pursuant to the Amended Joint Plan, (c) such Borrower will not have an unreasonably small capital in relation to its business or with respect to any contemplated transaction, and (d) such Borrower has not incurred (by way of assumption or otherwise) any obligations or liabilities (contingent or otherwise) under any of the Loan Documents, or made any conveyance in connection with the Loan Documents, with actual intent to hinder, delay, or defraud either present or future creditors of such Borrower.

"Specified Commercial Tort Claims" is defined in Section 6.4.

"Swept Funds" means the $1,085,084.09 swept by Lender from GH's deposit accounts on February 3, 4, and 5, 2014.

"Swept Funds Account" is defined in Section 6.1(e).

"Tangible Net Worth" means, as to the entity to which it refers and at any time, the sum of the following, determined in accordance with GAAP:

10

(a)     the amount of capital, stated capital or capital account balance (after deducting the cost of any treasury shares), plus

(b)     the amount of capital surplus and retained earnings (or, in the case of a capital surplus or retained earnings deficit, minus the amount of such deficit), minus

(c)  .  the sum of the following (without duplication of deductions in respect of items already deducted in arriving at surplus and retained earnings): (i) unamortized debt discount and expense and (ii) any write-up in book value of assets resulting from a revaluation thereof pursuant to GAAP subsequent to the most recent balance sheet prior to the date thereof, except any net write-up in value of foreign currency in accordance with GAAP; any write-up resulting from reversal of a reserve for bad debts or depreciation; and any write-up resulting from a change in methods of accounting for inventory, minus

(d)     as to GH, any account adjustments made related to any intercompany or affiliated entities, *i.e.*, FHA, Peoria Regional Medical Center, LLC, PHD Property, LLC, Ahwatukee Regional Medical Center, LLC, Buckeye Regional Medical Center, LLC, Buckeye Medical Land, LLC related to transactions that occurred prior to the GH Bankruptcy.

"Tax Distribution" is defined in the Amended Joint Plan.

"Term Obligation Maturity Date" means the first day of the month of the 48th calendar month after the Effective Date.

"Title Company" means Fidelity National Title Insurance Company.

"Title Policy" means a title insurance policy (which policy shall be in the ALTA 2006 form of lender's (or mortgagee's) policy of title insurance (including, without limitation, the coverage set forth in ALTA Section 11(a)) issued by the Title Company, at Borrowers' sole cost and expense, in form and substance acceptable to Lender, naming Lender as insured, in the amount of the sum of the FHA Term Obligation and the maximum principal amount of the Revolver, showing the Peoria Deed of Trust as a first priority lien on GH 41's entire interest in the Peoria Property and any appurtenant easements including, without limitation, all reciprocal easement agreements and other parking agreements, subject only to permitted encumbrances approved by Lender, together with such endorsements as Lender may require in its sole and absolute discretion.

"Total Debt" means all indebtedness for borrowed money which, in accordance with GAAP, will be included in determining total liabilities of GH or FHA, as applicable, as shown on the liability side of a balance sheet, including any such indebtedness represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"UCC" means the Uniform Commercial Code, as amended and in effect in the State of Oklahoma.

1.2     UCC Terms. The following capitalized terms shall have the meanings set forth in the UCC: Equipment, Inventory, Accounts, Chattel Paper, General Intangibles, Goods,

11

Documents, Fixtures, Deposit Accounts, Instruments, Investment Property, Letter-of-credit Rights, Software, and Commercial Tort Claims.

       1.3     Amended Joint Plan Terms. Capitalized terms used herein but not defined herein, but which are defined in the Amended Joint Plan, shall have the meanings set forth therein.

       1.4     Singular and Plural. Terms defined in the singular shall have correlative meanings in the plural, and vice versa.

Section 2.     The Obligations.

       2.1     GH Term Obligation. Subject to the terms and conditions of this Agreement, the Reorganized GH SNB Claim is hereby established in the amount of $5,711,285.42 (the "GH Term Obligation") to be payable in equal monthly installments of $31,729.36 of principal plus all accrued interest commencing on the 14th day of April, 2016 and continuing on the same day of each month thereafter with the balance of principal and all accrued but unpaid interest and any other charges due and payable on the Term Obligation Maturity Date.

       2.2     FHA Term Obligation. Subject to the terms and conditions of this Agreement, the Reorganized FHA SNB Claim is hereby established in the amount of $8,288,714.58 (the "FHA Term Obligation") to be payable in equal monthly installments of $46,048.41 of principal plus all accrued interest commencing on the 14th day of April, 2016 and continuing on the same day of each month thereafter with the balance of principal and all accrued but unpaid interest and any other charges due and payable on the Term Obligation Maturity Date.

       2.3     Revolver. Subject to the terms and conditions of this Agreement, and provided that no Event of Default has occurred, Lender agrees to make one or more advances (each an "Advance") pursuant to a revolving loan (the "Revolver") made jointly and severally to Holdco, GH, and FHA in an aggregate amount (the "Availability") not to exceed the lesser of (a) the Borrowing Base in effect from time to time, or (b) $750,000. The Revolver may be repaid and any Availability thereunder reborrowed at any time prior to the earlier of an Event of Default or the Revolver Maturity Date.

       2.4     Notes. The GH Term Obligation shall remain evidenced by: (a) the Promissory Note (Land) in the original principal amount of $7,328,924.00, dated effective November 8, 2007, and made by GH in favor of Lender, as amended from time to time; (b) the Promissory Note (Working Capital) in the original principal amount of $5,000,000.00, dated effective November 8, 2007, and made by GH in favor of Lender, as amended from time to time; and (c) the Promissory Note (Equipment) in the original principal amount of $8,040,000.00, dated effective November 8, 2007, and made by GH in favor of Lender, as amended from time to time. The FHA Term Obligation shall remain evidenced by: (x) the Promissory Note (Equipment) in the original principal amount of $6,748,206.00, dated effective March 5, 2012, and made by FHA in favor of Lender, as amended from time to time; and (y) the Promissory Note (Working Capital) in the original principal amount of $5,000,000.00, dated effective March 5, 2012, and made by FHA in favor of Lender, as amended from time to time. The LOC shall remain evidenced by the Letter of Credit Demand Promissory Note in the original principal amount of $1,200,000.00, dated effective March 5, 2012, and made by FHA in favor of Lender, as amended

from time to time. The Revolver shall be evidenced by the Revolving Note executed by Holdco, GH, and FHA and delivered to Lender.

2.5     Loan Purposes. Availability and Advances under the Revolver may only be used for the general working capital purposes of Borrowers or as otherwise specifically permitted by the Amended Joint Plan. Neither Availability nor Advances under the Revolver may be used to support additional LOCs nor to fund the Operating Reserve.

2.6     GH Guaranty Obligation. GH acknowledges and agrees that the GH Guaranty is in full force and effect except as limited by this subsection.

(a)     The Obligations of GH under the GH Guaranty are limited in amount to a maximum of $3,000,000.00.

(b)     The GH Collateral shall secure the Obligations of GH under the GH Guaranty as set forth in Section 6.1(a).

(c)     The Obligations of GH under the GH Guaranty shall be due and payable upon the occurrence of any one of the following circumstances: (i) if, prior to maturity of the FHA Obligations, there is a default in the terms of the FHA Obligations, a liquidation of FHA's assets, and a liquidation of the Peoria Property resulting in less than full recovery of the FHA Obligations, (ii) the failure to pay in full at maturity the balance of the FHA Obligations, or (iii) subsequent to maturity of the FHA Obligations, there is any default under the terms of the Reorganized FHA SNB Claim. For purposes of sub-part (i) of the first sentence of this paragraph, a liquidation of the assets of FHA will be deemed to occur upon the earlier of (a) the completion of a sale of all or substantially all of the assets of FHA, including, without limitation, any such sale conducted by or on behalf of any party with lien interests in the assets of FHA, or (b) a voluntary bankruptcy filing or any other insolvency proceeding commenced or consented to by FHA, or any involuntary bankruptcy or other involuntary insolvency proceeding of FHA that is not dismissed within 60 days of its commencement. For purposes of sub-part (i) of the first sentence of this paragraph, a liquidation of the Peoria Property will be deemed to occur upon the earlier of (x) completion of a judicial or non-judicial foreclosure, including, without limitation, a trustee sale, of the Peoria Property and, if applicable, the entry of an order by a court of competent jurisdiction establishing the fair-market value of the Peoria Property as provided in Arizona Revised Statutes § 33-814, or (y) a voluntary bankruptcy filing or any other insolvency proceeding commenced or consented to by the owner of the Peoria Property, or any involuntary bankruptcy or other involuntary insolvency proceeding of the owner of the Peoria Property that is not dismissed within 60 days of its commencement. The amount of the GH Guaranty claim shall not exceed the amount necessary to satisfy in full the FHA Obligations, including all principal, accrued interest, fees, and expenses arising therefrom.

Section 3.     Interest.

3.1     Interest Rate. Subject to Sections 3.2, 3.3, and 14.15, the unpaid principal of each of the Loans shall bear interest at the rate of 8.75% per annum from the Effective Date until paid.

3.2     Default Interest: Subject to Sections 3.3 and 14.15:

13

(a)     upon the occurrence and during the continuance of a GH Event of Default, the unpaid principal of each of the GH Term Obligation, the Revolver, and the LOC Obligation shall bear interest at the rate of 15% per annum;

(b)     upon the occurrence and during the continuance of an FHA Event of Default, the unpaid principal of each of the FHA Term Obligation, the Revolver, and the LOC Obligation shall bear interest at the rate of 15% per annum; and

(c)     upon the occurrence and during the continuance of a Revolver Event of Default, the unpaid principal of each of the Loans shall bear interest at the rate of 15% per annum.

3.3     _Interest Calculation_. Interest shall be computed for the actual number of days elapsed on the basis of a year of 360 days.

Section 4.     _Payment_.

4.1     _Payments of Obligations_.

(a)     _GH Term Obligation_. GH shall pay the GH Term Obligation as set forth in _Section 2.1_. A final payment of all outstanding Obligations owing with respect to the GH Term Obligation shall be due and payable on the Term Obligation Maturity Date.

(b)     _FHA Term Obligation_. FHA shall pay the FHA Term Obligation as set forth in _Section 2.2_. GH and Holdco shall subsidize FHA's monthly payment Obligations, as necessary, so that Lender receives timely monthly debt service payments on the FHA Term Obligation in full. A final payment of all outstanding Obligations owing with respect to the FHA Term Obligation shall be due and payable on the Term Obligation Maturity Date.

(c)     _Revolver_. Commencing on April 14, 2016, and on the same day of each month thereafter, Borrowers shall make payments of accrued and unpaid interest with respect to the Revolver. A final payment of all outstanding Obligations owing with respect to the Revolver shall be due and payable on the Revolver Maturity Date. Unless otherwise agreed, any unpaid principal and all accrued but unpaid interest due on the Revolver Maturity Date will be converted to a term obligation amortized and payable in equal monthly installments of principal plus accrued interest on the 14th day of each month over a term of 24 months, with all principal and accrued interest being finally due and payable on the date that is 24 months after the Revolver Maturity Date.

(d)     _LOC Obligation_. Borrowers shall immediately reimburse Lender for any drawings under the LOC or any other LOCs.

(e)     _Other Obligations_. All other Obligations owing from any Borrower to Lender from time to time pursuant to the Loan Documents shall be payable on demand unless otherwise specified in a Loan Document, but in any event shall be due and payable on the maturity date thereof.

14

4.2     Manner of Payments. All payments of Obligations shall be made in United States dollars, without offset, counterclaim, or defense of any kind, free and clear of (and without any deduction for) taxes, in immediately available funds at the office specified by Lender not later than 12:00 noon, Oklahoma City, Oklahoma time on the date due. Funds received after such hour shall be deemed to have been received on the following Business Day.

4.3     Payment Authorization. In the event a payment is late or an Event of Default occurs, each Borrower authorizes Lender, in its sole discretion, to charge any of such Borrower's Deposit Accounts to make any payments of principal and interest.

4.4     Voluntary Prepayment. Borrowers may prepay to Lender the Obligations at any time without penalty. If, within 18 months after the Effective Date, the FHA Term Obligation, the GH Term Obligation, and the Revolver are all paid in full (and, in the case of the Revolver, additional Advances are not permitted or the Revolver has been terminated), and if the LOCs have been extinguished, fully satisfied, and/or paid in full, then the combined principal balance of the FHA Term Obligation, the GH Term Obligation, and the Revolver will be discounted by $1,500,000 at the payoff.

4.5     Additional Mandatory Payments.

(a)     On a quarterly basis commencing on June 1, 2016, and on the same day of each third month thereafter, Borrowers shall distribute to Lender a portion of the Net Distributable Cash as follows (each a "Bank SNB Quarterly Distribution"):

(i)     20% of the Net Distributable Cash, which shall be paid to Lender as an additional principal reduction until all claims of Lender have been paid in full.

(ii)     Notwithstanding the foregoing, the Bank SNB Quarterly Distributions shall be reduced to 10% of Net Distributable Cash until such point as the aggregate total of all Distributions to the GH USC Trust and the FHA Liquidating Trust (not including the FHA Litigation Reserve, GH Litigation Reserve, GH Administrative Subsidy, and the FHA Administrative Subsidy, all such terms as defined in the Plan) are proportionate, i.e. until the obligations owed to the GH USC Trust and the FHA Liquidating Trust have been reduced to the same percentage of their respective original amounts.

(iii)     At any time the Bank SNB Quarterly Distribution is reduced to 10% of Net Distributable Cash, then Borrowers shall use funds from the Operating Reserve as necessary to provide to Lender an additional cash payment equal to the 10% of Net Distributable Cash then payable to Lender.

(b)     Asset Sale. On any date on which any Borrower or GH 41 receives proceeds from any sale of any Collateral (other than inventory in the ordinary course of business or the disposition of worn or obsolete equipment), such Borrower shall pay to, or shall cause GH 41 to pay to, Lender an amount equal to 100% of such sales proceeds (net of reasonable closing costs actually paid customarily associated with the sale of such Collateral) to be applied as a prepayment of the Obligations. This Section 4.5(b) shall not be construed to permit any sale not otherwise permitted by this Agreement.

15

(c)    Casualty Events. Not later than 3 Business Days following the receipt by any Borrower or GH 41 of the proceeds of insurance, any condemnation award, or other compensation in respect of any loss or damage to, or any condemnation or other taking of property constituting any part of the Collateral, such Borrower shall pay to, or shall cause GH 41 to pay to, Lender an amount equal to 100% of such proceeds (net of reasonable and customary costs actually paid associated with the recovery of such proceeds) to be applied as a prepayment of the Obligations.

(d)    Overadvance. If the aggregate principal balance of the Revolver exceeds the Availability, Borrowers shall prepay the Revolver in the amount of the excess not later than the first Business Day following any Borrower's knowledge of the excess.

(e)    Application of Payments. Payments received pursuant to this Section 4.5 shall be applied first to a Term Obligation in Lender's sole and absolute discretion, and then to the Revolver, except that payments received pursuant to paragraph (d) shall be applied to the Revolver.

4.6    Late Charges. If any Borrower makes any payment of the Obligations more than 10 days past the due date for such payment, such Borrower shall pay a late charge in an amount equal to 5% of the amount of the unpaid, past due Obligations. Payment of the late charge shall not cure the Event of Default resulting from any late payment of the Obligations.

4.7    Increased Costs; Capital Adequacy.

(a)    Change in Law. If any Change in Law shall (i) impose, modify, or deem applicable any reserve, special deposit, compulsory loan, insurance charge, or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, Lender, (ii) subject Lender to any tax with respect to any Loan or Loan Document, or change the basis of taxation of payments to Lender in respect thereof, or (iii) impose on Lender or any interbank market any other condition, cost, or expense affecting the Loans or any Loan Document and the result thereof shall be to increase the cost to Lender of making or maintaining the Loans or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest, or any other amount) then, upon request by Lender, Borrowers will pay to Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

(b)    Capital Adequacy. If Lender determines that any Change in Law affecting Lender or its holding company regarding capital requirements has, or would have, the effect of reducing the rate of return on Lender's or such holding company's capital as a consequence of this Agreement or the Loans to a level below that which Lender or such holding company could have achieved but for such Change in Law (taking into consideration Lender's and such holding company's policies with respect to capital adequacy), then from time to time Borrowers will pay to Lender such additional amount or amounts as will compensate it or its holding company for any such reduction suffered.

16

Section 5.     Conditions Precedent.

5.1     Conditions to Closing. Lender is not required to enter into this Agreement or the other Loan Documents or grant any other accommodation to Borrowers until the date (the "Closing Date") on which the following conditions have been satisfied or waived by Lender:

(a)     Amended Joint Plan Payments. The Bankruptcy Court has entered the Confirmation Order in the FHA Bankruptcy and the GH Bankruptcy, the Amended Joint Plan has become effective, and GH and FHA have made all Effective Date payments required by the Amended Joint Plan.

(b)     Representations and Warranties. The representations and warranties in this Agreement shall be true and accurate as of the Closing Date.

(c)     Documents. The Loan Documents shall be duly authorized, executed, and delivered to Lender.

(d)     Intentionally Omitted.

(e)     Secretary's Certificate. Lender shall have received a certificate of the secretary, manager, or other responsible officer of each Borrower and GH 41 certifying (i) copies of such Person's organizational documents, (ii) copies of resolutions of the directors, members, or managers, as applicable, of such Person authorizing the transactions contemplated in this Agreement and the other Loan Documents, and (iii) the title, name, and signature of each person authorized to sign the Loan Documents on behalf of such Person.

(f)     Certificate of Good Standing. Lender shall have received a certificate of the Secretary of State of the State of Arizona certifying the existence and good standing of Borrowers and GH 41 in the State of Arizona.

(g)     Confirmation Order. Lender shall have received a signed copy of the Confirmation Order.

(h)     Opinion of Counsel. Lender shall have received an opinion of counsel to Borrowers and GH 41 as to the matters set forth on Exhibit E.

(i)     Anti-Money Laundering. Lender shall have received all documentation and information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the United States PATRIOT Act.

(j)     USC Intercreditor Agreement. The GH USC Trust and Lender shall have entered into the GH USC Trust Intercreditor Agreement.

(k)     Pledge Agreement. Holdco shall have executed and delivered to Lender the Pledge Agreement.

17

(l)     Deposit Accounts and Reserves. Borrowers shall have established, and shall have caused GH 41 to establish, with Lender all deposit accounts and reserves required to be established with Lender pursuant to this Agreement, including, without limitation, all Deposit Accounts and Reserves of Borrowers and GH 41, the Swept Funds Account, the Effective Date Reserve, the Operating Reserve, and the FHA Administrative Claim Reserve.

(m)     Peoria Deed of Trust. The Peoria Deed of Trust shall be duly authorized, executed, and delivered to Lender.

(n)     Security Agreements. The GH 41 Security Agreement and each required Deposit Account Security Agreement shall be duly authorized, executed, and delivered to Lender.

(o)     Subordinations and Releases of Encumbrances on Peoria Property. Lender shall have received (i) a subordination agreement, in form and substance acceptable to Lender in its sole discretion, from GH with respect to that certain deed of trust naming GH as beneficiary and recorded in Maricopa County, Arizona at Instrument No. 2011-0834478, and (ii) such releases as may be determined by Lender in its discretion to be necessary to release and terminate all other encumbrances (other than real property tax liens for taxes not yet due and payable) on the Peoria Property.

(p)     Guarantor Forbearance Agreements. Lender and all guarantors (other than GH) of the Obligations of GH or FHA that elected to accept the Amended Joint Plan and the offered forbearance described in Sections 2.1.FHA(b) and 2.2.GH(b) of the Amended Joint Plan shall have entered into forbearance agreements in form and substance acceptable to Lender.

(q)     Title Policy. Lender shall have received from the Title Company a current title commitment and pro forma title policy, together with electronic copies of all recorded title exceptions, with respect to the Peoria Property. On or promptly after the Closing Date, Lender shall have received the Title Policy, together with all endorsements required by Lender.

(r)     Option Agreement. GH shall have executed and delivered to Lender the Option Agreement.

(s)     Appraisal. Lender shall have received payment of the fees incurred in connection with Lender's appraisal of the Peoria Property.

(t)     Intentionally Omitted.

(u)     Other Documents. Lender shall have received such other agreements, documents, instruments, and certificates as it may reasonably request and in such form as Lender may reasonably require.

5.2     Conditions to Advances. Lender is not required to make any Advances under the Revolver or grant any other accommodation to Borrowers unless the following conditions are satisfied:

18

(a) <u>No Event of Default</u>. No Event of Default shall exist or result from the making of the Loans and no event shall have occurred, or occur with the making of the Loans, that with the giving of notice or passage of time, or both, would constitute an Event of Default.

(b) <u>Representations and Warranties</u>. The representations and warranties in this Agreement shall be true and accurate as of the date of any Advance made pursuant to the Revolver.

(c) <u>Request for Advance; Borrowing Base Certificate</u>. Not later than 3 Business Days prior to the date of any Advance made pursuant to the Revolver, Lender shall have received a duly executed request for such Advance in the form of <u>Exhibit F</u> to this Agreement. For the first 12 months following the Effective Date, each Monday (unless Monday is not a Business Day, in which case on the next following Business Day), Borrowers shall submit a Borrowing Base Certificate duly executed by the chief financial officer of each Borrower certifying as to the status of Accounts as of the close of business on the last Business Day of the previous week. Thereafter, Borrowers shall submit a Borrowing Base Certificate no later than the first day and the fifteenth day (or the first Business Day thereafter) of each calendar month or as otherwise requested by Lender, but not more often than weekly.

(d) <u>Financial Covenants</u>. Borrowers shall be in compliance with the financial covenants set forth in <u>Section 10</u>.

(e) <u>No Draw Periods</u>. Commencing 6 months after the Effective Date, Borrowers shall not have requested an Advance under the Revolver for 30 consecutive days during the prior 6 months.

(f) <u>Field Audits</u>. Borrowers will permit field audits of operations (including, but not limited to, operations, accounts receivable, and equipment) as reasonably requested by Lender. Lender shall be permitted to conduct an initial field audit prior to the initial Advance request under the Revolver and to conduct quarterly field audits thereafter. Absent extraordinary circumstances, Lender will provide Borrowers with written notice of a field audit at least 7 Business Days prior to the occurrence of such audit, and Lender will use reasonable efforts to conduct such field audits at such times and in such a manner as to avoid interference in the operation of Borrowers' businesses. Borrowers will be responsible for the reasonable cost of all field audits conducted by Lender.

(g) <u>Other Documents</u>. Lender shall have received such other agreements, documents, instruments, and certificates as it may reasonably request and in such form as Lender may reasonably require.

(h) <u>Material Adverse Effect</u>. No event shall have occurred or circumstance exist that has or could reasonably be expected to have a Material Adverse Effect.

(i) <u>No Overadvance</u>. After the making of each Advance under the Revolver, the outstanding principal balance of the Revolver shall not exceed the Availability.

19

Section 6.    Collateral.

  6.1    Grant of Security Interests.

        (a)    GH Collateral. To secure the prompt payment and performance of all of
the GH Obligations, and in addition to any grant of security previously given pursuant to any of
the other Loan Documents, GH hereby grants to Lender a lien and continuing security interest in
all of GH's assets, including, without limitation, all of GH's right, title, and interest in any
Equipment, Inventory, Accounts, Chattel Paper, General Intangibles, Goods, Documents,
Fixtures, Deposit Accounts (including the Reserves, the Revolver Reserve, the Swept Funds
Account, the Effective Date Reserve, the Operating Reserve, and the FHA Administrative
Reserve, but the Lender's lien rights in the FHA Administrative Reserve are subordinated to the
administrative claims of the FHA Bankruptcy as and when they become finally Allowed),
Instruments, Investment Property, Letter of Credit Rights, Software, Commercial Tort Claims
(including the Specified Commercial Tort Claims), money, and all other property of GH pledged
as security for the GH Obligations in any GH Loan Document, in each case, whether owned now
or acquired after the date of this Agreement, and including all proceeds of the foregoing and all
books and records related to the foregoing (all of the foregoing, the "GH Collateral"); provided,
however, that the GH Collateral (i) shall include only those assets that GH can pledge as
collateral legally and without breaching a valid and enforceable contractual obligation assumed
by GH throughout the GH Bankruptcy and/or pursuant to the Effective Date Contract Notice,
and (ii) shall not include any security deposit held by GH MPT pursuant to the MPT GH Lease,
or GH's interests in or under the MPT GH Lease. Lender's lien and security interest in the GH
Collateral shall be senior to all other liens, claims, and encumbrances with respect to all of the
GH Obligations to Lender, except the GH Obligations to Lender arising from the GH Guaranty.
Lender's lien rights in the GH Collateral pertaining to the GH Obligations arising under the GH
Guaranty are expressly subordinated to the lien rights of the GH USC Trust subject to the terms
of the GH USC Trust Intercreditor Agreement. Notwithstanding anything to the contrary set
forth herein, Lender's liens remain subject to the FHA MPT Intercreditor Agreement.

        (b)    FHA Collateral. To secure the prompt payment and performance of all of
the FHA Obligations, and in addition to any grant of security previously given pursuant to any of
the other Loan Documents, FHA hereby grants to Lender a lien and continuing security interest
in all of FHA's assets, including, without limitation, all of FHA's right, title, and interest in any
Equipment, Inventory, Accounts, Chattel Paper, General Intangibles, Goods, Documents,
Fixtures, Deposit Accounts (including the Reserves, the Revolver Reserve, the Swept Funds
Account, the Effective Date Reserve, the Operating Reserve, and the FHA Administrative
Reserve, but the Lender's lien rights in the FHA Administrative Reserve are subordinated to the
administrative claims of the FHA Bankruptcy as and when they become finally Allowed),
Instruments, Investment Property, Letter of Credit Rights, Software, Commercial Tort Claims
(including the Specified Commercial Tort Claims), money, and all other property of FHA
pledged as security for the FHA Obligations in any FHA Loan Document, in each case, whether
owned now or acquired after the date of this Agreement, and including all proceeds of the
foregoing and all books and records related to the foregoing (all of the foregoing, the "FHA
Collateral"); provided, however, that the FHA Collateral shall include only those assets that FHA
can pledge as collateral legally and without breaching a valid and enforceable contractual
obligation assumed by FHA throughout the FHA Bankruptcy and/or pursuant to the Effective

Case 2:18-bk-04557-BMW    Doc 16    Filed 05/03/18    Entered 05/03/18 15:04:14    Desc
Main Document    Page 59 of 174

Date Contract Notice. Lender's lien and security interest in the FHA Collateral shall be senior to all other liens, claims, and encumbrances with respect to all of the FHA Obligations to Lender, except as otherwise provided in the FHA MPT Intercreditor Agreement.

(c)  Holdco Collateral. To secure the prompt payment and performance of all Obligations under the Revolver, Holdco hereby grants to Lender a lien and continuing security interest in all of Holdco's assets, including, without limitation, all of Holdco's right, title, and interest in any Equipment, Inventory, Accounts, Chattel Paper, General Intangibles, Goods, Documents, Fixtures, Deposit Accounts (including the Reserves, the Revolver Reserve, the Swept Funds Account, the Effective Date Reserve, the Operating Reserve, and the FHA Administrative Reserve, but the Lender's lien rights in the FHA Administrative Reserve are subordinated to the administrative claims of the FHA Bankruptcy as and when they become finally Allowed), Instruments, Investment Property, Letter of Credit Rights, Software, Commercial Tort Claims (including the Specified Commercial Tort Claims), money, and all other property of Holdco pledged as security for the Obligations under the Revolver in any Loan Document, in each case, whether owned now or acquired after the date of this Agreement, and including all proceeds of the foregoing and all books and records related to the foregoing (all of the foregoing, the "Holdco Collateral"). Lender's lien and security interest in the Holdco Collateral shall be senior to all other liens, claims, and encumbrances.

(d)  GH 41 Collateral. To secure the prompt payment and performance of all of the FHA Obligations and all Obligations under the Revolver, GH 41 shall deliver to Lender the Peoria Deed of Trust pursuant to which GH 41 shall grant to Lender a lien and continuing security interest in all of the assets described therein, including the Peoria Property. To secure the prompt payment and performance of all of the Obligations under the Revolver, GH 41 shall deliver to Lender the GH 41 Security Agreement pursuant to which GH 41 shall grant to Lender a lien and continuing security interest in all of GH 41's assets, including, without limitation, all of GH 41's right, title, and interest in any Equipment, Inventory, Accounts, Chattel Paper, General Intangibles, Goods, Documents, Fixtures, Deposit Accounts, Instruments, Investment Property, Letter of Credit Rights, Software, Commercial Tort Claims (including the Specified Commercial Tort Claims), money, and all other property of GH 41 pledged as security for the Obligations under the Revolver in any Loan Document, in each case, whether owned now or acquired after the date of this Agreement, and including all proceeds of the foregoing and all books and records related to the foregoing. All of the foregoing collateral described in this paragraph shall be referred to as the "GH 41 Collateral." Lender's lien and security interest in the GH 41 Collateral shall be senior to all other liens, claims, and encumbrances.

(e)  LOC Collateral. Upon the Closing Date, Lender will return the Swept Funds to GH. The Swept Funds shall be maintained with Lender in a certificate of deposit or other interest-bearing instrument or deposit account (the "Swept Funds Account"), which shall serve as additional collateral for the LOC. On the Closing Date and from time to time, GH shall provide additional funds (together with the Swept Funds, the "LOC Collateral") as necessary to increase the amount in the Swept Funds Account to fully cash collateralize (i) the full amount of the LOC, (ii) any increases to the amount of the LOC, and (iii) any additional letter(s) of credit issued by Lender for the account of any Borrower (collectively, the "LOCs"). To secure the prompt payment and performance of all of the Obligations under the LOCs, GH hereby grants to Lender a lien and continuing security interest in the LOC Collateral, whether owned now or

21

acquired after the date of this Agreement, and including all proceeds of the foregoing. To the extent any of the LOCs is drawn, Lender shall have the right immediately to liquidate the LOC Collateral to the extent necessary to reimburse Lender for drawings on the LOCs. To the extent the LOCs are not drawn, and if Borrowers obtain the discharge of any liability of Lender under the LOCs by fully replacing the LOCs through another banking institution, fully retiring the LOCs, or otherwise, Lender shall release the LOC Collateral and its security interest therein, and Holdco will be entitled to the LOC Collateral and any interest accrued thereon. Lender is under no obligation to increase the amount of the LOC or to issue additional letters of credit for the account of any Borrower. If any of the LOCs remain outstanding after full payment of the GH Term Obligation, the FHA Term Obligation, and the Revolver (and, in the case of the Revolver, additional Advances are not permitted or the Revolver has been terminated), Borrowers shall take such action as is reasonable and necessary to cause Lender to be released from all liability under the LOCs. In default thereof, Lender will be entitled to retain the LOC Collateral and give notice of its intent not to renew any outstanding LOCs.

(f) <u>Revolver Reserve</u>. To the extent the Revolver has not been retired and paid in full when all LOCs are replaced, fully retired, or otherwise satisfied without being drawn as set forth herein, GH shall reserve from the Swept Funds the sum of $750,000 plus accrued unpaid interest, fees, and expenses under the Revolver (the "<u>Revolver Reserve</u>"), which shall secure repayment of all amounts due and owing under the Revolver. To secure the prompt payment and performance of all of the Obligations under the Revolver, GH hereby grants to Lender a lien and continuing security interest in the Revolver Reserve, whether owned now or acquired after the date of this Agreement, and including all proceeds of the foregoing. Once the Revolver has been retired and paid in full, the Revolver Reserve will be released to GH.

6.2    <u>No Assumption of Liability</u>. The security interests granted by this Agreement are given as security only and shall not subject Lender to, or in any way modify, any obligation or liability of any Borrower or GH 41 relating to any of the Collateral.

6.3    <u>Further Assurances</u>. Promptly upon request, Borrowers shall deliver, and shall cause GH 41 to deliver, such instruments, assignments, title certificates, or other documents or agreements, and shall take such actions, and cause GH 41 to take such action, as Lender deems appropriate to evidence or perfect Lender's liens and security interests in any of the Collateral, or otherwise to give effect to the intent of this Agreement.

6.4    <u>Commercial Tort Claims</u>. Borrowers represent and warrant to Lender that all of Borrowers' Commercial Tort Claims are set forth on <u>Schedule 6.4</u> (the "<u>Specified Commercial Tort Claims</u>"). If any Commercial Tort Claim arises after the date of this Agreement, the Borrower with an interest in such after acquired Commercial Tort Claim shall promptly (i) deliver to Lender a revised <u>Schedule 6.4</u> containing a description of such Commercial Tort Claim, and (ii) take all steps as Lender may request to grant to Lender a first priority lien therein.

Section 7.    <u>Representations and Warranties</u>. Borrowers each represent and warrant to Lender as follows:

22

7.1 <u>Legal Status</u>. Borrowers and GH 41 are each limited liability companies duly formed and existing in good standing under the laws of the State of Arizona. They do not do business in any jurisdiction except Arizona.

7.2 <u>Subsidiaries</u>. Neither any Borrower nor GH 41 owns any voting or economic interests in any other Person, except that Holdco owns 100% of the membership interests in GH and at least 97% of the membership interests in FHA, and GH owns 100% of the membership interests in GH 41.

7.3 <u>Authorization and Validity</u>. The execution, delivery, and performance of the Loan Documents have been duly authorized by all necessary organizational action by each Borrower and GH 41 and their respective governing bodies. Each Loan Document is an enforceable obligation of the signer thereof, except as enforceability may be limited by bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally. The Confirmation Order has become a Final Order.

7.4 <u>No Conflict</u>. The execution, delivery, and performance by Borrowers and GH 41 of this Agreement and the other Loan Documents do not and will not:

(a) violate the terms of the certificate of formation or limited liability company agreement of such party;

(b) violate any provision of any judgment, decree, or order of any court or governmental authority by which such party is bound, or any provision of any law or regulation applicable to such party, including without limitation, the Confirmation Order;

(c) result in a default under any contract, obligation, indenture, or other instrument to which such party is a party, except where such default would not reasonably be expected to have a Material Adverse Effect;

(d) result in or require the imposition of any lien or encumbrance on any of such party's property other than the liens imposed or required under the Loan Documents or the Confirmation Order; or

(e) require any authorization, approval, or other action by, or notice to, or filing with, any governmental authority, regulatory body, or any other Person, except the Confirmation Order.

7.5 <u>Indebtedness</u>. No Borrower has any outstanding Indebtedness that is not Permitted Indebtedness.

7.6 <u>Title to Properties</u>. Each Borrower and GH 41 has, as applicable, good, marketable, and indefeasible title to all of its material real and personal property, free and clear of all liens, charges, security interests, and encumbrances that are not Permitted Liens.

7.7 <u>Taxes</u>. Borrowers and GH 41 have filed all federal, state, and local tax returns and other reports that such Borrower and GH 41 is required by law to file, and has paid, or made provision for the payment of, all taxes upon it, its income, and its properties that are due and

23

payable, except to the extent (a) being contested diligently and in good faith by proper proceedings, (b) that would not have a Material Adverse Effect if such proceedings were to be adversely determined, (c) that adequate reserves for the payment of the taxes have been established in accordance with GAAP, and (d) that such party has delivered written notice thereof to Lender.

7.8    Litigation. There are no suits, proceedings, claims, or disputes pending or, to the knowledge of Borrowers, threatened against or affecting any Borrower, GH 41, or any of Borrowers' or GH 41's assets or properties that (a) relate to any of the Loan Documents or the transactions contemplated by the Loan Documents, or (b) if adversely determined, could reasonably be expected to have a Material Adverse Effect.

7.9    Compliance with Laws. Borrowers and GH 41 are in compliance in all material respects with all laws and regulations applicable to any Borrower, GH 41, and their respective business and properties.

7.10    Compliance with Environmental Laws. None of any Borrower's or GH 41's past or present operations or properties is subject to any federal, state, or local investigation to determine whether any remedial action is needed to address any environmental pollution, hazardous material, or environmental clean-up. Neither a Borrower nor GH 41 has received any notice of any possible noncompliance with, investigation of a possible violation of, litigation relating to, or potential fine or liability under, any Environmental Law, or with respect to any release, environmental pollution, or hazardous materials.

7.11    Locations of Collateral. Schedule 7.11 sets forth an accurate and complete list of each location where any Collateral is stored.

7.12    Financial Statements. The most recent balance sheet of each Borrower and GH 41 and the related financial statements provided to Lender are materially complete and correct and fairly present the financial condition of each Borrower and GH 41 as at the dates thereof in accordance with GAAP. Since the last monthly operating reports filed by GH and FHA in the GA Bankruptcy and the FHA Bankruptcy, respectively, no events have occurred that alone or together with other events have had or would reasonably be expected to have a Material Adverse Effect.

7.13    Liabilities. No Borrower or GH 41 has any material liabilities, fixed or contingent, that are not reflected in the financial statements delivered to Lender or that have not otherwise been disclosed in writing to Lender.

7.14    Solvency. Borrowers and GH 41 are presently Solvent.

7.15    Foreign Assets Control Regulations, Etc. Neither the receipt by Borrowers of the proceeds of the Loans nor Borrowers' use of the proceeds of the Loans will violate the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended), or any enabling legislation or executive order relating thereto.

24

(a)     Borrowers and GH 41 (i) are not Persons described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Executive Order No. 13,244 of September 24, 2011, and (ii) do not engage in any dealings or transactions with any such Person. Borrowers and GH 41 are in compliance, in all material respects, with the USA PATRIOT Act.

(b)     No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain, or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, assuming in all cases that such Act applies to Borrowers and GH 41.

7.16    Complete Disclosure. No Loan Document contains any untrue statement of a material fact or fails to disclose any material fact. Borrowers and GH 41 have disclosed to Lender in writing any fact or circumstance that could reasonably be anticipated to have a Material Adverse Effect.

Section 8.     Affirmative Covenants. Until all Obligations have been satisfied in full, Borrowers and GH 41 shall comply with the following covenants:

8.1     Payment of Indebtedness. Each Borrower and GH 41 shall promptly pay all of its Indebtedness as it becomes due, except to the extent that any such Indebtedness (other than the Obligations) is being contested diligently and in good faith and for which reserves or other provisions (if any) required by GAAP shall have been made.

8.2     Existence. Each Borrower and GH 41 shall do or cause to be done all things necessary to preserve, renew, and keep in full force and effect its existence and comply with the provisions of its organizational documents.

8.3     Compliance with Laws; Licenses. Each Borrower and GH 41 shall comply in all material respects with all laws, rules, regulations, and orders applicable to each Borrower and GH 41, respectively, their respective business or their respective properties. Each Borrower and GH 41 shall maintain all licenses, permits, governmental approvals, and franchises necessary for the conduct of its respective business.

8.4     Taxes. Each Borrower and GH 41 shall pay when due all federal, state, and local taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits or upon any of its properties, except, to the extent contested diligently and in good faith by proper proceedings that stay the imposition of any penalty, fine, or lien resulting from the non-payment thereof and with respect to which adequate reserves have been established in accordance with GAAP.

8.5     Collateral.

(a)     Location of Collateral. Each Borrower and GH 41 shall maintain all material items of Collateral that is not real property at a location that is either owned or leased by the particular Borrower or GH 41.

25

(b)  Records with Respect to Collateral. Each Borrower and GH 41 shall keep accurate and complete records of its respective Collateral, including acquisitions and dispositions of Collateral, and shall submit the records to Lender upon request.

(c)  Condition of Collateral. Each Borrower and GH 41 shall maintain all of its Goods in good operating condition and repair, and make all necessary replacements and repairs so that the value and operating efficiency of such Borrower's or GH 41's Goods shall be preserved at all times, reasonable wear and tear excepted. Each Borrower and GH 41 shall keep all Collateral from being affixed to any real property that is not subject to a mortgage in favor of Lender.

8.6  Inspection. Each Borrower and GH 41 shall permit Lender from time to time, subject (except when a default exists) to reasonable notice, to visit and inspect the Collateral and the other properties and operations of such Borrower or GH 41, inspect and audit such Borrower's or GH 41's books and records, and discuss such Borrower's or GH 41's business, assets, prospects, and results of operations with its officers, management-level employees, agents, accountants, and advisors. Borrowers shall reimburse, or shall cause GH 41 to reimburse, Lender for all its reasonable charges, costs, and expenses incurred in connection with any of the foregoing.

8.7  Accounts Audit. Not later than 150 days following the date of this Agreement, Borrowers shall permit, and if GH 41 has any accounts receivable at the time of audit shall cause GH 41 to permit, an accounts receivables audit, at Borrowers' expense, by a third party auditing firm selected by Lender in its reasonable discretion. Thereafter, Borrowers shall permit, and shall cause GH 41 to permit, and reimburse Lender for, up to two such audits each calendar year.

8.8  Insurance. Each Borrower and GH 41 shall maintain and keep in force the insurance policies reasonably required by Lender from time to time. The insurance policies of Borrowers and GH 41 shall contain an endorsement, in form and substance satisfactory to Lender, describing Lender as an additional insured or loss payee, as applicable, and providing that the insurance company shall give Lender 30 days prior written notice (10 days in the event of cancellation for non-payment of premiums) before such policies are altered, canceled or expired.

8.9  Deposit Accounts. Each Borrower and GH 41 shall maintain all of its Deposit Accounts with Lender. Notwithstanding the foregoing, each of GH and FHA may establish a single Deposit Account, respectively, with a financial institution acceptable to Lender in its reasonable discretion into which GH and FHA may deposit cash receipts, (i) which Deposit Accounts shall be and remain subject to Lender's control pursuant to a control agreement acceptable to Lender in its sole discretion, (ii) which funds deposited into such Deposit Accounts shall not exceed $50,000 in any day, and (iii) which funds deposited into such Deposit Accounts shall be swept daily into one or more Deposit Accounts maintained with Lender.

8.10  Operating Reserve. Holdco shall establish one or more operating reserves to fund Borrowers' ongoing operations (the "Operating Reserve"). The Operating Reserve shall be deemed fully funded at $10,000,000. Funds comprising the Operating Reserve shall not be considered in calculating the Borrowing Base.

26

8.11     Reporting Obligations.

(a)     Quarterly Reports. Within 45 days after the close of each fiscal quarter of Borrowers and GH 41, Borrowers shall provide, and shall cause GH 41 to provide, to Lender an unaudited balance sheet of each Borrower and GH 41 and the related statements of income and shareholders' equity for such fiscal quarter, together with a certification by the entity's responsible financial officer that such financial statements are complete and correct, present the financial conditions at the end of such period and the results of its operation during such period in accordance with GAAP, consistently applied, and certifying, in a form satisfactory to Lender, that the particular Borrower or GH 41 has not been and is not then in default as to any of the covenants contained in this Agreement or any of the Loan Documents and that there was no known Event of Default (or specifying those Events of Default of which he or she is aware).

(b)     Annual Reports. Within 120 days after the close of each fiscal year of each Borrower and GH 41, each Borrower shall provide, and shall cause GH 41 to provide, to Lender a balance sheet of such Borrower or GH 41 and the related statements of income and shareholders' equity for such fiscal year; provided, however, that such financial statements shall not be required for the fiscal year ending December 31, 2015. Such financial statements shall be reviewed by an independent accounting firm reasonably acceptable to Lender. For the avoidance of doubt, the fiscal year of each Borrower and GH 41 ends December 31 of each year.

(c)     Tax Returns. Within 10 days of the filing of each Borrower's and GH 41's annual state (if any) or federal tax returns (which shall be not later than April 15 of each year, unless such Borrower or GH 41 provides to Lender copies of applicable state and federal forms extending the deadline for filing such returns), Borrowers shall provide, and shall cause GH 41 to provide, to Lender a true and correct copy of such tax return.

(d)     Compliance Certificate. Concurrently with delivery of the financial statements required by Sections 8.11(a) and (b), each Borrower shall deliver, and shall cause GH 41 to deliver, to Lender a compliance certificate in the form of Exhibit G.

(e)     Notice of Litigation. Immediately following knowledge thereof, each Borrower shall deliver, and shall cause GH 41 to deliver, to Lender written notice of any litigation that is pending or threatened against a Borrower or GH 41 that, if adversely determined, would have a Material Adverse Effect.

(f)     Notice of Default. Immediately following knowledge of any default or Event of Default under any Loan Document, each Borrower shall deliver, and shall cause GH 41 to deliver, to Lender written notice of the default or Event of Default together with a reasonably detailed description of the default or Event of Default.

(g)     Commercial Tort Claims. Immediately following knowledge of the existence of any Commercial Tort Claim (other than a Specified Commercial Tort Claim), each Borrower shall deliver to Lender written notice thereof together with a reasonably detailed description thereof in accordance with Section 6.4.

27

(h)    <u>Other Information</u>. Promptly upon request, each Borrower shall provide, and shall cause GH 41 to provide, Lender with any other information or reports that Lender reasonably requests.

8.12    <u>Option Agreement</u>. GH shall comply with all terms and obligations set forth in the Option Agreement, provided that GH may elect not to exercise the option rights set forth therein. In the event that GH elects to exercise its option rights, GH shall deliver or cause to be delivered to Lender a deed of trust on the Adjacent Property as additional security for the GH Term Obligation and a policy of title insurance as required by Lender in its sole discretion with respect to the Adjacent Property, and shall comply with all other obligations required under the Option Agreement set forth therein.

8.13    <u>Appraisals</u>. If deemed reasonably necessary by Lender, if required by law, or if otherwise required in connection with any provision of any of the Loan Documents, and in any event at least annually, Lender shall have the right to order an appraisal of the Peoria Property, and the Adjacent Property in the event Lender obtains a lien on the Adjacent Property pursuant to the terms of the Option Agreement, from time to time from an appraiser selected by Lender, at Borrowers' sole cost and expense, which appraisals shall comply with all federal and state standards for appraisals and otherwise shall be satisfactory to Lender in all respects; provided, however, that so long as no Event of Default shall exist and be continuing, Borrowers shall not be required to pay for more than one appraisal per calendar year.

8.14    <u>Certain Post-Closing Obligations</u>. As promptly as practicable, and in any event within the time periods after the Closing Date specified in <u>Schedule 8.14</u>, the Borrowers shall deliver the documents or take the actions specified on <u>Schedule 8.14</u>.

Section 9.    <u>Negative Covenants</u>. Borrowers covenant and agree with Lender, so long as the Obligations remain outstanding, as follows:

9.1    <u>Existence of Liens</u>. Neither a Borrower nor GH 41 shall create or permit to exist any lien, mortgage, security interest, or encumbrance on any of the assets of any Borrower or GH 41, except for Permitted Liens.

9.2    <u>Restrictions on Debt</u>. Neither a Borrower nor GH 41 shall create or permit to exist any Indebtedness of any Borrower or GH 41 that is not Permitted Indebtedness.

9.3    <u>Sale of Assets</u>. Borrowers and GH 41 shall not, without Lender's prior written consent, sell, transfer, convey, or otherwise dispose of, whether pursuant to a single transaction or a series of transactions, any of their respective material assets, other than (a) the sale of inventory in the ordinary course of business, and (b) the disposition of worn or obsolete equipment in the ordinary course of business. Notwithstanding the foregoing, Lender hereby consents to any sale of the Adjacent Property pursuant to the terms of the Option Agreement.

9.4    <u>Purchase of Assets</u>. Borrowers and GH 41 shall not, whether pursuant to a single transaction or a series of transactions: (a) purchase, lease, or otherwise acquire any material assets except (i) as provided in the Amended Joint Plan or (ii) as needed in the ordinary course of business not to exceed $200,000.00 in the aggregate per calendar for GH and $150,000.00 in the

28

aggregate per calendar year for FHA; nor (b) make any material capital expenditure except as may be required by applicable leases or the Amended Joint Plan.

9.5 <u>Changes in Structure</u>. Borrowers and GH 41 shall not, without Lender's prior written consent: (a) merge or consolidate with any Person (or enter into any merger or consolidation agreement or plan), or permit any such merger or consolidation with it; (b) sell all or substantially all of their respective assets; (c) make any material change in the nature of or manner in which it conducts its business; (d) issue any Indebtedness convertible into any equity interest; (e) issue any equity interests or rights convertible into equity interests; or (f) agree to do any of the foregoing.

9.6 <u>Change of Name; Amendments to Organic Documents</u>. Neither a Borrower nor GH 41 shall change its name or otherwise amend its certificate of formation or limited liability company agreement without Lender's prior written consent, not to be unreasonably withheld.

9.7 <u>Distributions</u>. Borrowers and GH 41 shall not pay any dividends, or make any distributions or similar payments (except as provided for under the Amended Joint Plan, e.g., Borrowers shall make the Tax Distributions required under the terms of the Amended Joint Plan), or incur or permit to exist any lien or restriction on any such payments (except for restrictions and liens arising under the Loan Documents or permitted under the Amended Joint Plan).

9.8 <u>Loans and Investments</u>. Neither a Borrower nor GH 41 shall make any loans to, or investments in, any Person, except for (a) advances to employees for travel expenses and similar items in the ordinary course of business, and (b) extensions of trade credit in the ordinary course of business.

9.9 <u>Subsidiaries</u>. Neither a Borrower nor GH 41 shall form or acquire any subsidiary.

9.10 <u>Collection of Accounts</u>. Borrowers and GH 41 shall collect their respective Accounts in the ordinary course of business, and will not make any discount, credit, rebate or other reduction in the original amount owing except, prior to an Event of Default, for ordinary course reductions in accordance with existing policies.

9.11 <u>Expenses</u>. Holdco shall allocate all shared expenses between GH and FHA on a pro rata basis based upon the net patient revenues of each of GH and FHA.

9.12 <u>Reserves</u>. On the date hereof, Senior Management shall have established such Reserves as it deems reasonably necessary for operational expenses and capital expenditures of Borrowers. From time to time thereafter, Senior Management shall replenish or increase such Reserves as they in good faith deem reasonably necessary, and subject to the restrictions and requirements for funding of the Amended Joint Plan, including but not limited to, as necessary, the Effective Date Reserve and/or the Operating Reserve.

Section 10. <u>Financial Covenants</u>.

10.1 <u>Debt Service Coverage Ratio</u>. Borrowers jointly will have and maintain a minimum Debt Service Coverage Ratio of 1.25:1.0 using a trailing 3-month average.

29

10.2 <u>Net Operating Margin</u>. Holdco, on a consolidated basis with its subsidiaries, shall, commencing on March 30, 2016, and calculated on a rolling 90-day (3 month) average, maintain at all times a Net Operating Margin of not less than 6.5%.

10.3 <u>FHA Financial Covenants</u>. FHA shall comply with the following financial covenants:

(a) <u>Tangible Net Worth</u>. FHA shall maintain Tangible Net Worth of not less than the amounts set forth below for the applicable period, which shall be tested annually based upon trailing 12-month operating and financial results for the applicable calendar years:

| Test Date | Amount |
| --- | --- |
| As of December 31, 2016 | FHA Initial Tangible Net Worth plus $1,500,000 |
| As of December 31, 2017 | FHA Initial Tangible Net Worth plus $3,000,000 |
| As of December 31, 2018 | FHA Initial Tangible Net Worth plus $4,500,000 |
| As of December 31, 2019 | FHA Initial Tangible Net Worth plus $6,000,000 |

(b) <u>EBITDAR Coverage</u>. FHA shall not permit (A) the total of its EBITDAR plus any GH subsidy of payments due by FHA to Lender to be less than 100% of its Fixed Charges at any time, and (B) its EBITDAR to be less than the percentages of its Lease Payments set forth below for the applicable period:

| Test Date | Amount |
| --- | --- |
| As of December 31, 2016 | 100% of FHA's Lease Payments |
| As of December 31, 2017 | 125% of FHA's Lease Payments |
| As of December 31, 2018 | 150% of FHA's Lease Payments |
| As of March 31, 2019 and each June 30, September 30, December 31, and March 31 thereafter | 150% of FHA's Lease Payments |

This covenant shall be tested (A) annually for years ending December 31, 2016, December 31, 2017, and December 31, 2018, based on FHA's year-end, trailing 12-month operating and financial results for the applicable calendar years, and (B) quarterly beginning March 31, 2019, based on FHA's trailing 12-month operating and financial results for the applicable period.

(c) <u>Net Operating Margin</u>. FHA shall, commencing on March 30, 2016, and calculated on a rolling 180-day (6-month) average maintain at all times a Net Operating Margin of not less than 6.5%.

30

10.4 <u>GH Financial Covenants</u>. GH shall comply with the following financial covenants:

(a) <u>Tangible Net Worth</u>. GH shall maintain Tangible Net Worth of not less than the amounts set forth below for the applicable period, which shall be tested annually based upon trailing 12-month operating and financial results for the applicable calendar years:

| Test Date | Amount |
|---|---|
| As of December 31, 2016 | GH Initial Tangible Net Worth plus $1,500,000 |
| As of December 31, 2017 | GH Initial Tangible Net Worth plus $3,000,000 |
| As of December 31, 2018 | GH Initial Tangible Net Worth plus $4,500,000 |
| As of December 31, 2019 | GH Initial Tangible Net Worth plus $6,000,000 |

(b) EBITDAR Coverage. GH shall not permit (A) the total of its EBITDAR less any GH subsidy of payments due by FHA to Lender to be less than 125% of its Fixed Charges at any time, and (B) its EBITDAR to be less than 150% of its Lease Payments at any time. This covenant shall be tested based on GH's trailing 12-month operating and financial results for the applicable period and measured on a quarterly basis beginning the quarter ending March 31, 2016.

(c) <u>Net Operating Margin</u>. GH shall, commencing on June 30, 2016, and calculated on a rolling 180-day (6-month) average, maintain at all times a Net Operating Margin of not less than 6.5%.

Section 11. <u>Events of Default</u>.

11.1 <u>GH Event of Default</u>. The occurrence of any of the following shall constitute a "<u>GH Event of Default</u>":

(a) <u>Non-Payment of Loans</u>. The failure of GH or Holdco to pay any principal, interest, or other Obligation owing by GH or Holdco under any of the Loan Documents when due and payable, and, unless occurring at maturity, such failure continues for 10 days after the due date thereof.

(b) <u>Breach of Covenant</u>. A default by GH or Holdco in any of the covenants set forth in <u>Sections 8</u>, <u>9</u>, or <u>10</u> of this Agreement or a default by GH, Holdco, or GH 41 of any of their respective covenants or agreements in the Loan Documents that remains uncured for 30 days after receipt of notice thereof from Lender.

(c) <u>Event of Default Under Loan Documents or Plan</u>. The occurrence of an event of default or breach of any of GH's, Holdco's, or GH 41's obligations under the Amended Joint Plan.

31

(d) <u>Breach of Representation or Warranty.</u> Any representation, statement, certificate, schedule, or report made or furnished to Lender by or on behalf of GH, Holdco, or GH 41 in, or in connection with, the Loan Documents being false when made or deemed made.

(e) <u>Change in Control.</u> The occurrence of any Change in Control of GH, Holdco, or GH 41.

(f) <u>Destruction of Collateral.</u> A loss, theft, damage, or destruction occurs with respect to any Collateral owned by GH, Holdco, or GH 41, and the amount not covered by insurance exceeds $100,000.

(g) <u>Insolvency.</u> (a) GH, Holdco, or GH 41 ceases to be Solvent, (b) GH, Holdco, or GH 41 admits in writing its inability to pay its debts as they mature, (c) GH, or GH 41 makes an assignment for the benefit of creditors, or (d) bankruptcy proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors are instituted by or against GH (other than the GH Bankruptcy), Holdco, or GH 41 and, if instituted against any such entity, the same is not dismissed within 30 days of the filing thereof.

(h) <u>Dissolution.</u> Any order, judgment, or decree is entered against GH, Holdco, or GH 41 decreeing its involuntary dissolution or split up and such order shall remain undischarged and unstayed for a period in excess of 30 days, or GH, Holdco, or GH 41 shall otherwise dissolve or cease to exist.

(i) <u>Levy Judgment.</u> An attachment or garnishment writ, or the like, is levied against all or any portion of the assets of GH, Holdco, or GH 41 or a judgment for the payment of money is rendered against GH, Holdco, or GH 41 and within 30 days from the entry of judgment has not been discharged, satisfied, or released, or stayed pending appeal or, if any such judgment is affirmed on appeal, has not been discharged, satisfied, or released within 30 days from the entry of the final order of affirmance on appeal.

(j) <u>Other Debts.</u> A default or event of default occurs in any Indebtedness of GH, Holdco, or GH 41 in excess of $10,000.

(k) <u>Material Adverse Effect.</u> A Material Adverse Effect occurs with respect to GH, Holdco, or GH 41.

(l) <u>Failure of Perfection.</u> The security interests granted to Lender by GH, Holdco, or GH 41 fail or cease to create a valid and perfected and, except to the extent otherwise permitted by this Agreement, first priority lien in favor of Lender either (i) due to action or inaction of GH, Holdco, or GH 41 or (ii) GH, Holdco, or GH 41 fails or refuses to take all necessary action to remedy the situation.

11.2 <u>FHA Event of Default.</u> The occurrence of any of the following shall constitute an "FHA Event of Default":

(a) <u>Non-Payment of Loans.</u> The failure of FHA or Holdco to pay any principal, interest, or other Obligation owing by FHA or Holdco under any of the Loan

32

Documents when due and payable, and, unless occurring at maturity, such failure continues for 10 days after the due date thereof.

(b) <u>Breach of Covenant</u>. A default by FHA or Holdco in any of the covenants set forth in <u>Sections 8</u>, <u>9</u>, or <u>10</u> of this Agreement or a default by FHA, Holdco, or GH 41 of any of their respective covenants or agreements in the Loan Documents that remains uncured for 30 days after receipt of notice thereof from Lender.

(c) <u>Event of Default Under Loan Documents or Plan</u>. The occurrence of an event of default or breach of any of FHA's, Holdco's, or GH 41's obligations under the Amended Joint Plan.

(d) <u>Breach of Representation or Warranty</u>. Any representation, statement, certificate, schedule, or report made or furnished to Lender by or on behalf of FHA, Holdco, or GH 41 in the Loan Documents being false when made or deemed made.

(e) <u>Change in Control</u>. The occurrence of any Change in Control of FHA, Holdco, or GH 41.

(f) <u>Destruction of Collateral</u>. A loss, theft, damage, or destruction occurs with respect to any Collateral owned by FHA, Holdco, or GH 41, and the amount not covered by insurance exceeds $100,000.

(g) <u>Insolvency</u>. (a) FHA, Holdco, or GH 41 ceases to be Solvent, (b) FHA, Holdco, or GH 41 admits in writing its inability to pay its debts as they mature, (c) FHA, Holdco, or GH 41 makes an assignment for the benefit of creditors, or (d) bankruptcy proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors are instituted by or against FHA (other than the FHA Bankruptcy), Holdco, or GH 41 and, if instituted against any such entity, the same is not dismissed within 30 days of the filing thereof.

(h) <u>Dissolution</u>. Any order, judgment, or decree is entered against FHA, Holdco, or GH 41 decreeing its involuntary dissolution or split up and such order shall remain undischarged and unstayed for a period in excess of 30 days, or FHA, Holdco, or GH 41 shall otherwise dissolve or cease to exist.

(i) <u>Levy Judgment</u>. An attachment or garnishment writ, or the like, is levied against all or any portion of the assets of FHA, Holdco, or GH 41 or a judgment for the payment of money is rendered against FHA, Holdco, or GH 41 and within 30 days from the entry of judgment has not been discharged, satisfied, or released, or stayed pending appeal or, if any such judgment is affirmed on appeal, has not been discharged, satisfied, or released within 30 days from the entry of the final order of affirmance on appeal.

(j) <u>Other Debts</u>. A default or event of default occurs in any Indebtedness of FHA, Holdco, or GH 41 in excess of $10,000.

(k) <u>Material Adverse Effect</u>. A Material Adverse Effect occurs with respect to FHA, Holdco, or GH 41.

33

(l)    Failure of Perfection. The security interests granted to Lender by FHA, Holdco, or GH 41 fail or cease to create a valid and perfected and, except to the extent otherwise permitted by this Agreement, first priority lien in favor of Lender either (i) due to action or inaction of FHA, Holdco, or GH 41 or (ii) FHA, Holdco, or GH 41 fails or refuses to take all necessary action to remedy the situation.

11.3    Revolver Event of Default. The occurrence of any of the following shall constitute a "Revolver Event of Default":

(a)    Non-Payment of Revolver. The failure of Borrowers to pay any principal, interest, or other Obligation owing under any of the Loan Documents with respect to the Revolver when due and payable, and, unless occurring at maturity, such failure continues for 10 days after the due date thereof.

(b)    Failure of Perfection. The security interests granted to Lender by Borrowers as security for the Revolver fail or cease to create a valid and perfected and, except to the extent otherwise permitted by this Agreement, first priority lien in favor of Lender either (i) due to action or inaction of Borrowers or (ii) Borrowers fail or refuse to take all necessary action to remedy the situation.

(c)    Insolvency. (a) a Borrower or GH 41 ceases to be Solvent, (b) a Borrower or GH 41 admits in writing its inability to pay its debts as they mature, (c) a Borrower or GH 41 makes an assignment for the benefit of creditors, or (d) bankruptcy proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors are instituted by or against a Borrower (other than the GH Bankruptcy or the FHA Bankruptcy) or GH 41 and, if instituted against any such entity, the same is not dismissed within 30 days of the filing thereof.

Section 12.    Remedies.

12.1    Remedies for GH Event of Default. If a GH Event of Default shall occur, then during the continuance thereof:

(a)    All GH Obligations and all Obligations under the Revolver, notwithstanding any term of this Agreement or the other Loan Documents to the contrary, shall at Lender's option (which shall be deemed to have been exercised immediately upon the occurrence of a GH Event of Default pursuant to Section 11.1(g)) and without advance notice become immediately due and payable, without presentment, demand, protest, or notice of dishonor, all of which are hereby expressly waived by Borrowers. Lender shall give Borrowers notice of the exercise of its option to accelerate after the fact, but failure to give such notice shall not affect an acceleration.

(b)    Lender shall have all rights, powers, and remedies available under the Amended Joint Plan or any of the Loan Documents or accorded by law with respect to the GH Obligations and/or the Obligations under the Revolver, including, without limitation, the right to resort to any or all security for the GH Obligations and/or the Obligations under the Revolver, and to exercise any or all of the rights of a beneficiary or secured party pursuant to applicable law.

34

(c)     Lender may require any Borrower and/or GH 41 to assemble Collateral securing the GH Obligations and the Obligations under the Revolver owned by or in the control of such party at such party's expense, and make it available to Lender at a place designated by Lender.

(d)     Lender may enter any premises where Collateral securing the GH Obligations and/or the Obligations under the Revolver is located and, without charge by any Borrower or GH 41, store such Collateral on such premises until sold (which sale may be conducted on such premises).

(e)     Borrowers agree that 10 calendar days' notice of any proposed sale or other disposition of Collateral securing the GH Obligations and/or the Obligations under the Revolver by Lender shall be reasonable. Lender shall have the right to sell, lease, or otherwise dispose of any Collateral securing the GH Obligations and/or the Obligations under the Revolver for cash, credit, or any combination thereof, and Lender may purchase any such Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may set off the amount of such price against the GH Obligations and/or the Obligations under the Revolver. All rights, powers, and remedies of Lender in connection with the GH Obligations and/or the Obligations under the Revolver may be exercised at any time by Lender and from time to time after the occurrence of a GH Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers, or remedies provided by law or equity.

12.2     Remedies for FHA Event of Default. If an FHA Event of Default shall occur, then during the continuance thereof:

(a)     All FHA Obligations, all Obligations under the GH Guaranty subject to the provisions of Section 2.6, and all Obligations under the Revolver, notwithstanding any term of this Agreement or the other Loan Documents to the contrary, shall at Lender's option (which shall be deemed to have been exercised immediately upon the occurrence of an FHA Event of Default pursuant to Section 11.2(g)) and without advance notice become immediately due and payable, without presentment, demand, protest, or notice of dishonor, all of which are hereby expressly waived by Borrowers. Lender shall give Borrowers notice of the exercise of its option to accelerate after the fact, but failure to give such notice shall not affect an acceleration.

(b)     Lender shall have all rights, powers, and remedies available under the Amended Joint Plan or any of the Loan Documents or accorded by law with respect to the FHA Obligations, all Obligations under the GH Guaranty, and/or the Obligations under the Revolver, including, without limitation, the right to resort to any or all security for the FHA Obligations, the Obligations under the GH Guaranty, and/or the Obligations under the Revolver, and to exercise any or all of the rights of a beneficiary or secured party pursuant to applicable law.

(c)     Lender may require any Borrower and/or GH 41 to assemble Collateral securing the FHA Obligations, the Obligations under the GH Guaranty, and/or the Obligations under the Revolver owned by or in the control of such party at such party's expense, and make it available to Lender at a place designated by Lender.

(d)     Lender may enter any premises where Collateral securing the FHA Obligations, the Obligations under the GH Guaranty, and/or the Obligations under the Revolver is located and, without charge by any Borrower or GH 41, store such Collateral on such premises until sold (which sale may be conducted on such premises).

(e)     Borrowers agree that 10 calendar days' notice of any proposed sale or other disposition of Collateral securing the FHA Obligations, the Obligations under the GH Guaranty, and/or the Obligations under the Revolver by Lender shall be reasonable. Lender shall have the right to sell, lease, or otherwise dispose of any Collateral securing the FHA Obligations, the Obligations under the GH Guaranty, and/or the Obligations under the Revolver for cash, credit, or any combination thereof, and Lender may purchase any such Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may set off the amount of such price against the FHA Obligations, the Obligations under the GH Guaranty, and/or the Obligations under the Revolver. All rights, powers, and remedies of Lender in connection with the FHA Obligations, the Obligations under the GH Guaranty, and/or the Obligations under the Revolver may be exercised at any time by Lender and from time to time after the occurrence of an FHA Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers, or remedies provided by law or equity.

12.3    Remedies for Revolver Event of Default. If a Revolver Event of Default shall occur, then during the continuance thereof:

(a)     All Obligations, notwithstanding any term of this Agreement or the other Loan Documents to the contrary, shall at Lender's option (which shall be deemed to have been exercised immediately upon the occurrence of a Revolver Event of Default pursuant to Section 11.3(c)) and without advance notice become immediately due and payable, without presentment, demand, protest, or notice of dishonor, all of which are hereby expressly waived by Borrowers. Lender shall give Borrowers notice of the exercise of its option to accelerate after the fact, but failure to give such notice shall not affect an acceleration.

(b)     Lender shall have all rights, powers, and remedies available under the Amended Joint Plan or any of the Loan Documents or accorded by law, including, without limitation, the right to resort to any or all security for the Obligations and to exercise any or all of the rights of a beneficiary or secured party pursuant to applicable law.

(c)     Lender may require a Borrower or GH 41 to assemble Collateral owned by or in the control of such Borrower or GH 41 at such Borrower's or GH 41's expense, and make it available to Lender at a place designated by Lender.

(d)     Lender may enter any premises where Collateral is located and, without charge by a Borrower or GH 41, store Collateral on such premises until sold (which sale may be conducted on such premises).

(e)     Borrowers agree that 10 calendar days' notice of any proposed sale or other disposition of Collateral by Lender shall be reasonable. Lender shall have the right to sell, lease, or otherwise dispose of any Collateral for cash, credit, or any combination thereof, and Lender may purchase any Collateral at public or, if permitted by law, private sale and, in lieu of actual

36

payment of the purchase price, may set off the amount of such price against the Obligations. All rights, powers, and remedies of Lender in connection with the Obligations may be exercised at any time by Lender and from time to time after the occurrence of a Revolver Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers, or remedies provided by law or equity.

Section 13.    License. Upon the occurrence of an Event of Default, Borrowers hereby irrevocably constitute and appoint Lender, and any officer or agent of Lender, with full power of substitution, as such Borrowers' true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Borrower or in Lender's own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or useful to accomplish the purposes of this Agreement and the other Loan Documents, and, without limiting the generality of the foregoing, hereby gives such attorneys the power and right, on behalf of such Borrower, without notice to or assent by such Borrower, to do the following: (a) to indorse and collect any cash proceeds of the Collateral; (b) to apply the proceeds of any Collateral received by Lender to the Obligations; and (c) to discharge past due taxes, assessments, charges, fees, or liens on the Collateral. The particular Borrower shall reimburse Lender on demand for any payment made or any expense incurred by Lender in connection therewith, provided that this authorization shall not relieve any Borrower of any of its obligations under any of the Loan Documents.

Section 14.    Miscellaneous.

14.1    Failure or Indulgence Not Waiver. No failure or delay on the part of Lender in the exercise of any power, right, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof or of any other right, power, or privilege. All rights and remedies existing under this Agreement and the other Loan Documents are cumulative, and not exclusive of any rights or remedies otherwise available.

14.2    Modification. No modification, amendment, or waiver of any provision of this Agreement or the other Loan Documents, nor the consent to any departure by a Borrower or GH 41 therefrom, shall be effective unless in writing signed by Lender and Borrowers. No notice to or demand on a Borrower in any case shall entitle such Borrower to any other or further notice or demand in the same, similar, or other circumstances.

14.3    USA PATRIOT Act. Lender hereby notifies Borrowers that pursuant to the requirements of the USA PATRIOT Act, Lender may be required to obtain, verify, and record information that identifies a Borrower, including the name and address of such Borrower and other information that will allow Lender to identify Borrowers in accordance with the USA PATRIOT Act.

14.4    Indemnification. Borrowers shall indemnify Lender and all of its officers, employees, directors, attorneys, agents, affiliates, successors, and assigns (each, an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, and related expenses (including the fees, charges, and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by a Borrower or GH 41 arising out of, in connection with, or as a result of (a)

37

the execution or delivery of this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, or the consummation of the transactions contemplated hereby or thereby, (b) any Loan or the use or proposed use of the proceeds therefrom, (c) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by a Borrower, GH 41, or any subsidiaries, or any environmental liability related in any way to a Borrower, GH 41, or any subsidiaries, or (d) any actual or prospective claims, litigation, investigation, or proceeding relating to any of the foregoing, whether based on contract, tort, or any other theory, whether brought by a third party or by a Borrower or GH 41, and regardless of whether any Indemnitee is party thereto. Except that, this indemnity does not apply to the extent that the loss or liability was occasioned by the gross negligence or willful misconduct of Indemnitee.

14.5    <u>Notices</u>. Except as otherwise expressly provided herein, any notice herein required or permitted to be given shall be in writing and shall be deemed effective when delivered personally, by certified mail, return receipt requested, or by FedEx or other national overnight courier to the appropriate party at the address set forth below (or at such other address as may be designated by either party in a written notice sent in accordance with this section):

| | |
|---|---|
| If to GH: | Gilbert Hospital, LLC<br>5656 S. Power Rd., Suite 133<br>Gilbert, AZ 85295<br>Attn: Dennis Rutherford, CFO |
| If to FHA: | Florence Hospital at Anthem, LLC<br>4545 N. Hunt Hwy<br>Florence, AZ 85232<br>Attn: Dennis Rutherford, CFO |
| If to Holdco: | New Vision Health, LLC<br>5656 S. Power Rd., Suite 133<br>Gilbert, AZ 85295<br>Attn: Dennis Rutherford, CFO |
| If to Lender: | Bank SNB<br>6301 Waterford Boulevard, Suite 101<br>Oklahoma City, OK 73118<br>Attn: General Counsel |

With additional copies to the same street address, but:

Attn: Chief Credit Officer
and
Attn: Director of Managed Assets

14.6    <u>Severability</u>. In case any provision in this Agreement or the other Loan Documents shall be invalid, illegal, or unenforceable, such provision shall be severable from the

38

remainder of such contract and the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

14.7 <u>Construction</u>. The rule of construction that a document is to be construed most strictly against the party who drafted the document shall not be applicable because all parties participated in the preparation of this Agreement and the other Loan Documents. "Includes" and "including" are not limiting. References to exhibits shall be to exhibits to this Agreement.

14.8 <u>Dates for Payment and Performance</u>. If payment or performance of any Obligation under the Loan Documents is required on a day that is not a Business Day, the payment or performance of the Obligation shall be due on the next succeeding Business Day.

14.9 <u>Applicable Law</u>. The laws of the State of Oklahoma shall govern this Agreement and the other Loan Documents, and the legal relations between the parties arising therefrom without giving effect to any conflict of law provision (whether of the State of Oklahoma or any other jurisdiction) that would cause the application of the law of any other jurisdiction.

14.10 <u>Assignability</u>. No Borrower may assign its rights or obligations under this Agreement or the other Loan Documents to any other Person without the prior written consent of Lender, and any attempted assignment in violation hereof shall be null and void ab initio.

14.11 <u>Participations</u>. Lender is authorized to assign or sell all or any portion of the Loans and to sell participation interests in the Loans, and Borrowers agree that each holder of a participation interest or subsequent holder of the Loans will be entitled to rely on the terms of the Loan Documents. Borrowers authorize Lender to disclose all financial and other information about Borrowers in connection with the sale of the Loans or of participation interests in the Loans. Borrowers ratify any such actions taken prior to the date of this Agreement.

14.12 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile, e-mail, .pdf, or other electronic transmission shall constitute effective execution and delivery of this Agreement and may be used in lieu of the original Agreement for all purposes.

14.13 <u>Further Assurances</u>. At any time or from time to time upon the request of Lender, each Borrower shall, and shall take affirmative steps to cause GH 41 and other third parties to, execute and deliver such further documents and do such other acts and things as Lender may reasonably request in order to effect fully the purposes of this Agreement, the Amended Joint Plan, the Confirmation Order, and the other Loan Documents and to provide for the payment of the Obligations in accordance with the terms of this Agreement and the other Loan Documents.

14.14 <u>Costs and Expenses</u>. Borrowers shall pay all reasonable out-of-pocket fees and expenses incurred by Lender and its affiliates (including legal fees) after the Effective Date in connection with the administration and enforcement of the Loan Documents or the protection of Lender's rights under the Loan Documents, including all out-of-pocket expenses incurred during any workout, restructuring, or negotiations in respect of the Loans or the Loan Documents.

14.15 <u>Usury</u>. It is the intention of Borrowers and Lender to comply with applicable usury laws. Therefore, notwithstanding any provisions to the contrary in this Agreement or in any other Loan Document, neither this Agreement nor any other Loan Document shall require the payment or permit the collection of interest in excess of the maximum amount permitted by law. If compliance with this Agreement or any other Loan Document would result in a violation of any applicable usury law, the amount of the payment obligation imposed by this Agreement or any other Loan Document shall be reduced to the maximum amount permitted by law. If Lender receives any payment of interest, or receives any payment or transfer that is deemed to be interest by applicable law, in an amount that exceeds applicable law, the amount in excess of the limit imposed by law shall be applied to reduce the principal amount owing under this Agreement or the other Loan Documents. If the amount received in excess of the limit imposed by law exceeds the unpaid principal balance due to Lender under this Agreement or the other Loan Documents, the excess amount shall be refunded without interest to Borrowers.

14.16 <u>Integration</u>. This Agreement, the other Loan Documents, the Amended Joint Plan, and the Confirmation Order reflect the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, whether before or after the date hereof, except in a writing executed by the parties hereto and referring specifically to this Agreement. From time to time prior to the payment in full of the Obligations, Borrowers and Lender may conduct discussions and negotiations with respect to the Loans and the Loan Documents. Borrowers agree that no part of such discussions or negotiations should be understood as an offer to contract or to alter the terms of the Loans or the Loan Documents prior to the execution of a definitive written agreement. Prior to the execution of a definitive written agreement, no Borrower shall act in reliance on any statement of Lender or its officers. No single officer of Lender is authorized to approve any change to the terms of the Loans or the Loan Documents without prior approval in accordance with Lender's policies and procedures.

14.17 <u>Time</u>. Time is of the essence of this Agreement, the Loan Documents, and the Loans.

14.18 <u>NOTICE OF FINAL AGREEMENT</u>. THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

14.19 <u>VENUE</u>. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE BROUGHT IN THE DISTRICT COURT OF OKLAHOMA COUNTY, OKLAHOMA, OR IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY IRREVOCABLY ACCEPTS THE JURISDICTION OF SUCH COURTS. THIS AGREEMENT SHALL NOT AFFECT THE RIGHT OF LENDER TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY BORROWER IN ANY OTHER JURISDICTION ALLOWED BY LAW. EACH PARTY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR

LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

14.20 WAIVER OF JURY TRIAL. EACH BORROWER AND LENDER VOLUNTARILY, KNOWINGLY, IRREVOCABLY, AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) BETWEEN A BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, THE LOAN DOCUMENTS, OR THE LOANS. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO ENTER INTO THIS AGREEMENT.

14.21 Reaffirmation. GH and FHA each hereby reaffirms all terms, conditions, and covenants set forth therein except as modified by this Agreement, reaffirms all of its obligations under the Loan Documents and the Loans except as modified by this Agreement, and agrees that the Loan Documents and all of each such party's payment and performance Obligations thereunder remain in full force and effect except as modified by this Agreement.

[Remainder of page intentionally left blank. Signature pages follow.]

41

EXECUTED as of the date first written above.

**GH**

GILBERT HOSPITAL, LLC, an Arizona
limited liability company

By: _____

Name: Bryan Hargis
Title: Chief Executive Officer

**FHA**

FLORENCE HOSPITAL AT ANTHEM, LLC,
an Arizona limited liability company

By: _____

Name: Bryan Hargis
Title: Chief Executive Officer

**HOLDCO**

NEW VISION HEALTH, LLC, an Arizona
limited liability company

By: _____

Name: Bryan Hargis
Title: Chief Executive Officer

Signature Page to Amended and Restated Loan and Security Agreement

**LENDER**

BANK SNB, an Oklahoma state banking
corporation

By: _____
Name: Ryan Thompson
Title: Senior Vice President

Signature Page to Amended and Restated Loan and Security Agreement

**SCHEDULE 6.4**

<u>SPECIFIED COMMERCIAL TORT CLAIMS</u>

None.

SCHEDULE 6.4

**SCHEDULE 7.11**

<u>LOCATIONS OF COLLATERAL</u>

Gilbert Hospital:
5656 S. Power Road
Gilbert, AZ 85295

Gilbert Hospital Business Office:
5656 S. Power Road, Suite 133
Gilbert, AZ 85295

Florence Hospital at Anthem:
4545 N. Hunt Highway
Florence, AZ 85132

Server Location:
Higley Unified School District No. 60
Computer Server Room, 1st Floor
2935 S. Recker Road
Gilbert, AZ 85295

**SCHEDULE 8.14**

<u>CERTAIN POST-CLOSING OBLIGATIONS</u>

1.      By no later than 60 days after the Closing Date, deliver to Lender Deposit Account Security Agreements and control agreements, in form and substance acceptable to Lender in its sole discretion, properly executed by GH and/or FHA and each financial institution (other than Lender) at which GH and/or FHA maintains Deposit Accounts as permitted by <u>Section 8.9</u>.

2.      By no later than 10 days after the Closing Date, Lender shall have received the certificates of insurance evidencing compliance with <u>Section 8.8</u>.

**EXHIBIT A**

<u>GH LOAN DOCUMENTS</u>

The GH Loan Documents include, without limitation:

1.    That certain Promissory Note (Land) in the original principal amount of $7,328,924.00, dated effective November 8, 2007, and made by GH in favor of Lender, as amended from time to time.

2.    That certain Promissory Note (Working Capital) in the original principal amount of $5,000,000.00, dated effective November 8, 2007, and made by GH in favor of Lender, as amended from time to time.

3.    That certain Promissory Note (Equipment) in the original principal amount of $8,040,000.00, dated effective November 8, 2007, and made by GH in favor of Lender, as amended from time to time.

4.    That certain Security Agreement (Accounts) dated effective November 8, 2007 made by GH in favor of Lender, as amended from time to time.

5.    That certain Security Agreement (Equipment and Accounts Receivable) dated effective November 8, 2007 made by GH in favor of Lender, as amended from time to time.

6.    That certain UCC-1 Financing Statement naming GH as debtor and Lender as secured party, filed with the Arizona Secretary of State on November 9, 2007 at Filing No. 200715109223, as thereafter amended and continued from time to time.

7.    That certain UCC-1 Financing Statement naming GH as debtor and Lender as secured party, filed with the Arizona Secretary of State on November 9, 2007 at Filing No. 200715109267, as thereafter amended and continued from time to time.

8.    That certain UCC-1 Financing Statement naming GH as debtor and Lender as secured party, filed with the Arizona Secretary of State on November 9, 2007 at Filing No. 200715109256, as thereafter amended and continued from time to time.

9.    That certain Lockbox Agreement dated effective dated effective November 8, 2007 between GH and Lender, as amended from time to time.

10.    That certain Account Sweep Agreement dated effective November 8, 2007 between GH and Lender, as amended from time to time.

11.    All guaranties executed and delivered in connection with the FHA Loan, as amended from time to time.

12.    All other documents executed or delivered in connection with the GH Loan, as amended from time to time.

EXHIBIT A

**EXHIBIT B**

FHA LOAN DOCUMENTS

The FHA Loan Documents include, without limitation:

1. That certain Promissory Note (Equipment) in the original principal amount of $6,748,206.00, dated effective March 5, 2012, and made by FHA in favor of Lender, as amended from time to time.

2. That certain Promissory Note (Working Capital) in the original principal amount of $5,000,000.00, dated effective March 5, 2012, and made by FHA in favor of Lender, as amended from time to time.

3. That certain Letter of Credit Demand Promissory Note in the original principal amount of $1,200,000.00, dated effective March 5, 2012, and made by FHA in favor of Lender, as amended from time to time.

4. That certain Security Agreement dated effective March 5, 2012 between FHA and Lender, as amended from time to time.

5. That certain Security Agreement (Accounts) dated effective March 5, 2012 between FHA and Lender, as amended from time to time.

6. That certain Security Agreement (Cash Collateral Account) dated effective March 5, 2012 between FHA and Lender, as amended from time to time.

7. That certain Security Agreement (Restricted Account) dated effective March 5, 2012 between FHA and Lender, as amended from time to time.

8. That certain UCC-1 Financing Statement naming FHA as debtor and Lender as secured party, filed with the Arizona Secretary of State on February 27, 2012 at Filing No. 201216832153, as thereafter amended and continued from time to time.

9. That certain UCC-1 Financing Statement naming FHA as debtor and Lender as secured party, filed with the Arizona Secretary of State on February 27, 2012 at Filing No. 201216832266, as thereafter amended and continued from time to time.

10. That certain UCC-1 Financing Statement naming FHA as debtor and Lender as secured party, filed with the Arizona Secretary of State on February 27, 2012 at Filing No. 201216832164, as thereafter amended and continued from time to time.

11. That certain UCC-1 Financing Statement naming FHA as debtor and Lender as secured party, filed with the Arizona Secretary of State on February 27, 2012 at Filing No. 201216832142, as thereafter amended and continued from time to time.

12. That certain Guaranty Agreement dated effective March 5, 2012 made by GH in favor of Lender, as amended from time to time.

EXHIBIT B

13. That certain Lockbox Agreement dated effective March 5, 2012 between FHA and Lender, as amended from time to time.

14. That certain Account Sweep Agreement dated as of March 5, 2012 between FHA and Lender, as amended from time to time.

15. All guaranties executed and delivered in connection with the FHA Loan, as amended from time to time.

16. All other documents executed or delivered in connection with the FHA Loan, as amended from time to time.

EXHIBIT B

**EXHIBIT C**

<u>BORROWING BASE CERTIFICATE</u>

(Attached)

EXHIBIT C



**Bank SNB Borrowing Base Certificate/ Compliance Statement**

This Borrowing Base Certificates is delivered under the terms and in compliance with the LOAN AGREEMENT by and between BANK SNB and
_____ therein named under Note No. _____

| Gilbert Hospital Borrowing Base | | |
|---|---|---|
| **Description** | | |
| GH Net Eligible A/R (1) | | |
| **Total** | $ ▮ | |
| | | |
| Advance rate (60% discount) | 40% | |
| Total GH Eligible A/R per Advance Rate | $0 | |
| | | |
| **TOTAL BORROWING BASE AVAILABILITY** | $ ▮ | |
| **REVOLVING LINE OF CREDIT OUTSTANDING** | $ ▮ | |
| **Advance Request** | $ ▮ | |
| Deposit to Account No: | | |
| _____ | | |
| | *Total $ ▮ | * Total not to exceed $750,000 |
| *TOTAL REMAINING BORROWING BASE AVAILABILITY* | $ ▮ | |

(1) "Eligible Account" means any Account (other than any portion owing in respect of sales excise, or similar taxes) owing to GH that meets, and continues
   to meet, each of the following requirements:
(a) It arises in the ordinary course of business from the final, bona fide sale of goods or the rendering of services that have been fully performed by GH
(b) It is owned solely by GH
(c) It is the enforceable and unconditional obligation of the Centers for Medicare and Medicaid Services under its Medicare, Medicaid,
   Medicare Managed and Managed Care programs.
(d) The amount of the Account eligible is net and after deductions for contractual adjustments.
(e) It is not more than 60 days past the original claim date.
(f) For the first 180 days after the Effective Date, it is an Account owed to GH.
(g) After the expiration of the 180- day period in subsection (f) above it is (i) an Account owed to GH; or (ii) an Account owed to FHA provided that Lender
   shall have at Borrowers' prior request conducted a field audit of FHA pursuant to section 5.2 (f) of the Amended and Restated Loan Agreement.

(2). If the TOTAL BORROWING BASE AVAILABILITY is negative, the Borrower is required to pay down the line in an amount to return the Revolving Line of Credit back into compliance.

DATE: _____        BY: _____

**EXHIBIT D**

FORM OF REVOLVING NOTE

**REVOLVING NOTE**

$750,000.00                                        March 14, 2016

The undersigned, for value received, jointly and severally promise to pay to the order of Bank SNB, an Oklahoma banking corporation ("Lender"), at the principal office of Lender in Stillwater, Oklahoma, or such other office as Lender may designate from time to time, the principal amount of $750,000.00, or so much thereof as may be outstanding from time to time.

This Note is the "Revolving Note" referred to in, and evidences indebtedness incurred under, and is subject to the terms and provisions of, the Amended and Restated Loan and Security Agreement dated as of even date herewith (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement;" terms not otherwise defined have the meanings assigned to them in the Loan Agreement), between the undersigned and Lender. Reference is made to the Loan Agreement for a statement of the terms and provisions under which this Note may or must be paid prior to its due date or its due date accelerated.

The undersigned promise to pay interest on the unpaid principal amount of this Note on the terms set forth in the Loan Agreement. Payments on this Note shall be made as set forth in the Loan Agreement. This Note may be prepaid as set forth in the Loan Agreement.

If the undersigned make any payment of the Obligations more than 10 days past the due date for such payment, the undersigned shall pay a late fee in the amount equal to 5% of the amount of the unpaid, past due Obligations. Payment of the late fee shall not cure the Event of Default resulting from any late payment of the Obligations.

This Note is made under and governed by the laws of the State of Oklahoma.

The undersigned, any other party liable with respect to the Revolver evidenced by this Note, and any and all endorsers and accommodation parties, and each one of them, if more than one, waive any and all presentment, demand, notice of dishonor, protest, and all other notices and demands in connection with the enforcement of Lender's rights under this Note, the Loan Agreement, and the other Loan Documents, except as otherwise specifically provided for therein.

This Note may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Note and all of which, when taken together, will be deemed to constitute one and the same agreement.

[Remainder of page intentionally blank. Signature page follows]

EXHIBIT D

EXECUTED as of the date first written above.

GILBERT HOSPITAL, LLC, an Arizona
limited liability company

By:_____
Name: Bryan Hargis
Title: Chief Executive Officer


FLORENCE HOSPITAL AT ANTHEM,
LLC, an Arizona limited liability company

By:_____
Name: Bryan Hargis
Title: Chief Executive Officer


NEW VISION HEALTH, LLC, an
Arizona limited liability company

By:_____
Name: Bryan Hargis
Title: Chief Executive Officer


EXHIBIT D

**EXHIBIT E**

<u>FORM OF OPINIONS TO BE GIVEN BY COUNSEL</u>

1.  Each Borrower and GH 41 (each a "<u>Loan Party</u>") is a limited liability company existing in good standing under the laws of the State of Arizona.

2.  The execution, delivery, and performance of the Loan Documents by each Loan Party:

    a.  have been authorized by all necessary limited liability company action by such Loan Party;

    b.  do not violate any provision of the certificate of formation or operating agreement of such Loan Party;

    c.  do not require any filing or registration by any Loan Party with, or approval or consent of, any governmental authority of the State of Arizona; and

    d.  do not violate any law or regulation of any governmental agency or authority of the State of Arizona.

3.  Each Loan Document has been duly executed on behalf of each Loan Party that is party thereto and constitutes the enforceable obligation of such Loan Party.

4.  The Confirmation Order has become a Final Order.

EXHIBIT E

**EXHIBIT F**

FORM OF REQUEST FOR ADVANCE

**REQUEST FOR ADVANCE**

This request is made pursuant to the Amended and Restated Loan and Security Agreement, dated as of March 14, 2016 (the "Loan Agreement"), among Gilbert Hospital, LLC, an Arizona limited liability company, Florence Hospital at Anthem, LLC, an Arizona limited liability company, New Vision Health, LLC, an Arizona limited liability company (collectively, "Borrowers"), and Bank SNB, an Oklahoma banking corporation ("Lender"). Capitalized terms used in this Request for Advance have the meanings given to such terms in the Loan Agreement.

The undersigned, being the duly elected chief financial officer of each Borrower, hereby request that Lender make an Advance under the Revolver to Borrowers in the principal amount of $[_____]. The date on which such Advance is requested to be made is [_____], 20[___].

In connection with the requested Advance, the undersigned certifies as follows:

1.      No Event of Default currently exists.

2.      After giving effect to the Advance requested above, the aggregate outstanding principal balance of the Revolver will not exceed the Availability.

3.      The representations and warranties of Borrowers set forth in the Loan Agreement are true and correct as of the date of this Request for Advance, except to the extent specifically relating to an earlier date, in which case such representations and warranties were true and correct as of such date.

Dated _____, 20__

[_____]

By:_____

Name:_____

Title:_____

EXHIBIT F

**EXHIBIT G**

COMPLIANCE CERTIFICATE

**COMPLIANCE CERTIFICATE**

To: BANK SNB ("Lender")

This Compliance Certificate is made with reference to that certain Amended and Restated Loan and Security Agreement, dated as of March 14, 2016 (the "Loan Agreement"), among Gilbert Hospital, LLC, an Arizona limited liability company, Florence Hospital at Anthem, LLC, an Arizona limited liability company, New Vision Health, LLC, an Arizona limited liability company (collectively, "Borrowers"), and Lender, and with further reference to GH 41, LLC, an Arizona limited liability company (collectively with Borrowers, "Borrower Parties"). All capitalized terms used in this Compliance Certificate shall have the meanings set forth for such terms in the Loan Agreement.

The undersigned, each of whom is the responsible financial officer of one or more of the Borrower Parties, hereby certify as follows:

1. All financial statements delivered herewith are complete and correct, present the financial conditions at the end of such period and the results of the respective Borrower Parties' operations during such period in accordance with GAAP, consistently applied.

2. Each Borrower Party has not been, and is not as of the date hereof, in default as to any of the covenants contained in the Loan Agreement or any of the Loan Documents, and there is no known Event of Default, except as specified below:

_____

     IN WITNESS WHEREOF, the undersigned have each executed this Compliance Certificate as of the ____ day of _____, ____.

| GILBERT HOSPITAL, LLC, an Arizona limited liability company | NEW VISION HEALTH, LLC, an Arizona limited liability company |
|---|---|
| By:_____ | By:_____ |
| Name:_____ | Name:_____ |
| Title:_____ | Title:_____ |
| FLORENCE HOSPITAL AT ANTHEM, LLC, an Arizona limited liability company | GH 41, LLC, an Arizona limited liability company |
| By:_____ | By:_____ |
| Name:_____ | Name:_____ |
| Title:_____ | Title:_____ |

EXHIBIT G

# EXHIBIT C

## SECURITY AGREEMENT
### (Equipment and Accounts Receivable) ·

THIS SECURITY AGREEMENT (the "Agreement") is made effective the 8th day of November, 2007, by GILBERT HOSPITAL LLC, an Arizona limited liability company ("Debtor"), having a notice address of 5656 South Power Road, Gilbert, Arizona, 85230, in favor of STILLWATER NATIONAL BANK AND TRUST COMPANY (the "Secured Party"), having a notice address at 6301 Waterford Boulevard, Suite 101, Oklahoma City, Oklahoma 73116.

RECITALS: *85295

WHEREAS, the Debtor and the Secured Party have entered into a certain Loan Agreement of even effective date herewith (the "Loan Agreement"); and

WHEREAS, pursuant to the Loan Agreement the Debtor has agreed to secure payment of the indebtedness described herein by granting the Secured Party a security interest covering the Property (as defined below);

NOW, THEREFORE, in consideration of the premises and the agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor hereby agrees with the Secured Party as follows:

1. _Definitions_. Unless otherwise defined herein, all terms which are defined in the Loan Agreement will have the same meanings herein as therein, and all terms used herein which are defined in the Oklahoma Uniform Commercial Code ("UCC") will have the same meanings herein.

2. _Security Interest_. The Debtor hereby grants to the Secured Party a first priority security interest in all of the Debtor's goods, chattels, accounts, accounts receivable, government and non-government health care accounts receivable, including but not limited to healthcare insurance receivables, contract rights, inventory, medical supplies, equipment, medical and surgical equipment, surgical implements and supplies, computer equipment, computer hardware, computer software, general intangibles, and all other tangible and intangible personal property, whether now owned or hereafter acquired, and all proceeds, products, rents, profits and income therefrom (the "Property").

3. _Secured Indebtedness_. The security interest granted hereby in the Property is given to secure the Debtor's payment of (a) a certain Promissory Note (Land) of even date herewith in the principal face amount of $7,328,924.00 signed by the Debtor in favor of the Secured Party ("Note I"), and all extensions, renewals, amendments, modifications, substitutions and changes in form of Note I, together with all interest thereon; (b) a certain Promissory Note (Equipment) of even date herewith in the principal face amount of $8,040,000.00 signed by the Debtor in favor of the Secured Party ("Note II"), and all extensions, renewals, amendments, modifications and changes in form of Note II, together with all interest thereon; (c) a certain Promissory Note (Working Capital) of even date herewith in the principal face amount of $5,000,000.00 signed by the Debtor in favor of the Secured Party ("Note III") (Note I, Note II, and Note III are collectively referred to herein as the "Notes")

1

and all extensions, renewals, amendments, modifications and changes in form of Note III, together with all interest thereon; (d) all advances made by the Secured Party to protect the security hereof, including advances made for or on account of levies, insurance, repairs, taxes and for maintenance or recovery of the Property, together with interest thereon at the rate specified in the Note; and (e) all costs and expenses incurred in connection with the collection and enforcement of the foregoing items described at Sections 3(a), 3(b), 3(c) and 3(d) including reasonable attorneys' fees and expenses. (The foregoing items described at Sections 3(a) through 3(e) hereof inclusive are collectively referred to herein as the "Secured Indebtedness.")

4. <u>Debtor's Representations and Covenants</u>. The Debtor hereby warrants, represents and agrees as follows:

4.1 <u>Location of Debtor</u>. The Debtor is a registered limited liability company organized under the law of Arizona. Its chief executive office and present principal place of business is the same as set forth in the introductory paragraph hereof (the "Business Location").

4.2 <u>Location of Property</u>. The Property is or will be located at the Debtor's hospital located in Gilbert, Arizona (the "Hospital Location"), and the Debtor will not move the Property or locate any of the Property at any other location without the prior written consent of the Secured Party.

4.3 <u>Business Purpose</u>. The Property is to be used by the Debtor solely in connection with the operation of the Debtor's acute care hospital and for working capital purposes in connection therewith.

4.4 <u>Title</u>. The Debtor has or will obtain marketable title to the Property free and clear of all liens, encumbrances and security interests.

4.5 <u>Transfers</u>. Without the prior written consent of the Secured Party, the Debtor agrees that the Debtor will not sell, exchange, lease or in any manner dispose of any of the Property or any interest therein, without replacing the same with similar property of equal or greater value as needed in the ordinary course of business.

4.6 <u>Maintenance of Property</u>. The Debtor will use the utmost care to maintain the Property in good condition and repair, ordinary wear and tear excepted, and without the Secured Party's prior written consent, will not suffer or permit any lien, charge or encumbrance to attach thereto, whether by reason of repairs, taxes, assessments or otherwise. The Debtor will not use or permit the Property to be used in violation of any law, statute or ordinance. The Debtor will not, in any event, permit anything to be done that may impair the value of the Property or the security intended to be afforded by this Agreement.

4.7 <u>Insurance</u>. The Debtor will insure the Property as required under the Loan Agreement. If the Debtor fails to pay the premiums for any such insurance, the Secured Party may do so for the Debtor's account, adding the amount so paid by the

2

Secured Party to the other amounts secured hereby; however, the Secured Party is under no obligation and has no duty to pay such premiums. The Secured Party is hereby appointed the Debtor's attorney-in-fact to endorse any draft or check which may be payable to the Debtor in order to collect the proceeds of such property damage insurance. All insurance proceeds will be applied either to the Secured Indebtedness, or to the repair, restoration or replacement of the damaged or destroyed property, at the election of the Lender. Any proceeds required to be made available to Debtor for use in restoring, repairing and/or replacing any such damage to Property will be made available in accordance with the procedures for Debtor obtaining an advance under the Loan Agreement.

4.8    Inspection of Property. At any reasonable time and on reasonable prior notice to Debtor, but subject to HIPAA, the Secured Party may inspect the Property and all of the Debtor's records concerning the Property and the Borrower's business operations.

4.9    Further Assurances. The Debtor will from time to time sign, execute, deliver and file, alone or with the Secured Party, any financing statements, security agreements or other documents; procure any instruments or documents; and take all further action that may be reasonably necessary or desirable, or that the Secured Party's reasonable discretion in order to confirm, perfect, preserve and protect the security interests intended to be granted hereby, and in addition, the Debtor hereby authorizes the Secured Party to file such financing statements in such locations covering the Property as may be deemed necessary by the Secured Party without the signature of the Debtor.

4.10   Filing Reproductions. At the option of the Secured Party, a carbon, photographic or other reproduction of this Agreement or of a financing statement covering the Property will be sufficient as a financing statement and may be filed as a financing statement.

4.11   Financing Statement Filings; Notifications. The Debtor will immediately notify the Secured Party of any condition or event that may change the proper location for the filing of any financing statements or other public notice or recordings for the purpose of perfecting a security interest in the Property. Without limiting the generality of the foregoing, the Debtor will: (a) immediately notify the Secured Party of any change to a jurisdiction other than the State of Arizona in the location of the Debtor's chief executive office or chief place of business, or in the Debtor's state of organization; (b) prior to any of the Property becoming so related to any particular real estate, other than the Hospital Location, so as to become a fixture on such real estate, notify the Secured Party of the description of such real estate and the name of the record owner thereof; and (c) immediately notify the Secured Party of any change in the Debtor's name, identity or company structure. In any notice furnished pursuant to this Section 4.11, the Debtor will expressly state that the notice is required by this Agreement and contains facts that will or may require additional filings of financing statements or other notices for the purpose of continuing perfection of the Secured Party's security interest in the Property.

3

5.    <u>Secured Party's Expenditures</u>. If the Debtor fails to make any expenditure or pay any sum necessary to: (1) keep and maintain the Property in good repair, ordinary wear and tear and insured casualty excepted; (2) discharge any lien, encumbrance, levy, security interest or other charge on the Property; or (3) maintain insurance upon the Property as required hereby, the Secured Party may but will not be required to make any expenditure for such purpose or purposes and all sums so expended will be payable on demand, will bear interest at the rate specified in the Notes and all such sums and interest will additionally be secured hereby. The Debtor will pay all costs of filing any financing, continuation or termination statements with respect to the security interest granted hereby in the Property.

6.    <u>Default; Remedies</u>. On the occurrence of a Default under the Loan Agreement (which term "Default" will have the same meaning herein as such term is defined in the Loan Agreement), the Secured Party may, at its option and without notice to any party, declare all or any portion of the Secured Indebtedness to be immediately due and payable and may proceed to enforce payment of the same, to foreclose the Secured Party's security interest in the Property pursuant to the provisions of the UCC, to exercise any or all other rights and remedies provided herein and in the other Loan Documents and by the UCC or otherwise available at law or in equity. Whenever the Debtor is in Default under the Loan Agreement, the Debtor on demand by the Secured Party, will assemble the Property and make it available to the Secured Party at the Business Location, or if the Business Location is unavailable, at a place designated by the Secured Party. All remedies hereunder are cumulative, and any indulgence or waiver by the Secured Party will not be construed as an abandonment of any other right hereunder or of the power to enforce the same or another right at a later time. Whether the Secured Party elects to exercise any other rights or remedies under this Agreement or applicable law, the Secured Party, as a matter of right and without regard to the sufficiency of the security for repayment of the Secured Indebtedness, without notice to Debtor and without any showing of insolvency, fraud, or mismanagement on the part of Debtor, and without the necessity of filing any judicial or other proceeding other than the proceeding for appointment of a receiver, shall be entitled to the appointment of a receiver or receivers of the Property or any part thereof, including, but not limited to, all healthcare accounts receivable, healthcare insurance receivables, and all other accounts receivable (the "Receivables"), and any or all deposit accounts into which such Receivables have been deposited, and Debtor hereby irrevocably consents to the appointment of a receiver or receivers. Any receiver appointed pursuant to the provisions of this subsection shall have the usual powers and duties of receivers in such matters including, but not limited to, the collection of the Receivables

7.    <u>Secured Party's Duties</u>. The powers conferred upon the Secured Party by this Agreement are solely to protect its interest in the Property and will not impose any duty upon the Secured Party to exercise any such powers. Except as may otherwise be provided in the Loan Agreement, the Secured Party will be under no duty whatsoever to make or give any presentment, demand for performance, notice of nonperformance, protest, notice of protest, notice of dishonor, or other notice or demand in connection with any of the Property or the Secured Indebtedness, or to take any steps necessary to preserve any rights against prior parties. The Secured Party will not be liable for failure to collect or realize upon any or all of the Secured Indebtedness or Property, or for any delay in so doing, nor will the Secured Party be under any duty to take any action whatsoever with regard thereto.

4

8.     Continuing Agreement.  This is a continuing agreement and the grant of a security interest hereunder will remain in full force and effect and all the rights, powers and remedies of the Secured Party hereunder will continue to exist until all of the Secured Indebtedness is paid in full.

9.     Preservation of Liability.  Neither this Agreement nor the exercise by the Secured Party of (or the failure to so exercise) any right, power or remedy conferred herein or by law will be construed as relieving any person liable on the Secured Indebtedness from liability on the Secured Indebtedness and for any deficiency thereon.

10.    Successors and Assigns.  The covenants and agreements herein contained by or on behalf of the Debtor will bind the Debtor, and the Debtor's legal representatives, successors and assigns and will inure to the benefit of the Secured Party and the Secured Party's successors and assigns.

11.    Invalidity.  If any provision hereof will for any reason be held to be invalid or unenforceable, such invalidity or unenforceability will not affect any other provision hereof.

12.    Construction.  This Agreement will be construed and interpreted in accordance with the laws of the State of Oklahoma.

This Agreement is executed effective the date first above written.

GILBERT HOSPITAL LLC, an Arizona limited liability company

By: _____
     Timothy A. Johns, M.D., Manager

(the "Debtor")

STILLWATER NATIONAL BANK AND TRUST COMPANY

By: _____
Name: Robert L. Dickson
Title: SVP
(the "Secured Party)

5

# EXHIBIT D

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT is made effective the 5th day of March, 2012, between FLORENCE HOSPITAL AT ANTHEM, LLC, an Arizona limited liability company (the "Debtor"), having a notice address of 5656 South Power Road, Gilbert, Arizona 85295-8487, Attn: David Wanger and Randy Calvert, and STILLWATER NATIONAL BANK AND TRUST COMPANY (the "Secured Party"), having a notice address at 6301 Waterford Boulevard, Suite 101, Oklahoma City, Oklahoma 73118, Attn: Chief Lending Officer.

## R E C I T A L S :

WHEREAS, the Debtor and the Secured Party have entered into a certain Loan Agreement of even date herewith (the "Loan Agreement"); and

WHEREAS, pursuant to the Loan Agreement, the Debtor has agreed to secure payment of the indebtedness described herein by granting the Secured Party a security interest covering the Property, as defined below;

## A G R E E M E N T :

NOW, THEREFORE, in consideration of the premises and the agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of all of which are hereby acknowledged, the Debtor hereby agrees with the Secured Party as follows:

1. <u>Definitions</u>. Unless otherwise defined herein, all terms which are defined in the Loan Agreement will have the same meanings herein as therein, and all capitalized terms used herein which are defined in the Oklahoma Uniform Commercial Code ("UCC") will have the same meanings herein.

2. <u>Security Interest</u>. The Debtor hereby grants to the Secured Party a first priority security interest in all of the Borrower's goods, chattels, accounts, accounts receivable, government and non-government health care accounts receivable, including but not limited to health-care-insurance receivables, documents, chattel paper, instruments, contract rights, inventory, medical supplies, equipment, and medical equipment, furniture, hospital beds, kitchen equipment and supplies, computer equipment, computer hardware, computer software, computer software licenses, all licenses and permits now owned or hereafter acquired by the Borrower in connection with Borrower's operation of Borrower's acute care hospital, including but not limited to licenses and certificates of need, all third party provider, payor and reimbursement agreements with Medicare, Medicaid, the Arizona Health Care Cost Containment System ("AHCCCS") or any other governmental or non-governmental party together with the rights to payment and reimbursement thereunder, general intangibles, and all other tangible and intangible personal property, whether now owned or hereafter acquired, and all proceeds, products, rents, profits and income therefrom (the "Property").

3. <u>Secured Indebtedness</u>. The security interest granted hereby in the Property is given to secure the Debtor's payment of (a) a certain Promissory Note (Working Capital) of even date herewith in the principal face amount of $5,000,000.00 signed by the Debtor in favor of the Secured Party, and

all extensions, renewals, amendments, modifications, substitutions and changes in form thereof ("Note I"), together with all interest thereon ; (b) a certain Promissory Note (Equipment) of even date herewith in the principal face amount of $6,748,206.00 signed by the Debtor in favor of the Secured Party, and all extensions, renewals, amendments, modifications, substitutions and changes in form thereof ("Note II"), together with all interest thereon; (c) a certain Letter of Credit Demand Promissory Note of even date herewith in the principal face amount of $1,200,000.00 signed by the Debtor in favor of the Secured Party, and all extensions, renewals, amendments, modifications, substitutions and changes in form thereof ("Note III"), together with all interest thereon (Note I, Note II and Note III are collectively referred to herein as the "Notes"), (d) all advances made by the Secured Party to protect the security hereof, including advances made for or on account of levies, insurance, repairs, taxes and for maintenance or recovery of the Property, together with interest thereon at the rate specified in the Notes; and (e) all costs and expenses incurred in connection with the collection and enforcement of the foregoing items at Sections 3(a) through 3(d), including reasonable attorneys' fees and expenses. (The foregoing items 3(a) through 3(e) are collectively referred to herein as the "Secured Indebtedness.")

4. <u>Debtor's Representations and Covenants</u>. The Debtor hereby warrants, represents and agrees as follows:

4.1 <u>Principal Place of Business</u>. The Debtor's chief executive office is the same as set forth in the introductory paragraph hereof. The Debtor's principal place of business is 4545 N. Hunt Highway, Florence, Arizona 85232.

4.2 <u>Control of Property</u>. The Property is or will be in the possession of the Debtor.

4.3 <u>No Transfers</u>. Without the prior written consent of the Secured Party, the Debtor will not in any manner sell, convey, dispose of, transfer or encumber any of the Property or any interest therein, or permit any lien, encumbrance or security interest to attach thereto except those contemplated herein in favor of the Secured Party.

4.4 <u>Secured Party's Security Interest</u>. This Agreement creates a valid and binding security interest in the Property securing the Secured Indebtedness. All filings and other actions necessary or appropriate (other than notation on any certificate of title or title registration) to perfect or protect such security interest will be or have been duly taken. No further or subsequent filing, recording, registration or other public notice of such security interest (other than notation on any certificate of title or title registration) is necessary in any office or jurisdiction in order to perfect such security interest or to continue, preserve or protect such security interest except for continuation statements.

4.5 <u>Further Assurances</u>. The Debtor will from time to time sign, execute, deliver and file, alone or with the Secured Party, any financing statements, security agreements or other documents; procure any instruments or documents as may be reasonably requested by the Secured Party; and take all further action that may be necessary or desirable, or that the Secured Party may request, to confirm, perfect, preserve and protect the security interests intended to be granted hereby, and in addition, the Debtor hereby authorizes the Secured Party to execute and deliver on behalf of the

2

Debtor and file such financing statements, security agreements and other documents without the signature of the Debtor either in the Secured Party's name or in the name of the Debtor and as agent and attorney-in-fact for the Debtor.

4.6   <u>Filing Reproductions.</u> At the option of the Secured Party, a carbon, photographic or other reproduction of this Agreement or of a financing statement covering the Property will be sufficient as a financing statement and may be filed as a financing statement.

4.7   <u>Financing Statement Filings; Notifications.</u> The Debtor will immediately notify the Secured Party of any condition or event that may change the proper location for the filing of any financing statements or other public notice or recordings for the purpose of perfecting a security interest in the Property. Without limiting the generality of the foregoing, the Debtor will: (a) immediately notify the Secured Party of any change to a jurisdiction other than the State of Arizona in the location of the Debtor's chief executive office or chief place of business or in the Debtor's state of organization; and (b) immediately notify the Secured Party of any change in the Debtor's name, identity or company structure. In any notice furnished pursuant to this paragraph 4.7, the Debtor will expressly state that the notice is required by this Agreement and contains facts that will or may require additional filings of financing statements or other notices for the purpose of continuing perfection of the Secured Party's security interest in the Property. The Debtor will pay all costs of filing any financing, continuation or termination statements with respect to the security interest granted hereby in the Property.

5.   <u>Default; Remedies.</u> On the occurrence of a Default under the Loan Agreement, or any of the Loan Documents (which term "Default" will have the same meaning herein as such term is defined in the Loan Agreement) the Secured Party may, at its option and without notice to any party, declare all or any portion of the Secured Indebtedness to be immediately due and payable and may proceed to enforce payment of the same, to foreclose the Secured Party's security interest in the Property pursuant to the provisions of the UCC, to exercise any or all other rights and remedies provided herein and in the other Loan Documents (which term "Loan Documents" will have the same meaning herein as defined in the Loan Agreement) and by the UCC or otherwise available at law or in equity. Whenever the Debtor is in Default under the Loan Agreement or any of the Loan Documents, the Debtor on demand by the Secured Party, will assemble the Property and make it available to the Secured Party at a place designated by the Secured Party. All remedies hereunder are cumulative, and any indulgence or waiver by the Secured Party will not be construed as an abandonment of any other right hereunder or of the power to enforce the same or another right at a later time. Whether the Secured Party elects to exercise any other rights or remedies under this Agreement or applicable law, the Secured Party will be entitled to have a receiver appointed to take possession of the Property without notice, which notice the Debtor hereby waives, notwithstanding anything contained in this Agreement or any law heretofore or hereafter enacted.

6.   <u>Secured Party's Duties.</u> The powers conferred upon the Secured Party by this Agreement are solely to protect its interest in the Property and will not impose any duty upon the Secured Party to exercise any such powers. The Secured Party will be under no duty whatsoever to make or give any presentment, demand for performance, notice of nonperformance, protest, notice of protest, notice of

3

dishonor, or other notice or demand in connection with any of the Property or the Secured Indebtedness, or to take any steps necessary to preserve any rights against prior parties. The Secured Party will not be liable for failure to collect or realize upon any or all of the Secured Indebtedness or Property, or for any delay in so doing, nor will the Secured Party be under any duty to take any action whatsoever with regard thereto.

7.     Continuing Agreement. This is a continuing agreement and the grant of a security interest hereunder will remain in full force and effect and all the rights, powers and remedies of the Secured Party hereunder will continue to exist until all Indebtedness owing by the Debtor to the Secured Party has been paid in full or until this Security Agreement is cancelled pursuant to the terms of the Loan Agreement.

8.     Preservation of Liability. Neither this Agreement nor the exercise by the Secured Party of (or the failure to so exercise) any right, power or remedy conferred herein or by law will be construed as relieving any person liable on the Secured Indebtedness from liability on the Secured Indebtedness and for any deficiency thereon.

9.     Successors and Assigns. The covenants and agreements herein contained by or on behalf of the Debtor will bind the Debtor, and the Debtor's legal representatives, successors and assigns and will inure to the benefit of the Secured Party and the Secured Party's successors and assigns.

10.     Invalidity. If any provision hereof will for any reason be held to be invalid or unenforceable, such invalidity or unenforceability will not affect any other provision hereof.

11.     Construction. This Agreement will be construed and interpreted in accordance with the laws of the State of Oklahoma.

This Agreement is executed effective the date first above written.

FLORENCE HOSPITAL AT ANTHEM, LLC, an
Arizona limited liability company

By: _____

TIMOTHY A. JOHNS, Manager

(the "Debtor")

# EXHIBIT E

**ARIZONA
SECRETARY OF STATE
03/15/16 16:52
F I L E D**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

```
Return acknowledgment to:

Capitol Corporate Services, Inc.
P.O. Box 13461      Phoenix, AZ 85002
800/255-1052
```

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| NEW VISION HEALTH, LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 5656 S. Power Rd., Suite 133 | Gilbert | AZ | 85295 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| BANK SNB | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 6301 Waterford Boulevard, Suite 101 | Oklahoma City | OK | 73118 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

**All assets of the Debtor.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**File with AZ SOS**

Case 2:18-bk-04557-BMW   Doc 16   Filed 05/03/18   Entered 05/03/18 15:04:14   Desc
Main Document      Page 108 of 174

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Return acknowledgment to:

★

Capital Corporate Services, Inc.
P.O. Box 13461    Phoenix, AZ 85002
800/254-0051

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|
| **2016-001-0013-2 Filed 03/15/16** | |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:

This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Indigo-DLI Holdings I, LLC** | | | |
| 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **147 West 35th Street, Suite 1001** | **New York** | **NY** | **10001** | **USA** |

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Bank SNB** | | | |
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
**To be filed with the Arizona Secretary of State**

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

# EXHIBIT F

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| GILBERT HOSPITAL, LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 5656 S. Power Rd., Suite 133 | Gilbert | AZ | 85295 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| BANK SNB | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 6301 Waterford Boulevard, Suite 101 | Oklahoma City | OK | 73118 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

**All assets of the Debtor.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)  ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:  ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility     6b. Check only if applicable and check only one box:  ☐ Agricultural Lien  ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA
**File with AZ SOS**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)     International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Return acknowledgment to:

Capitol Corporate Services, Inc.
PO. Box 13461    Phoenix, AZ 85002
800/255-4052

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| **2016-001-2477-5 Filed 03/15/16** | Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:    AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Indigo-DLI Holdings I, LLC** | | | |
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **147 West 35th Street, Suite 1001** | **New York** | **NY** | **10001** | **USA** |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Bank SNB** | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
**To be filed with the Arizona Secretary of State**

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# EXHIBIT G

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)
Phone:(800) 331-3282 Fax: (818) 662-4141

B. SEND ACKNOWLEDGEMENT TO: (Name and Address)

19574 CONNER & WINTE

CT Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

31997717

AZAZ

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| FLORENCE HOSPITAL AT ANTHEM, LLC | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5656 South Power Road | Gilbert | AZ | 85295-8487 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | LLC | AZ | L14101447 ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| STILLWATER NATIONAL BANK AND TRUST COMPANY | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| PO BOX 1988 | STILLWATER | OK | 74076 | USA |

4. This FINANCING STATEMENT covers the following collateral.

All of the Debtor's goods, chattels, accounts, accounts receivable, government and non-government health care accounts receivable, including but not limited to health-care-insurance receivables, documents, chattel paper, instruments, contract rights, inventory, medical supplies, equipment, and medical equipment, furniture, hospital beds, kitchen equipment and supplies, computer equipment, computer hardware, computer software, computer software licenses, all licenses and permits now owned or hereafter acquired by the Debtor in connection with Debtor's operation of Debtor's acute care hospital, including but not limited to licenses and certificates of need, all third party provider, payor and reimbursement agreements with Medicare, Medicaid, the Arizona Health Care Cost Containment System ("AHCCCS") or any other governmental or non-governmental party together with the rights to payment and reimbursement thereunder, general intangibles, and all other tangible and intangible personal property, whether now owned or hereafter acquired, and all proceeds, products, rents, profits and income therefrom.

| 5. ALTERNATIVE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

31997717                                                07898-0887

FILING OFFICE COPY - NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

Prepared by CT Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Phone: (800) 331-3282 Fax: (818) 662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)** 14181 - BANK SNB

```
CT Lien Solutions          56579118
P.O. Box 29071
Glendale, CA  91209-9071   AZAZ
```

File with Secretary of State, AZ

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
201216832153  2/27/2012  SS AZ

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION.** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial).** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION.** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☒ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:
This Change affects ☐ Debtor or ☒ Secured Party of record

AND Check one of these three boxes to:
☒ CHANGE name and/or address Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name. Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| STILLWATER NATIONAL BANK AND TRUST COMPANY | | | |
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BANK SNB | | | |
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| PO BOX 1988 | STILLWATER | OK | 74076 | USA |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes. ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| STILLWATER NATIONAL BANK AND TRUST COMPANY | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:** Debtor Name: FLORENCE HOSPITAL AT ANTHEM, LLC
56579118          921-PRESTON

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Prepared by CT Lien Solutions, P.O. Box 29071
Glendale, CA 91209-9071 Tel (800) 331-3282

**ARIZONA
SECRETARY OF STATE
11/29/16 07:10
F I L E D**

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Phone: (800) 331-3282 Fax: (818) 662-4141

B. E-MAIL CONTACT AT FILER (optional)
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)   14161 - BANK SNB

CT Lien Solutions                    56635636
P.O. Box 29071
Glendale, CA 91209-9071              AZAZ

File with Secretary of State, AZ

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
201216832153   2/27/2012   SS AZ

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in Item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in Item 7a or 7b, and address of Assignee in Item 7c and name of Assignor in Item 9
For partial assignment, complete Items 7 and 9 and also indicate affected collateral in Item 8

4. ☒ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:
Check one of these two boxes:                    AND Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record   ☐ CHANGE name and/or address  Complete   ☐ ADD name  Complete item   ☐ DELETE name  Give record name
Item 6a or 6b; and item 7a or 7b and item 7c      7a or 7b, and item 7c      to be deleted in Item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME

OR  6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME

OR  7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME
BANK SNB

OR  9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10. OPTIONAL FILER REFERENCE DATA:  Debtor Name: FLORENCE HOSPITAL AT ANTHEM, LLC
56635636              921-PRESTON

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Prepared by CT Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

**UCC FINANCING STATEMENT AMENDMENT**
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:

Return acknowledgment to:

Capitol Corporate Services, Inc.
PO Box 13461   Phoenix, AZ 85002
800/255-3052

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**201216832153** Filed 02/27/2012

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:                    AND Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Indigo-DLI Holdings I, LLC** | | | |
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **147 West 35th Street, Suite 1001** | **New York** | **NY** | **10001** | **USA** |

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes. ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Bank SNB** | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
**To be filed with the Arizona Secretary of State**

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

# EXHIBIT H



INDIGO

INDIGO-DLI HOLDINGS I, LLC
INDIGO CAPITAL SERVICES, LLC

325 WEST 38TH STREET, ROOM 1005
NEW YORK, NY 10018

November 2, 2017

*Via Federal Express and Electronic Mail*

Gilbert Hospital, LLC
Florence Hospital at Anthem, LLC
New Vision Health, LLC
GH 41 LLC
5656 S. Power Rd., Suite 133
Gilbert, AZ 85259
Attn.:   Dennis Rutherford
         Lou Schroeder

RE:   Amended and Restated Loan and Security Agreement among Gilbert Hospital, LLC ("GH"),
      Florence Hospital at Anthem, LLC ("FHA"), New Vision Health, LLC ("Holdco," and collectively
      with GH and FHA, "Borrowers"), and Indigo-DLI Holdings I, LLC, as successor by assignment
      from Bank SNB ("Indigo-DLI"), dated March 14, 2016 (as amended, the "Loan Agreement") and
      each of the other Loan Documents; Waiver Agreement among Borrowers, GH 41 LLC ("GH 41,"
      and collectively with Borrowers, "Borrower Parties"), Indigo-DLI, and Indigo-Maricopa Realty, LLC
      ("Indigo-Maricopa") dated July 26, 2017 (as amended, the "Waiver Agreement"); Option
      Agreement for the Purchase and Sale of Real Property and Joint Escrow Instructions between
      GH and Indigo-Maricopa, as successor by assignment from CRK Properties, Inc., dated March
      14, 2016 (as amended, the "Option Agreement"). Capitalized terms not otherwise defined herein
      shall have the meanings set forth in the Loan Agreement, the other Loan Documents, the Waiver
      Agreement, or the Option Agreement, as applicable.

Dear Dennis and Lou:

       We are providing this notice letter to you due to due to recent facts and circumstances related to
our lending relationship.

       In particular, Indigo-DLI and Indigo-Maricopa have become aware of the following defaults and
Events of Default (collectively, the "Specified Events of Default"): (i) breach of Section 10.4(c) of the Loan
Agreement for failure to maintain the required Net Operating Margin as tested for the period ending
August 31, 2017; (ii) breach of Sections 2.1 and 4.1(a) of the Loan Agreement and corresponding
promissory notes for failure to timely pay the monthly payment on the GH Term Obligation due October
14, 2017, with such failure continuing for ten (10) days thereafter; (iii) breach of Sections 2.2 and 4.1(b) of
the Loan Agreement and corresponding promissory notes for failure to timely pay the monthly payment
on the FHA Term Obligation due October 14, 2017, with such failure continuing for ten (10) days
thereafter; and (iv) breach of Sections 2.3 and 4.1(c) of the Loan Agreement and corresponding
promissory note for failure to timely pay the monthly payment on the Revolver due October 14, 2017, with
such failure continuing for ten (10) days thereafter. Additionally, Borrowers may not be in compliance with
the following enumerated Sections:  10.1, 10.2, 10.3a, 10.3c, 10.4a, 10.4b, 10.4c and 8.11b (120
days). Indigo-DLI and Indigo-Maricopa therefore hereby notify Borrower Parties of the occurrence of the
Specified Events of Default.


INDIGO

Because there is no applicable notice and cure period as to at least one of the Specified Events of Default, the Option Period has terminated pursuant to <u>Section 4(e)</u> of the Option Agreement. As a result of the termination of the Option Period as set forth herein and the irrevocable instructions provided in <u>Section 6(b)(ii)</u> of the Option Agreement, Escrow Holder shall cause the Quitclaim Deed to be recorded in the Official Records of the County.

Please also be advised that Indigo-DLI and Indigo-Maricopa do not waive the Specified Events of Default or any other defaults or Events of Default that previously existed or may now or hereafter exist under the Loan Agreement, the other Loan Documents, the Waiver Agreement, or the Option Agreement, whether or not set forth in this letter.  As a result of the Specified Events of Default, Indigo-DLI and Indigo-Maricopa have the present unconditional right to enforce certain rights, powers and remedies under the Loan Agreement, the other Loan Documents, the Waiver Agreement, and the Option Agreement and that exist at law or in equity, including, without limitation, the right to (i) charge default interest in accordance with <u>Section 3.2</u> of the Loan Agreement retroactively from the initial date of any default or Event of Default and/or require the Borrower Parties to pay a late charge equal to 5% of the unpaid, past due amounts in accordance with <u>Section 4.6</u> of the Loan Agreement, and (ii) nullify any discounted payoff opportunity provided in the Waiver Agreement.  Indigo-DLI and Indigo-Maricopa expressly hereby reserve any and all of their respective rights, remedies, claims and causes of action under the Loan Agreement, the other Loan Documents, the Waiver Agreement, and the Option Agreement and that exist at law or in equity with respect to the Specified Events of Default and any and all other defaults and Events of Default that previously existed or may now or hereafter exist under the Loan Agreement, the other Loan Documents, the Waiver Agreement, or the Option Agreement.  Nothing in this letter, nor any delay in the exercise of or omission to exercise any rights, powers or remedies available to Indigo-DLI or Indigo-Maricopa, now or from time to time, shall impair any such rights, powers or remedies or be construed to be a waiver by Indigo-DLI or Indigo-Maricopa of such rights, powers or remedies or be construed to be a waiver by Indigo-DLI or Indigo-Maricopa of the Specified Events of Default or an acquiescence thereto.  Each such right, power and remedy may be exercised by Indigo-DLI or Indigo-Maricopa at any time.

None of (a) any discussions or correspondence between Indigo-DLI, Indigo-Maricopa, and Borrower Parties, or any other person, regarding the Specified Events of Default, any other default or Event of Default, the Loan Agreement, the other Loan Documents, the Waiver Agreement, the Option Agreement, or otherwise that may have previously occurred or that may occur hereafter, (b) the passage of time, or (c) any action now or hereafter taken (or not taken) by Indigo-DLI or Indigo-Maricopa shall: (i) be deemed to be a modification of, or amendment to, the Loan Agreement, the other Loan Documents, the Waiver Agreement, or the Option Agreement, (ii) be construed or have the effect of curing, excusing, waiving, relinquishing, releasing or postponing any defaults or Events of Default under the Loan Agreement, the other Loan Documents, the Waiver Agreement, or the Option Agreement, or be a consent to any waiver of any Events of Default or any other default, whether such defaults now exist or shall hereafter occur, (iii) establish a custom or course of dealing, (iv) constitute an election of remedies under the Loan Agreement, the other Loan Documents, the Waiver Agreement, or the Option Agreement, (v) modify the treatment of Borrower Parties' obligations under the Loan Agreement, the other Loan Documents, the Waiver Agreement, or the Option Agreement, or (vi) waive, limit or condition the rights, powers and remedies of Indigo-DLI or Indigo-Maricopa under the Loan Agreement, the other Loan


INDIGO

Documents, the Waiver Agreement, or the Option Agreement, at law or in equity or given by statute, all of which are hereby expressly reserved.

Please feel free to contact me at your convenience with any questions you may have.

Sincerely,

Indigo-DLI Holdings I, LLC

By: _____
Name: Benjamin Bornstein
Title:   Company Officer

Indigo Capital Services, LLC

By: _____
Name: Benjamin Bornstein
Title:   Company Officer

cc:   *Via Electronic Mail*

Peter Tobin

Kyle S. Hirsch, Esq.

*Via Federal Express*

David K. Gottlieb, Creditor Trustee
GH Unsecured Creditors Trust
15233 Ventura Blvd., 9th Floor
Sherman Oaks, CA 91403

GH USC Trust
c/o Brinkman Portillo Ronk, APC
4333 Park Terrace Drive, Suite 205
Westlake Village, CA 91361
Attn: Darren Brinkman, Esq.

Andante Law Group, PLLC
4100 N. Scottsdale Rd., #330
Scottsdale, AZ 85251
Attn:  Daniel E. Garrison, Esq.


INDIGO

*Via Federal Express – Cont'd*

Engelman Berger, P.C.
3636 N. Central Avenue, Suite 700
Phoenix, AZ  85012
Attn:  Kurt A. Peterson, Esq.

Fennemore Craig
2394 E. Camelback Road, Suite 600
Phoenix, AZ  85016-3429
Attn:  Gerald L. Shelley, Esq.

# EXHIBIT 2

DECLARATION OF PROPOSED RECEIVER

I, Jeremiah Foster, first being duly sworn, upon my oath, make the following declaration.

1.     I am of sound mind, over the age of 18 years, and fully competent to testify to the matters stated herein on the basis of my personal knowledge.

2.     I am Principal of Resolute Commercial Services, LLC, an Arizona limited liability company ("Resolute").

3.     I understand that Resolute has been proposed to serve as receiver of the property and business operations of defendants New Vision Health, LLC; Gilbert Hospital, LLC; and Florence Hospital at Anthem, LLC (collectively, "Borrowers").

4.     I understand that Borrowers own and operate two emergency hospitals - one in Gilbert, Arizona and one in Florence, Arizona.

5.     I have reviewed the proposed receivership order that accompanies the Application for Appointment of Receiver. I, on behalf of Resolute, am willing and able to perform the duties of receiver as outlined therein.

6.     I have attached to this declaration a copy of my *curriculum vitae*, as well as a presentation demonstrating my and my firm's background and experience relevant to the Borrowers' emergency hospital operations. I prepared these documents, which are true and accurate to the best of my knowledge.

7.     Based on my experience and the experience of those with whom I intend to work on this engagement as receiver, I believe Resolute, by and through me, is qualified to act as a receiver over Borrowers.

I have read the foregoing declaration and declare under penalty of perjury that the foregoing is true and correct.

DATED: April 4, 2018.

By_____
     Jeremiah Foster

11608077 19055
3206

# RESOLUTE

—————— problems solved.



## CURRICULUM VITAE

### SUMMARY

Jeremiah Foster is president and founder of Resolute, a receivership and financial advisory firm located in Scottsdale. He is the lead when it comes to business development, corporate renewal consulting and real estate activities for the firm. Jeremiah possess cross-functional experience in startup, growth, and turnaround environments. He has advised creditors, equity holders, and enterprises in their navigation of many phases of a turnaround, acquisition or divestiture plan. Personally, he has sold more than $550M in real estate and participated in the sale of 15 enterprises. Jeremiah graduated from University of Arizona with a Bachelors of Science degree in engineering.

### COURT APPOINTED RECEIVERSHIP EXPERIENCE

- Shoot the Moon, LLC, case no. 15-60979-11; United States Bankruptcy Court for the District of Montana. Assisted Chapter 11 Trustee with business operations and financial reporting of 11 franchise restaurants. Instrumental with the sale of enterprise and assets of the Debtor along with creditor claim settlements.
- Architectural Traditions LLC, case no. C20142834; Pima County Superior Court. Appointed to liquidate $30MM custom door manufacturer. Process involved structured asset sale and collection of receivables which resulted in full retirement of secured debt and surplus which was distributed pro rata to unsecured debtors via an orchestrated claims process.
- Meyer & Lundahl Manufacturing Co., case no. CV2014-013429; Maricopa County Superior Court. Appointed to liquidate a $20MM custom millwork manufacturer. Process involved sale of collateral to include FF&E and Real Estate.
- ClinTrica, case no. CV2014-051145; Maricopa County Superior Court. Appointed to take control of operating business that administered clinical trials for exploratory drugs.

## JEREMIAH FOSTER

President & Founder
of Resolute

### EDUCATION
Bachelors of Science,
Engineering
University of Arizona

### INDUSTRY EXPERIENCE
- Health Care and Medical
- Real Estate
- Manufacturing
- Hotels
- Retail Sales
- Hospitality
- Construction
- Fuel and Petroleum
- Consumer Products
- For Profit Education
- Financial Services

### AWARDS
2008 - AZRE magazine
RED Award - Rookie of the
Year, State of AZ

2008 - Junior
Achievement Bronze
Leadership Award

2010, 2011, 2012, and 2013
AZRE People to Know in
Commercial Real Estate

## COURT APPOINTMENTS

### Federal

- Financial Advisor to law firm to conduct a Chapter 11 Plan of Reorganization feasibility analysis for an alternative fuel company
- Liquidating Trustee for Shoot the Moon, LLC liquidating trust
- Chapter 11 Trustee, U.S. Bankruptcy Court v. Shoot The Moon, LLC, CV 15-60979-11, 2015
- Financial Advisor for Debtors, U.S. Bankruptcy Court v. Industrial Ride Shop, LLC; Industrial Skate and Boards, Inc., Case No. 2:16-bk-14176-BKM; Case No. 2:16-bk-14389-BKM
- Financial Advisor to Florence Hospital for real estate matters, Case No. 4:13-bk-03201

### Superior

- Dean M. Barlow v. Barlow Company, Inc. - Maricopa County Superior Court; Financial Advisor, 2016
- C. Dwayne Walker v. W B Contracting, Inc. - Apache County Superior Court; Receiver, 2015
- Jerry Workman, et al. v. Mohit Asnani, et al. - Maricopa County Superior Court; Special Master, 2015
- ClinTrico LLC v. Advanced Research LLC - Maricopa County Superior Court; Receiver, 2014
- Wells Fargo Bank v. Meyer & Lundahl Manufacturing Co. - Maricopa County Superior Court; Receiver, 2014
- Western Alliance Bank v. Architectural Traditions LLC - Pima County Superior Court; Receiver, 2014
- Bank of Montreal v. High-Tech Institute, Inc. - Maricopa County Superior Court; Receiver, 2014
- Monarch Capital Corporation v. For The Earth Corporation, et al. - Maricopa County Superior Court; Receiver, 2014
- General Electrical Capital Business Asset Funding v. Two Brother VIII, Inc. - Maricopa County Superior Court; Receiver, 2014
- General Electrical Capital Business Asset Funding v. Two Brother II, Inc. - Maricopa County Superior Court; Receiver, 2014
- Wells Fargo Bank National Association v. Cactus Rose Construction Inc. - Maricopa County Superior Court; Receiver, 2014
- Beal Bank Nevada v. Central Court West Associates, et al. - Clark County Superior Court; Receiver, 2013
- Enterprise Bank & Trust v. Byung T. Park & OK C. Park - Pima County Superior Court; Receiver, 2013
- Diversified Funding Group LLC v. Group Three Properties, et al. - Maricopa County Superior Court; Receiver, 2012
- Wells Fargo Bank v. Kingman Place Apartments LLC - Mohave County Superior Court; Receiver, 2012
- NY Credit Funding LLC v. Montecito Ventana LLC, et al. - Pima County Superior Court; Receiver, 2012
- Enterprise Bank & Trust v. Americana Nogales LLC, et al. - Santa Cruz Superior Court; Receiver, 2012
- Alliance Bank of Arizona v. MSJ Investment Properties LLC, et al. - Pima County Superior Court; Receiver, 2012

**EDUCATION**

Bachelors of Science, Engineering, University of Arizona

**PROFESSIONAL EXPERIENCE**

- Resolute – President & Founder          2008 - Present
- Insight Land & Investments              2005 - 2008
- Propaganda Communications, Inc.         2002 - Present
- Mobility Electronics                    1996 - 2002

**COMMUNITY INVOLVEMENT**

- Past Chairman of the Board and Member of the State and Central Executive Committees for Junior Achievement of Arizona
- Board Member, Christ Church School
- Past Board Member, Scottsdale Public Art Advisory Board
- Member, Arizona Town Hall
- Member, City of Scottsdale – McDowell Road/South Scottsdale Task Force
- Member, Downtown Scottsdale Town Hall
- Founding Member, One 5

**PROFESSIONAL AFFILIATIONS**

- Urban Land Institute (ULI)
- Association for Corporate Growth (ACG)
- Turnaround Management Association (TMA)
- Entrepreneur's Organization (EO)

**ABOUT RESOLUTE**

Resolute is a financial advisory firm that provides creative solutions to complex business problems by maximizing value for our clients.

Founded in 2008 by two partners with an average of 20 years of receivership and financial advisory experience in a wide range of industries. A service-driven firm dedicated to becoming your partner, Resolute presents clients with creative solutions to secure, resolve, and enhance financial assets and business operations.

Resolute's ability to maximize value in entangled business situations has been utilized by financial institutions, corporations, law firms, state and federal courts, and trustees throughout the country.

**R E S O L U T E**

———————— problems solved.

602.315.7104
jfoster@resolutecommercial.com

(Headquarters)
7201 E. Camelback Road, Ste. 250
Scottsdale, AZ 85251
o  480.947.3248
f  480.946.3556

1810 E. Sahara Avenue, Ste. 1464
Las Vegas, NV 89104
o  702.358.0627
f  702.369.1290

www.resolutecommercial.com

RESOLUTE
—— problems solved.

# Mr. Kyle Hirsch – Bryan Cave LLP

Proposal: Receivership for New Vision Health LLC,
Gilbert Hospital and Florence Hospital at Anthem

March 23, 2018



Prepared by: Jeremiah Foster

# Table of Contents

o   Resolute Distressed Healthcare Experience                        3

o   Expert Team

    •   Jeremiah Foster, Proposed Receiver                          5

    •   Phillip Robinson, Operating CFO                             6

o   Engagement

    •   Situational Timeline                                       8

    •   Issues of Concern                                          9

    •   Engagement Overview & Areas of Focus                      10

o   Rate Schedule                                                 12

o   About Resolute                                                14

o   Resolute Team                                                 16

RESOLUTE
————— problems solved.

# Resolute Distressed Healthcare Experience

We are not consultants or regulatory/compliance testimony experts. Our expertise in **operating** distressed healthcare scenarios is supported by our extensive experience.



> **WASHINGTON HOSPITAL**
> Receiver for 99 bed, 3 operatory regional acute care hospital in Culver City, CA; maintained operations for period of time, liquidated FF&E/real estate and collected receivables

> **PASADERA BEHAVIORAL HEALTH NETWORK**
> Receiver to Tucson based nonprofit that provided behavioral health care and substance abuse treatment; wound down operations, liquidated FF&E including sale of 11 acre campus and collected receivables

> **GLOBAL MEDICAL EQUIPMENT OF AMERICA, INC.**
> Receiver to national durable medical equipment enterprise consisting of 13 locations in 7 states. Operated company until determined that magnitude of Medicare fraud was substantial. Orderly liquidated all FF&E, real estate and collected receivables. Referred case to FBI for successful conviction for fraud of the Principals.

RESOLUTE
——————— problems solved.

# Resolute Distressed Healthcare Experience

> **NOW CARE URGENT CARE**
> Receiver for 13 unit regional urgent care enterprise.  Interim Management arose from partnership dispute between shareholders and failing business.  Resolute stabilized operations by instilling financial controls and discipline to turnaround under-performing business.  Resolute helped facilitate the sale to Private Equity backed roll up.



> **AZ-TECH RADIOLOGY**
> Financial advisor to debtor in bankruptcy with 8 radiology clinics located throughout Arizona. Assisted company by refining accounting/collections processes and building new marketing initiatives.

> **CLINTRICO**
> Receiver to operating business that manages network of physician lead clinical trials for exploratory drugs and education associated with cutting edge therapies.

> **PERPETUAL HEALTHCARE**
> Retained for Forensic Accounting over 3 healthcare companies regarding a partnership dispute

RESOLUTE
———— problems solved.

# Jeremiah Foster, Proposed Receiver

Jeremiah Foster is President and Founder of Resolute. He is the firm lead when it comes to receivership, corporate renewal, and business consulting.



- Accomplished fiduciary having served as: Chapter 11 Trustee, Liquidating Trustee, Superior Court Receiver, and Superior Court Special Master

- Adept at asserting leadership and control in challenged and distressed situations

- Executed sales of more than $550M in total consideration that have included enterprises and real estate

- Advised creditors, equity holders and enterprises in their navigation of many phases of a turnaround, acquisition or divestiture plans

RESOLUTE
———— problems solved.

# Phillip Robinson, Operating CFO

Phillip Robinson is a restructuring professional with significant interim management and CFO experience within the healthcare industry, including hospitals, medical groups and senior living facilities.



- Accomplished financial leader with 35+ years of experience with 20 of those years focused in the healthcare industry
- Led financial team that took a Texas community hospital through the bankruptcy process which led to a successful sale under the courts supervision
- Secured a $100 million real estate and receivables financing program for a diversified healthcare system
- Directed the financial aspects of the due diligence and acquisition of a distressed hospital in Florida, stabilization and turnaround of its cash flow and operations, and sale to its primary physicians all within one year
- Provided stabilization and strategic planning as interim CFO for urban hospital upon emergence from bankruptcy

RESOLUTE

——————— problems solved.

# Phillip Robinson, Operating CFO

**Operational Healthcare Experience**

> **GRANT THORNTON LLP**
> Director in the Corporate Advisory and Restructuring Services practice with major clients including Wadley Regional Medical Center, St Vincent's Catholic Medical Center, and West Penn Allegheny Health System. Led successful reorganization of a Texas not for profit community hospital through Chapter 11 filing and sale.

> **DOCTORS COMMUNITY HEALTHCARE CORP/MICHAEL REESE HOSPITAL**
> Interim CFO of six hospital for-profit holding company following emergence from bankruptcy

> **MEDICAL MANAGEMENT OF AMERICA**
> CFO for all financial activities of this private management company which controlled healthcare and real estate holdings with revenues in excess of $250 million. Coordinated acquisition and divestitures of hospitals and nursing homes.

> **TATUM PARTNERS**
> Provided senior level interim financial leadership, strategic planning consulting and financial/operational assessments for hospitals, medical groups and specialty practices around the country, including for-profit and not-for-profit healthcare providers.

RESOLUTE
———— problems solved.

# Situational Timeline

- **Case Number:** 2:14-bk-01451-MCW

**2014**

**2016**

January 10, 2018
New Vision Health, LLC filed
Motion for OSC

January 12, 2018
Without notice to the Creditor
Trustee or an opportunity to
respond, Bankruptcy Court
granted, in part, the Motion for
OSC

January 26, 2018
Creditor Trustee filed a timely
Motion for Relief From Order

March 6, 2013
Florence Hospital at Anthem
filed for bankruptcy

October 7, 2015 Second
Amended and Restated Joint
Plan of Reorganization for
Gilbert Hospital and
Florence Hospital at Anthem
filed

February 5, 2014 Gilbert
Hospital, LLC filed for
bankruptcy

February 19, 2016
The "Confirmed Plan
Documents", which include
the Plan, Confirmation Order,
and Amended Confirmation
Order took effect

Trust created to receive
funds from Gilbert Hospital's
management company, New
Vision Health, LLC for
distribution to the general
unsecured creditors of
Gilbert Hospital

**2013**

**2015**

**2018**

RESOLUTE

— ——— problems solved.

# Issues of Concern

**Borrower**
- Deteriorating financial plan
- Borrower needs to find exit solution quickly

**Stakeholders**
- How to provide certainty of sale
- Efficient distribution of proceeds
- Other strategic financial alternatives available

**Other**
- Outside of the Bankruptcy, what process promotes the sale
- Valuation/Identification of FF&E
- Collection of receivables

RESOLUTE
———— problems solved.

# Engagement Overview and Areas of Focus

**Resolute Receivership Services**

- Establish un biased control over management and collateral

- Develop 13 week cash flow statement to establish triggers and timing for protective advances (if needed)

- Define process for sale of going concern

- Help achieve consensus among the stakeholders in forging a plan to achieve recoveries

- Be proactive in defining and assessing alternatives, as appropriate, in seeking the best method for maximizing value for stakeholders

RESOLUTE

——————— problems solved.

# Engagement Overview and Areas of Focus

- Identify unencumbered assets

- Provide the Lender's professionals, where applicable, with input on the debtor's plan of reorganization to orderly liquidate/transition to purchaser

- Provide analyses to the Stakeholders with respect to any proposals from the proposed buyer that may affect recoveries

- Help formulate, if necessary, a liquidation plan if the sale process or existing stalking horse ceases to have the exclusive right to do so

RESOLUTE
———— problems solved.

# Hourly Rate Schedule

Principal / Receiver / Expert Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$350**

Senior Managing Director . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$300**

Managing Director / Controller . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$250**

Senior Accountant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$200**

Director . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$175**

Accounting/Associate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$150**

Administrative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$100**

RESOLUTE
——— problems solved.

# Reimbursable Costs

| | |
|---|---|
| Postage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **At Cost** |
| Photocopies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **$.10 Per Copy** |
| Fax – Outgoing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **$1.00 Per Page** |
| Fax – Incoming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **No Charge** |
| Messenger / Delivery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **At Cost** |
| Court Filing Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **At Cost** |
| Long Distance Telephone . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **At Cost** |
| Bond . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **At Cost** |
| Travel Time & Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **Time – ½ Hourly Rate** |
| | **Mileage – IRS Rate** |
| | **Other – At Cost** |

RESOLUTE
——————— problems solved.

# Resolute . . . Problems Solved

Leading integrated financial advisory firm whose services focus on providing both clients and businesses with intelligent and realistic resolutions.

- Founded in 2008 by two partners, Jeremiah Foster and John Mitchell, III, with a combined 50+ years of business and advisory experience

- Premiere receivership service company in the Southwest

- Backed by an 9-person team of professionals with experience in distressed assets, finance, accounting, and management, across a wide variety of industries and product types

- Headquartered in Scottsdale, AZ with an office in Las Vegas, NV

- Dedicated to resolving your problems.



RESOLUTE
———— problems solved.

# Where Many See Obstacles, Resolute Sees Outcomes

Since 2008, the team of professionals at Resolute have engaged with assets totaling over $1 Billion in locations all across the country.



**SINCE 2008**

**300+**
Distressed Engagements with Assets Totaling Over
**$1.2B**

**75+**
Asset/Enterprise Sales Realizing Total Value Over
**$250M**

■ Engagements

RESOLUTE
problems solved.

# Expertise On Your Side

Jeremiah has taken the lead when it comes to receivership, corporate renewal and business consulting. To date, Jeremiah has been appointed as Receiver, Trustee, Special Master, or Liquidating Trustee in over 20 matters and has executed sales of more than $550M in total consideration that have included enterprises and real estate. His extensive experience representing companies, lenders, and private equity sponsors has proved instrumental to their success in resolving distressed matters. He holds a Bachelor's of Science degree in Engineering from University of Arizona.

**Jeremiah Foster**
PRESIDENT AND FOUNDER
(480) 947-3248
jfoster@resolutecommercial.com



Phillip Robinson is a financial leader and restructuring professional with 35+ years of experience involving significant interim management and CFO experience within the healthcare industry, including hospitals, medical groups and senior living facilities. He has been an active member of the Healthcare Financial Management Association as well as the Turnaround Management Association. Phillip graduated from Illinois State University with a Bachelor of Accounting degree.

**Phillip Robinson**
SENIOR MANAGING DIRECTOR
(480) 947-3321
probinson@resolutecommercial.com



Nicole is tenacious when it comes to finding the missing pieces of a financial puzzle. Her areas of expertise include forensic accounting, Ponzi schemes, receiverships, bankruptcy, and fraud detection. She is responsible for the daily management of State and Federal Court-appointed receiverships, bankruptcy trustee, and analyses of multimillion dollar Ponzi schemes and solvency projects. Nicole graduated Summa Cum Laude from Arizona State University with a Bachelor of Science in Economics.

**Nicole Manos, CIRA, CFE**
SENIOR MANAGING DIRECTOR
(480) 947-3321
nmanos@resolutecommercial.com



RESOLUTE
————— problems solved.

# Expertise on Your Side

Jessie has substantial experience supporting senior managing directors and certified accounting professionals in her role as an asset manager. She has assisted in the evaluation of economic damages, asset valuation, and fraud investigations. She is proficient in defendant and asset investigation, forensic analysis of financial reports and statements, damage calculation, victim and creditor correspondence, and distributions from recoveries. She is also heavily involved in the planning and implementation of the firms receivership and trustee objectives.

**Jessie Sheehan**
MANAGING DIRECTOR
(480) 947-3321
jsheehan@resolutecommercial.com



Mark Thompson is a driven and innovative accounting professional with over 25 years of experience. Having earned his CPA designation in 1994 has allowed him to build the skills it takes to bridge the gap between what has been done and what needs to be done to achieve a company's financial objectives. Mark demonstrates strong interpersonal skills by building confidence from colleagues that work around him and across the organization. Possessing the ability to assess financial conditions of companies coupled with his understanding of diverse business environments allows for the development and implementation of new practices and processes to obtain the desired results.

**Mark Thompson, CPA**
MANAGING DIRECTOR
(480) 947-3321
mthompson@resolutecommercial.com



Doug is an integral part of the team for all corporate entities and project work. He manages the operational activities of the corporate entities as well as oversees the project accounting team. Doug brings more than 20 years of knowledge in accounting and operations to the company. He has assisted in creating and implementing policies and procedures for accounting, budgeting, inventory control and customer service.

**Doug Wolfgang**
CONTROLLER
(480) 947-3321
dwolfgang@resolutecommercial.com



RESOLUTE
————— problems solved.

# Expertise on Your Side

Lawrence is Resolute's Senior Advisor on matters relating to financial advisory and bankruptcy. Lawrence has experience in finance and management roles in the casino gaming industry. He has served as CFO or Vice President of five different companies and has extensive valuation experience. Lawrence has over 10 years of experience in restructuring and has served as financial advisor and expert in numerous cases. Lawrence is acknowledged by the U.S. Bankruptcy Court, District of Nevada as an expert in casino gaming valuation. His combination of operational and restructuring experience makes him an invaluable asset to Resolute.



**Lawrence Taylor**
SENIOR ADVISOR
(480) 947-3321
ltaylor@resolutecommercial.com

Nick Guerrieri's role at Resolute involves performing the analysis, due diligence and other required duties. Included in these duties are creditor- and debtor-side in court and out-of-court restructurings and insolvencies, develop financial models, pitch book materials and conduct research and analysis to help advise clients on actual or projected situations.



**Nick Guerrieri**
DIRECTOR
(480) 947-3321
nguerrieri@resolutecommercial.com

RESOLUTE
——— problems solved.

# Thank You

FOR MORE INFORMATION, PLEASE CONTACT:

## JEREMIAH FOSTER
principal & founder

O | 480.947.3248
C | 602.315.7104
E | jfoster@resolutecommercial.com

7201 EAST CAMELBACK ROAD, SUITE 250
SCOTTSDALE, AZ 85251

RESOLUTE

problems solved.

# EXHIBIT 3

 **Quarles & Brady** LLP

Renaissance One
Two North Central Avenue
Phoenix, Arizona 85004-2391
602.229.5200
Fax 602.229.5690
www.quarles.com

Attorneys at Law in
Chicago
Indianapolis
Madison
Milwaukee
Naples
Phoenix
Scottsdale
Tampa
Tucson
Washington, D.C.

Writer's Direct Dial: 602.229.5436
E-Mail: john.oneal@quarles.com

March 8, 2018

**VIA UPS AND FACSIMILE**

Florence Hospital at Anthem, LLC
5656 South Power Road
Gilbert, Arizona 85236
Attn: Dennis Rutherford, CEO
Facsimile: (480) 279-5836

Re: **DEMAND TO VACATE**

Dear Mr. Rutherford:

On February 13, 2018, MPT of Florence, LLC ("MPT") terminated the Lease Agreement dated November 4, 2014 (as amended, the "Lease") between MPT and Florence Hospital at Anthem, LLC ("FHA"), under which MPT leased to FHA that certain real property and improvements located in Florence, Arizona (the "Leased Premises"). Reference is also made to that certain Stipulation and Agreement Regarding Debtor's Assumption of Real Property Lease and Related Matters between MPT and FHA, filed in the United States Bankruptcy Court for the District of Arizona on January 8, 2014 (the "Stipulation Agreement"). Capitalized terms used and not defined in this letter have the meaning attributed to them in the Lease or the Stipulation Agreement.

MPT requested in its February 13, 2018 termination notice that FHA contact MPT immediately to discuss FHA's plan for an orderly transition of the Leased Premises. Since that time, MPT has not heard from FHA regarding FHA vacating the Leased Premises.

Accordingly, MPT hereby demands that FHA vacate the Leased Premises. And again, MPT requests that FHA immediately contact MPT and this office to arrange for an orderly transition of the Leased Premises from FHA.

This letter is without prejudice to, and MPT expressly reserves, any and all other rights and remedies under the Lease, the Other Agreements, the Stipulation Agreement, and all other agreements or instruments executed in connection therewith, applicable law or otherwise. MPT's

QB\144882.00005\51081186.1

Florence Hospital at Anthem, LLC
March 8, 2018
Page 2

failure, delay, or refusal to pursue such other rights and remedies at this time does not constitute a waiver of any right or remedy available to MPT now or in the future, all of which shall remain in full force and effect and shall not be deemed to be waived, impaired, estopped, diminished, or prejudiced in any manner.

Very truly yours,

John Maston O'Neal

JMO/lam

cc:  Gerald Shelley
     Fennemore Craig, P.C.
     2394 East Camelback Road
     Suite 600
     Phoenix AZ 85016

     Indigo-DLI Holdings I, LLC
     Indigo Capital Services, LLC
     325 West 38th Street, Room 1005
     New York, NY 10018
     Attn: Benjamin Bornstein

     Gilbert Hospital, LLC (as Guarantor)
     5656 South Power Road
     Gilbert, AZ 85236
     Attn:  Dennis Rutherford
     Facsimile: (480) 279-5836

QB\144882.00005\51081186.1



Renaissance One
Two North Central Avenue
Phoenix, Arizona 85004-2391
602.229.5200
Fax 602.229.5690
www.quarles.com

Writer's Direct Dial: 602.229.5438
E-Mail: john.breen@quarles.com

Attorneys at Law in
Chicago
Indianapolis
Madison
Milwaukee
Naples
Phoenix
Scottsdale
Tampa
Tucson
Washington, D.C.

March 8, 2018

VIA UPS AND FACSIMILE

Gilbert Hospital, LLC
5656 South Power Road
Gilbert, Arizona 85236
Attn:   Dennis Rutherford, CEO
Facsimile: (480) 279-5836

Re:   DEMAND TO VACATE

Dear Mr. Rutherford:

On February 13, 2018, MPT of Gilbert, LLC ("MPT") terminated the Amended and Restated Lease Agreement dated November 5, 2014 (as amended, the "Lease") between MPT and Gilbert Hospital, LLC ("Gilbert"), under which MPT leased to Gilbert that certain real property and improvements located in Gilbert, Arizona (the "Leased Premises"). Capitalized terms used and not defined in this letter have the meaning attributed to them in the Lease.

MPT requested in its February 13, 2018 termination notice that Gilbert contact MPT immediately to discuss Gilbert's plan for an orderly transition of the Leased Premises. Since that time, MPT has not heard from Gilbert regarding Gilbert vacating the Leased Premises.

Accordingly, MPT hereby demands that Gilbert vacate the Leased Premises. And again, MPT requests that Gilbert immediately contact MPT and this office to arrange for an orderly transition of the Leased Premises from Gilbert.

Please note that this letter is without prejudice to, and MPT expressly reserves, any and all other rights and remedies under the Lease, the Other Agreements, and all other agreements or instruments executed in connection therewith, applicable law or otherwise. MPT's failure, delay, or refusal to pursue such other rights and remedies at this time does not constitute a waiver of

QB\148862.00098\51081532.1

Gilbert Hospital, LLC
March 8, 2018
Page 2

any right or remedy available to MPT now or in the future, all of which shall remain in full force and effect and shall not be deemed to be waived, impaired, estopped, diminished, or prejudiced in any manner.

Very truly yours,

John Maston O'Neal

JMO/lam

cc:    Gerald Shelley
       Fennemore Craig, P.C.
       2394 East Camelback Road
       Suite 600
       Phoenix AZ 85016

QB\144882.00006\51081332.1

# EXHIBIT 4

 **SchianWalker**
COMPLEX LITIGATION AND BANKRUPTCY

**Dale C. Schian**
dale@biz.law

March 20, 2018

***Sent via Email Only [gshelley@fclaw.com]***

Gerald L. Shelley, Esq.
Fennemore Craig, P.C.
2394 East Camelback Road, #600
Phoenix, Arizona 85016-8429

      Re:     MEDHOST Forbearance

Dear Gerald:

On December 15, 2017 MEDHOST of Tennessee, Inc., MEDHOST Direct, Inc., and YourCareUniverse, Inc. (collectively "MEDHOST") sent written notice to Gilbert Hospital and Florence Hospital at Anthem (jointly, the "Companies") notifying the Companies of MEDHOST'S intention to terminate the "Agreements," as defined in the notices, unless past-due amounts were cured within 30 days.

On January 19, 2018 MEDHOST notified the Companies in writing of termination of the Agreements. Notwithstanding the termination, MEDHOST permitted the Companies an accommodation as follows:

However, while MEDHOST has the right to terminate the Agreements and all access to the system immediately, as an accommodation MEDHOST will delay this termination for a period of sixty (60) days for the sole purpose of allowing Customer to make arrangements for any of its data currently stored on MEDHOST servers. At the conclusion of that sixty day period, MEDHOST will terminate all remaining access to the system. All access to the system between the date of this letter and the date on which MEDHOST terminates such access shall be governed by the Agreements. Beyond this limited access, MEDHOST is hereby terminating all other services, including statement processing services, effective immediately.

The accommodation granted by MEDHOST is to expire on March 20, 2018. The Companies have requested that MEDHOST agree to forbear from terminating access to the MEDHOST system until April 3, 2018, and MEDHOST is willing to do so on the following terms and conditions:

      1.     The forbearance does not reinstate or otherwise afford the Companies any

00370536.7

Case 2:18-bk-04557-BMW    Doc 16    Filed 05/03/18    Entered 05/03/18 15:04:14    Desc
Main Document      Page 153 of 174

continuing rights under the Agreements except as set forth herein;

    2.    MEDHOST is willing to forbear from terminating access to the system until April 3, 2018;

    3.    All access to the system shall continue to be governed by the terms of the Agreements;

    4.    In consideration of MEDHOST's agreement to forbear in terminating service:

        a.    The Companies will immediately pay MEDHOST the amount of $50,000;

        b.    The Companies acknowledge that such payment is not by reason of an antecedent debt, but strictly in consideration of the new accommodation granted by MEDHOST;

        c.    On or before March 23, 2018, Florence Hospital at Anthem shall pay the sum of $30,000 as provided for in the Settlement Agreement of MEDHOST's Claims dated November 10, 2017 and approved pursuant to an *Order Approving Stipulation Regarding Settlement Agreement of MEDHOST Claims* dated March 13, 2018. If such payment is not timely received, MEDHOST's forbearance shall automatically terminate without further notice.

    5.    Absent further agreement in writing between the parties, MEDHOST's agreement to forbear shall automatically terminate on April 3, 2018; and

    6.    MEDHOST's prior accommodations and this agreement to forbear shall not create any entitlement or expectancy of additional accommodations or forbearance by MEDHOST in exercising its rights under the agreement.

    If the foregoing accurately reflects our agreement and to assure uninterrupted service, please sign in the space below and return an executed copy of this letter to me by tomorrow.

        Sincerely,

        Dale C. Schian

DCS:jsl

Gerald L. Shelley, Esq.
March 20, 2018
Page 3


cc: client

GILBERT HOSPITAL, LLC and FLORENCE
HOSPITAL AT ANTHEM, LLC


By _____
    Gerald L. Shelley, its Counsel

Kyle S. Hirsch, 024155
Julie M. Birk, 033908
BRYAN CAVE LEIGHTON PAISNER
Two N. Central Avenue, Suite 2100
Phoenix, AZ 85004-4406
Telephone: (602) 364-7000
Facsimile: (602) 364-7070
E-mail:     kyle.hirsch@bclplaw.com
            julie.birk@bclplaw.com

Attorneys for Plaintiff Indigo-DLI Holdings I, LLC

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| INDIGO-DLI HOLDINGS I, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> NEW VISION HEALTH, LLC, and Arizona limited liability company; GILBERT HOSPITAL, LLC, an Arizona limited liability company; and FLORENCE HOSPITAL AT ANTHEM, LLC, an Arizona limited liability company, <br><br> Defendants. | Case No. CV2018-005740 <br><br> **ORDER GRANTING APPLICATION FOR APPOINTMENT OF RECEIVER** <br><br> **(Commercial Court Assignment)** |

The Court has considered the Application for Appointment of Receiver ("Application") with the supporting declarations and exhibits filed by plaintiff Indigo-DLI Holdings I, LLC ("Plaintiff"), and the entire case record. Capitalized terms not otherwise defined in this Order shall have the meaning given in the Application.

Plaintiff alleges that defendant New Vision Health, LLC ("NVH") owns 100% of the equity interests in defendants Gilbert Hospital, LLC ("GH") and Florence Hospital at Anthem, LLC ("FHA" and, collectively with GH and NVH, "Borrowers"). Plaintiff

1 further alleges that GH operates an emergency healthcare facility located at 5656 S.
2 Power Road, Gilbert, Arizona ("GH Business") and that FHA operates an emergency
3 healthcare facility located at 4545 North Hunt Highway, Florence, Arizona ("FHA
4 Business" and, collectively with the GH Business, "Business"). Plaintiff further alleges
5 that Borrowers have defaulted on their payment and performance obligations to Plaintiff,
6 and that Plaintiff holds senior-priority perfected lien interests in and to virtually all of the
7 assets of Borrowers. Plaintiff further alleges that the immediate appointment of a
8 receiver is warranted to protect Plaintiff's security interests in the assets of Borrowers, to
9 preserve the value thereof and of the Business which value will erode unless and until a
10 receiver is appointed to sell, liquidate and/or marshall the assets of Borrowers for the
11 benefit of Borrowers' creditors, and to protect the public either through continued or
12 discontinued hospital operations while such sale, liquidation and/or marshalling takes
13 place.

14     The Court finds substantial cause for appointing a receiver. Accordingly,

15     **IT IS HEREBY ORDERED:**

16 **I.**     **GRANTING** the relief requested in the Application as set forth herein.

17 **II.**     **APPOINTMENT OF RECEIVER.** Resolute Commercial Services, LLC, an
18     Arizona limited liability company, by and through Jeremiah Foster, is hereby
19     appointed receiver ("Receiver"), effective immediately upon compliance with the
20     requirements of Arizona Rule of Civil Procedure 66(b)(2).

21 **III.**     **DUTIES OF RECEIVER.** The Receiver is granted the following powers and
22     duties:

23     A.     <u>Possession</u>. Take immediate and exclusive possession and control of all the
24         assets owned by Borrowers and used in connection with the Business
25         including, without limitation, all bank accounts, deposit accounts, accounts
26         receivable, equipment, general intangibles and intangible assets; licenses of
27         every kind; healthcare receivables of every kind and nature, including all
28

2

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
(602) 364-7000

11592867.7\0553206

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

proceeds thereof; Medicare or Medicaid provider number(s) and/or provider agreement(s) with all rights thereunder, including rights to bill and collect on accounts receivable generated thereunder; insurance contracts, payments, proceeds, reimbursements, and/or other recoveries; goods; instruments; inventory; investment property; leases; contract rights; books, records, lists, customer/client/patient lists, agreements, and all other documents; motor vehicles; furniture; fixtures; trade names, trademarks, and all other intellectual property rights; litigation claims; cash on hand; ownership interests and/or management control rights of Borrowers; and all other personal property owned by Borrowers (collectively, "Property"); and

B. **Operation, Maintenance, and Liquidation.** Take all actions that the Receiver deems necessary: to safeguard, preserve, protect, and maximize the value of the Property and the Business; to operate, sell, liquidate, and/or wind down the Business as the Receiver, in his absolute and sole discretion and business judgment, deems appropriate or as approved by the Court including, for example and without limitation: making all personnel decisions; entering into and terminating any and all contracts and agreements relating to the Business; acting under any license or permit issued to Borrowers in connection with the operation of the Business; marketing and selling all or any portion of the Property, including any or all of the Business, free and clear of liens, claims, liabilities, and/or encumbrances of any kind or nature except as may be expressly and voluntarily assumed; and collecting all government and non-government healthcare receivables directly and/or through one or more agents. Receiver shall be entitled to gain access to all information pertaining to the Property and the Business, including but not limited to all patient healthcare records; provided, however, that Receiver shall not be excused from, and

3

11592867.7\0553206

1  shall remain obligated to abide by, all aspects of the Health Insurance
2  Portability and Accountability Act; and

C.  **Pre-Receivership Bills**. Pay from funds of the receivership estate, subject
   to the Budget as defined in Paragraph (G) below, current operating, selling,
   wind down, and liquidation expenses of the Business and the Property,
   incurred by the Receiver subsequent to his appointment, including, without
   limitation, fees and administrative expenses of the Receiver and the fees
   and administrative expenses of the professionals retained by the Receiver;
   but the Receiver may not use funds of the receivership estate to pay any
   bills for goods or services contracted for or provided to Borrowers, the
   Business or the Property prior to the date of this Order, unless such
   payment is: (i) a pre-receivership payroll obligation pertaining to the
   Business and not payable to the owner of any Borrower; and/or (ii)
   necessary to enable the Receiver to continue to operate and/or wind down
   the Business and the Property and, in such case, only with Court approval
   or with the express written consent of Plaintiff; and

D.  **Receiver's Agent**. Hire and, subject to the Budget as defined in Paragraph
   (G) below, pay such agents, independent contractors, consultants, and
   employees (including, without limitation, Resolute Commercial Services,
   LLC) as may be needed to assist the Receiver in managing the Property and
   operating, selling, liquidating, and/or winding down the Business, if
   appropriate, provided the amount of the compensation paid to such agents,
   independent contractors, consultants, and employees must be comparable to
   that charged by similar companies for similar services. Such authority
   expressly includes such services as the Receiver deems necessary to collect
   government and non-government healthcare receivables generated by the
   Business; and

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

4

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

E.   Receiver's Counsel.   Hire independent legal counsel as the Receiver determines is reasonable and necessary, and subject to the Budget as defined in Paragraph (G) below, reimburse and compensate such legal counsel for their services at rates reasonable and appropriate for the services provided; and

F.   Reimbursement and Compensation Of Receiver.   Receive, from receivership funds (whether earned or borrowed): (i) reimbursement for reasonable and necessary out-of-pocket expenditures of the receivership, including Receiver's standard costs for mileage, faxes, copies and similar Receiver-provided benefits; (ii) compensation for fees earned by the Receiver, calculated at the hourly rate of $350/hour or such contingency fee arrangement as may be made with Plaintiff calculated based on recovery of liquidated Property; and (iii) compensation for Resolute Commercial Services, LLC, acting as consultant to the Receiver, at hourly rates ranging from $100/hour - $350/hour; and such other terms as agreed between Receiver and Plaintiff, for such time and effort as is reasonable and necessary for Receiver to accomplish the purpose and tasks set forth in this Order including but not limited to operating, selling, liquidating, and/or winding down the Business, preparing reports, attending hearings, preparing Court filings, and participating in discovery, and which time shall be accounted for in the monthly financial report; and

G.   Operating Budget.   Prepare a projected 13-week cash flow budget for the Property and the Business ("Budget"), to be approved in writing by Plaintiff, based upon operating data obtained from Borrowers and/or the Business and other sources where the use of a budget is appropriate. An initial Budget shall be prepared and submitted for Plaintiff's approval within thirty (30) days of the date of Receiver's appointment, and

5

1  subsequent Budgets shall be submitted for Plaintiff's approval within thirty

2  (30) days of the end of the pending Budget period; and

3  H.  Existing Bank Accounts.  Issue demands for the freezing and turnover of

4  funds upon any financial institution which is a depository of funds

5  belonging to Borrowers and/or related to or arising from the Business,

6  whether such accounts are in the name of Borrowers or not, and Receiver

7  may indemnify the institution upon whom such demand is made on behalf

8  of the receivership estate, and open such accounts in the name of the

9  Receiver as necessary to manage and operate the Business and/or the

10  receivership estate; and

11  I.  Utility Services and Deposits.  Issue demands in the name of the

12  receivership upon public utilities which Receiver determines provide

13  services to the Property and/or the Business, to transfer such services

14  together with any deposits held by the utility to the exclusive control of

15  such Receiver, and to establish and/or continue existing utility service by

16  paying only those utility expenses incurred during the course of the

17  receivership and, if required, by providing the utility provider with an

18  adequate security deposit; and

19  J.  Post Office Box.  Issue demands in the name of the receivership upon the

20  U.S. Postal Service, other mail and freight carriers, and private mailbox

21  operators to gain exclusive possession and control of such postal boxes as

22  may have been used by Borrowers for the receipt of funds and other mail

23  related to the Property and the Business, and take any other steps as

24  Receiver deems reasonable and necessary to retrieve, collect and review all

25  mail addressed to Borrowers related to the Property and the Business; and

26  K.  Source of Revenue.  Identify all revenue sources related to the Property

27  and/or the Business, whether fees, rents, royalties, insurance

28

6

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
(602) 364-7000

1　reimbursements and/or payments, receivables collections, avoidable

2　transfer recoveries or otherwise, and make demand upon all payees to make

3　remittances of future sums and past-due balances solely to the Receiver;

4　and

5　L.　Demand for Accounts Receivable.　From available records, compute the

6　amounts due from Borrowers' current or former customers/clients/patients,

7　insurance providers, and/or governmental entities and demand the

8　immediate payment to the Receiver of such amounts and to take

9　appropriate action to enforce the turnover of such funds; and

10　M.　Insurance.　Determine whether adequate insurance is in place, and, if not, to

11　obtain and pay for such insurance from available funds and to undertake all

12　steps necessary to satisfy the requirements of obtaining and maintaining

13　insurance; and

14　N.　Right to Lease.　Enter into leases for all or part of the Property, with

15　Plaintiff's written consent, upon terms and conditions which are

16　comparable to the terms and conditions upon which other properties are

17　offered for rent in the marketplace, and to pay leasing commissions under

18　any agreement providing for same pursuant to Paragraph (B) hereof; and

19　O.　Contracts.　Continue in effect or cure any contracts presently existing and

20　relating to the Property or the Business, including, without limitation, any

21　franchise agreements, existing licenses, or other agreements.　The Receiver

22　may enter into, modify, and/or reject contracts affecting any or all of the

23　Property or the Business, and may exercise rights existing under such

24　contracts, including, but not limited to, filing suit thereon, if necessary; and

25　P.　Improvements.　Expend sums from the receivership estate with Plaintiff's

26　written consent which, in the business judgment of the Receiver, are

27

28

7

required to make the Business and/or the Property competitive, marketable and/or profitable; and

Q.    *Advances by Plaintiff.* Obtain advances from Plaintiff or any other existing lender of any Borrower (though not obligating Plaintiff or any such lender to do so) of such funds as may be required by Receiver to cover operating expenses of the receivership, and the costs and expenses needed for Receiver to perform all of the tasks and duties set forth in this Order. To the extent advances are obtained from Plaintiff or any other existing lender of any Borrower, such amounts shall be added to the advancing lender's sums due and owing by such Borrower and secured by the Property (if applicable), and such advancing lender shall be entitled to charge interest on such advances at the highest rate (including the default rate) then payable under the underlying loan documents, with interest to be collected with and in addition to all other sums due such advancing lender as allowed thereunder for periodic interest, penalty interest, scheduled principal reductions, all Receiver's fees and expenses, attorneys' fees and court costs expended, and any other costs or fees incurred, by reason of such Borrower's default or by reason of Receiver accomplishing the purpose and tasks set forth in this Order. During the first month of the receivership only, to the extent the receivership estate has insufficient cash to pay the approved fees and expenses of the Receiver and Receiver's professionals (after accounting for the cash balance at the commencement of the receivership, subsequent collections, and payment of subsequent operating expenses), Plaintiff agrees to lend the receivership estate pursuant to the terms of this Paragraph Q up to $150,000 (but only to the extent of any cash shortfall) for the exclusive purpose of paying the approved fees and expenses of the Receiver and Receiver's professionals. Nothing in this

8

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

Paragraph Q is meant to cap the amount of approved fees and expenses of the Receiver and Receiver's professionals or limit the payment of fees and expenses of the Receiver and Receiver's professionals from the receivership estate; and

R.   Receiver's Right to Borrow.   Only to the extent any existing lender, including Plaintiff, is unwilling to make advances pursuant to Paragraph (Q) above, borrow for the purpose of funding operation of the receivership estate where the revenues are not sufficient for Receiver to perform all of the tasks and duties set forth in this Order; and

S.   Permits and Licenses.   Apply, obtain, and pay any reasonable fees for any lawful license, permit or other governmental approval relating to the Property or the Business; to confirm the existence of and exercise the privileges of any existing license or permit or the operation thereof related to the Property or the Business; and do all things necessary to protect and maintain such licenses, permits and approvals, including, but not limited to, taking such license in the name of the Receiver personally or his nominee. The Receiver may, in the name of the receivership estate, continue to utilize all of the permits and licenses pertaining to the Business or the Property, or transfer to the name of the receivership estate permits and licenses pertaining to the Business or the Property, or apply for new permits and licenses in the name of the receivership estate. The Receiver is expressly authorized to continue operating the Business, without interruption, under any applicable Medicare and/or Medicaid provider number and related provider agreement. The appointment of the Receiver shall not constitute a breach or default under any licenses, approvals, or permits presently affecting the Business or the Property; and

9

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
(602) 364-7000

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

1    T.    <u>Request Police Assistance</u>. Request assistance of law enforcement officials when taking possession, or at any other time during the term of the receivership, if, in the opinion of Receiver, such assistance is necessary to preserve the peace; and

5    U.    <u>Distribution of Funds</u>. If Receiver determines that it possesses funds in excess of those needed to pay all operating costs of the receivership, including tax liabilities, and if there are no other outstanding bills or obligations of Receiver (including fees and expenses of the Receiver or any employee or professional retained by the Receiver in accordance with this Order), and no lienholders of the Property senior to Plaintiff requiring payment, then Receiver may make distributions to Plaintiff, such sums to be applied by Plaintiff in the manner provided for in the underlying loan documents, or as otherwise determined by this Court, with the express provision that any such distribution shall not reinstate any loan, affect any foreclosure or UCC sale of any property of the receivership estate, or waive or modify Borrowers' performance obligations set forth in the existing loan documents in any way; and

18    V.    <u>Periodic Reporting</u>. Provide the Court and any other interested party who reasonably so requests a periodic (and in no event less frequently than quarterly) summary of revenues and disbursements on a "cash reporting basis" as that term is commonly understood within the accounting profession, and, upon conclusion of the receivership, the Receiver shall file with the Court a final summary accounting for the full term of the receivership; and

25    W.    <u>Financial Records and Reporting</u>. Take possession of Borrowers' financial records, including but not limited to any financial records in the possession of Borrowers' auditors and accountants, and, in the Receiver's business

10

11592867.7\0553206

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

1  judgment, to engage accountants to complete Borrowers' audited financial

2  statements; and

3  X.  <u>Taxpayer and Other ID Numbers</u>.  Use for any lawful purpose any taxpayer

4  identification numbers relating to the Property, Borrowers, and/or the

5  Business, or any other number assigned to the Property, the Business, or

6  any of the Borrowers, including without limitation any Medicare and/or

7  Medicaid billing number; and

8  Y.  <u>Bankruptcy Filing</u>.  Upon Receiver's receipt of notice of the

9  commencement of a bankruptcy case in which any Borrower is a debtor

10  and/or any or all of the Property is part of the bankruptcy estate, retain

11  possession and control of the receivership estate and continue to perform

12  Receiver's duties as set forth in this Order until such time as (i) Plaintiff

13  confirms in writing that it will not seek to excuse Receiver from the

14  turnover requirements of 11 U.S.C. § 543, or (ii) an order is entered by the

15  bankruptcy court directing Receiver otherwise; and

16  Z.  <u>Marketing and Sale of Business</u>.  Upon Plaintiff's prior written approval,

17  the Receiver is authorized to place the Business for sale on the market,

18  retain an investment banker and/or broker approved by Plaintiff, and

19  undertake any and all other duties associated with the marketing and sale of

20  all or part of the Business, including executing documents necessary for

21  consummation of a sale, with such sale being subject to Plaintiff and Court

22  approval.

23  **IV.  DUTIES OF BORROWERS AND OTHERS.**  Borrowers, including any

24  employee, officer, shareholder, representative, attorney, accountant, or other agent

25  of any of the Borrowers, or any entity under the control of any of the Borrowers,

26  shall:

27

28

11

11592867.7\0553206

A.  **Cooperate**. Provide reasonable cooperation with the Receiver and disclose all information relevant to Borrowers, the Business, and the Property, including copies of bills, service contracts, invoices, submissions to insurance providers, customer/client/patient healthcare records, and bank accounts, and names of all contractors, subcontractors, vendors, suppliers, employees, attorneys, accountants, representatives, insurers, and customers/clients/patients; and turn over to the Receiver any other material relevant and necessary in the business judgment of the Receiver to the fulfillment of the tasks and objectives set forth in this Order. Borrowers shall reasonably cooperate with the Receiver to facilitate Receiver's (i) collection of the private pay and private portion of Medicare and Medicaid receivables and receivables and settlements under Medicare and Medicaid and insurance company receivables; (ii) obtaining information necessary for any reporting to be submitted in accordance with applicable laws, rules, and regulations involving Medicare and/or Medicaid healthcare receivables; and

B.  **Be Enjoined**. Be prohibited and restrained from: (i) disturbing, in any way, Receiver's ability to perform his tasks and objectives as set forth in this Order or from enjoying the benefits of any contract or lease pertaining in any way to the operation or wind-down of the Business; (ii) collecting, or attempting to collect, the rent, issues, income and profits derived from the Business and/or the Property; (iii) expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in or disposing of, dissipating, mishandling, misappropriating, diverting, or otherwise permitting waste of any of the Property or other asset of Borrowers, including without limitation the Business and any revenue generated by the Business; (iv) taking any

12

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

actions that would, directly or indirectly, have an adverse impact on the value of the Property and/or the Business, including without limitation the whole or any part of the Property; and (v) without the express written consent of the Receiver, removing from the Property any personal property asserted to belong to them; and

C.  Provide Books and Records. Provide to Receiver no later than 12:00 p.m. MST, on the business day following entry of this Order all books and records relating to the Property and/or the Business, including any and all payroll and other employee-related records; and

D.  Customer Cooperation. With respect to the customers/clients/patients of the Business or others making payment to Borrowers or any other person on behalf of the Business, pay any amounts directly to Receiver effective as of the date of this Order; and

E.  Others Indebted to Borrowers. With respect to any other persons or entities owing sums to Borrowers which would otherwise be payable to Borrowers, pay such sums to Receiver, including any portion thereof which represents reimbursements or payment for past-due rents, sales, or services; and

F.  Surrender Assets. Turn over to Receiver, and to instruct their agents and employees to turn over to Receiver, all goods, inventory, profits, rents, security deposits, cash and all other assets of the receivership estate, all keys and contracts, all receivables, and all other things of value, and to cooperate with Receiver in all ways reasonable, as Receiver performs its Court-appointed tasks, without Borrowers interfering or impeding Receiver in any way, or Borrowers entering upon the receivership property except with the prior written consent of Receiver; and

G.  Further Surrender Assets. Cooperate in the transition to the Receiver of the control and/or management of the Property, the Business, and/or any asset

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

13

of Borrowers or the Business; and within twenty-four (24) hours after the effective date of the receivership, turn over to the Receiver all of the following pertaining to the Property and the Business (but only to the extent that such items are in their possession, custody or control):

1. All keys, key fobs, alarm codes, and other security devices (whether to real property, personal property, equipment, safe deposit boxes, mail boxes, or otherwise);

2. All records pertaining to customers/clients/patients, accounts, and assets, including, by way of illustration but not limitation, all credit card billings and cash receipts journals, insurance payment and reimbursement information, and patient healthcare receivable information;

3. All records regarding communications with any local, state or federal governmental agency regarding the Property and/or the Business;

4. All records regarding communications with all customer/client/patient insurance providers;

5. The petty cash fund, if any;

6. A current aged account receivables or delinquency report;

7. An aged listing of all payables;

8. A copy of any records relating to operating expenses for the Property and the Business;

9. A list of utilities and utility accounts;

10. Operating statement from the most recent year-end and from the current year;

11. All on-site employee payroll records and employee files and applications;

14

11592867.7\0553206

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

Case 2:18-bk-04557-BMW    Doc 16    Filed 05/03/18    Entered 05/03/18 15:04:14    Desc
Main Document      Page 169 of 174

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

12. An inventory of all equipment, furniture, vehicles and supplies for the Property and the Business;

13. All existing service contracts;

14. All franchise agreements, if any, including all amendments;

15. All signage agreements, if any, including all amendments;

16. All pending bids for contractor work;

17. All insurance policies (including the terms thereof) on the Property and/or the Business;

18. All vendor insurance certificates;

19. Documents identifying and summarizing all pending litigation (excluding this action);

20. All documents, books, records and computer files, computer equipment, software, management files, equipment, furniture, supplies and all passwords needed to access such software and computer files, email accounts maintained for the Property and/or the Business (and all off-site financial records) including, but not limited to, all records concerning the income and the operation and management of the Property and/or the Business; and

21. All documents pertaining to licenses and permits relating to the Business; and

22. Such other records pertaining to the management and assets of the Property and the Business as may be reasonably requested by the Receiver; and

H. <u>Access Codes</u>. Provide the Receiver with all passwords, passcodes, and user names required to access electronic data and to use any computer located on the receivership property or belonging to the Borrowers and/or pertaining to the Business, or any other computers on which such

15

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

information is stored, together with passwords needed to access the Business' e-mail accounts and the e-mail accounts of the Borrowers and its employees, contractors, representatives and agents; and

I.   Prepare Pre-Receivership Accounting. Prepare and submit to Plaintiff and Receiver an accounting for all income received for the one-year period prior to the commencement of the receivership, to be delivered no later than five (5) business days after the entry of this Order; and

J.   Insure. Fully cooperate with Receiver in adding Receiver and Plaintiff as additional insureds and Plaintiff as the loss payee on all insurance relating to the operation and management of the Property including, but not limited to, fire, extended coverage, property damage, liability, fidelity, errors and omissions, and workers' compensation, and modifying the policies if deemed appropriate by Receiver.

V.   **RECEIVER'S DISCRETION.** Notwithstanding the above authority and power to act with respect to the Property and the Business, Receiver shall not be obligated to take any actions which it does not deem reasonable and necessary, or if adequate funds are not available to pay for the actions or services of Receiver, its agents and/or third parties engaged by Receiver.

VI.  **NO IMPAIRMENT TO PLAINTIFF'S RIGHTS AND REMEDIES.** No impairment of Plaintiff's rights and remedies and nothing contained in this Order shall prohibit, limit, or restrain Plaintiff from enforcing its respective rights and exercising its respective remedies under applicable law and under the Loan and Security Documents against Borrowers, the Property (or any portion thereof), and/or any revenue generated by the Business including, without limitation, initiating or completing a sale or transfer of the Property, or any portion thereof, if such sale or transfer is approved and confirmed by this Court (except for the sale

16

or transfer of the Property that occurs in connection with a duly noticed and properly held UCC sale, which does not require Court approval).

**VII. LIABILITY OF PLAINTIFF.** Plaintiff, and its respective subsidiaries, affiliates, owners, members, managers, officers, directors, agents, representatives, shareholders, bond holders, and employees shall not be liable for any act or omission of the Receiver or its owners, members, managers, officers, directors, agents, representatives, shareholders, and employees. Plaintiff shall not be deemed to be a mortgagee in possession as a result of:

A. The appointment of a Receiver pursuant to this Order; and

B. The Receiver's taking possession of the Property and collecting revenues of the Business; and

C. Plaintiff initiating and/or completing any UCC sale of the Property; and

D. Plaintiff initiating and/or completing a sale or transfer of the Property, or any portion thereof, if such sale or transfer is approved and confirmed by this Court; and

E. The Receiver's management, operation, and/or winding down of the Business.

**VIII. LIMITATION OF RECEIVER'S LIABILITY.** In addition to any legal doctrine applicable to officers of the Court under Arizona law, including without limitation judicial immunity available to Court-appointed receivers, the Receiver and his agents, contractors, employees, and representatives shall be held harmless from any and all claims, losses, and/or liability arising out of any action or inaction in connection with carrying out the Receiver's duties and responsibilities set forth in this Order. In the event the Receiver prevails in any suit filed against the Receiver, his agents, contractors, employees and/or representatives over the Receiver's performance of his duties and responsibilities set forth in this Order, the reasonable fees and costs of defending such action (including any appeals

17

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

1  thereof to final resolution and award of judgment) not ordered to be paid by the
2  non-prevailing party(ies) shall be reimbursed as a receivership expense pursuant to
3  the terms of this Order.

IX.  **TERMINATION OF RECEIVERSHIP.**  The Receivership in the above-
5  captioned action created by this Order shall terminate upon:  (i) completion of a
6  UCC sale or any other transaction that results in the transfer of ownership of all of
7  the Property, and distribution of all remaining assets out of the receivership estate
8  consistent with the provisions set forth in this Order; (ii) payment in full of the
9  indebtedness owed to Plaintiff by Borrowers, and all expenses of the receivership
10  estate; or (iii) order of the Court.  Upon termination of the receivership, Plaintiff
11  shall file a Notice of Termination of the receivership which, unless an objection is
12  filed with the Court within five (5) court days following the filing of such Notice
13  with the Clerk of the Court, shall discharge Receiver and exonerate the
14  receivership bond, if any.  Upon the filing of the Notice of Termination of the
15  receivership, the Receiver is directed to transfer possession of all of the Property
16  remaining in the receivership estate, and any documents or records relating to such
17  Property, the Business, and the Borrowers, to the designated representative of
18  Borrowers (except in the event of a sale or other transaction that disposes of all of
19  the Property, in which case the transfer of possession shall be made to the person
20  or entity that acquired ownership of the Property) and to submit a final report and
21  accounting pursuant to applicable law, unless such final report and accounting are
22  waived by the then parties to this action.

23  **IT IS FURTHER ORDERED** that except by leave of this Court, all lessors,
24  lessees, customers/clients/patients, principles, investors, suppliers and/or creditors
25  seeking to enforce any claim, right, or interest against any Borrower, the Business and/or
26  the Property are barred by this Order from using any self-help or doing anything

27
28

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

18

Bryan Cave Leighton Paisner
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406

1  whatsoever to interfere in any way with the Receiver in the conduct of the receivership

2  estate.

3      **IT IS FURTHER ORDERED** that Plaintiff may, at any time, with or without

4  cause, apply to the Court for an order dismissing the Receiver and/or appointing a

5  substitute receiver to replace the Receiver appointed in this Order.

6      **IT IS FURTHER ORDERED** that the Receiver or Plaintiff may, at any time,

7  apply to this Court for further or other instructions and powers necessary to enable the

8  Receiver to properly perform the Receiver's duties and to properly preserve and protect

9  the Property, or otherwise resolve ambiguities or disagreements regarding the language

10  used in this Order.

11      **IT IS FURTHER ORDERED** that:

12  Receiver shall post a bond in the amount of $_____.

13      **IT IS FURTHER ORDERED** that this Order is entered:

14  ____ on an interim basis subject to further Court order.

15  ____ on a final basis.

16  DONE IN OPEN COURT this ____ day of _____, 2018.

17

18

19                          _____
                            Judge, Maricopa County Superior Court
20

21

22

23

24

25

26

27

28

19